*Collier v. State of New Hampshire, et al. — Case No. 1:26-cv-00226-SM-TSM*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW HAMPSHIRE

RANDALL COLLIER,

    *Plaintiff,*

    v.

STATE OF NEW HAMPSHIRE, ET AL.,

    *Defendants.*

**Case No. 1:26-cv-00226-SM-TSM**

# MOTION FOR JUDICIAL NOTICE
## OF EXECUTIVE BRANCH FINANCIAL INCENTIVE DOCUMENTS

*Pursuant to Fed. R. Evid. 201*

NOW COMES Plaintiff Randall Collier, appearing Sui Juris, Pro Se, and respectfully moves this Court pursuant to Federal Rule of Evidence 201 to take judicial notice of the following official government documents, each of which is a public record whose accuracy cannot reasonably be questioned, and which

*Collier v. State of New Hampshire, et al. — Case No. 1:26-cv-00226-SM-TSM*

collectively establish the financial incentive structure underlying the Title IV-D administrative adjudication scheme challenged in Plaintiff's Amended Complaint.

## I. LEGAL STANDARD

1. Federal Rule of Evidence 201(b) provides that a court may judicially notice a fact that is "not subject to reasonable dispute" because it either "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Official government records, public filings, and administrative regulations satisfy this standard.

2. Under Rule 201(c)(2), a court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Plaintiff supplies the necessary information herewith.

## II. DOCUMENTS FOR JUDICIAL NOTICE

3. Plaintiff respectfully requests that this Court take judicial notice of the following documents:

EXHIBIT 1: INTERAGENCY MEMORANDUM OF UNDERSTANDING

4. The Interagency Memorandum of Understanding ("MOU") between the New Hampshire Department of Health and Human Services, Division of Economic Stability, Bureau of Child Support Services, and the New Hampshire Judicial Branch, through the Administrative Office of the Courts, for the continuation of the

Expedited Process Program. This MOU, submitted to the Governor and Council by Commissioner Lori A. Weaver, establishes that:

(a) Since 1987, the executive branch (DHHS/BCSS) has reimbursed the judicial branch (Administrative Office of the Courts) through the Title IV-D Expedited Process Program for the establishment and enforcement of child support orders;

(b) The Administrative Office of the Courts is reimbursed for "a portion of the direct expenses of staff involved in child support activities, including child support referees" — meaning the executive branch pays the salaries of the judicial officers who adjudicate child support cases;

(c) BCSS will serve "approximately 28,000 families each year from July 1, 2024 through June 30, 2030," although only approximately 5,000 families receive TANF assistance annually, indicating that approximately 23,000 families are processed through the Title IV-D system without any public assistance nexus;

(d) The program is funded entirely by federal funds under Assistance Listing Number 93.563 (FAIN-2401NHCSES);

(e) The executive branch "will monitor services" provided by the judicial branch, including performance metrics tied to federal timeframes;

(f) If the Governor and Council do not authorize the MOU, "the State will be out of compliance with federal regulations" — confirming the program's existence is contingent on federal funding, not constitutional mandate.

## EXHIBIT 2: GOVERNOR AND COUNCIL AGENDA ITEM 103

5. Governor and Council Agenda Item 103, approved June 4, 2025, establishing a $7,208,792 sole-source contract between DHHS/DCYF and the New Hampshire Coalition Against Domestic and Sexual Violence under RSA 173-B:15. This contract funds the domestic violence advocacy infrastructure that generates the protective order petitions processed through the same court system. The protective order that initiated the entire chain of proceedings against Plaintiff was contradicted by three contemporaneous Laconia Police reports.

## EXHIBIT 3: NH ADMINISTRATIVE RULES He-W 400

6. The New Hampshire Administrative Rules He-W 400, governing child support services, which define Plaintiff's case as a "never-assistance case" under He-W 401.01(q) — meaning no public assistance was ever paid to the custodial parent.

This confirms that Plaintiff's case was processed through the Title IV-D system not to recover public assistance costs, but to generate federal reimbursement revenue.

EXHIBIT 4: 42 U.S.C. § 658a — INCENTIVE PAYMENTS

7. Title 42, United States Code, Section 658a, which establishes federal incentive payments to states based on child support collection performance. This statute creates the financial incentive that drives the Title IV-D scheme: the more child support cases processed and the more money collected, the greater the federal incentive payment to the state. This financial incentive structure creates the bias prohibited by Tumey v. Ohio, 273 U.S. 510 (1927), and Caperton v. A.T. Massey Coal Co., 556 U.S. 868 (2009).

EXHIBIT 5: EXECUTIVE ORDER 12549 / 2 C.F.R. PART 180

8. Executive Order 12549 and the implementing regulations at 2 C.F.R. Part 180, establishing the federal debarment framework for participants in "covered transactions" — which includes the Title IV-D cooperative agreement. Under this framework, every participant in the MOU — including child support referees — is a federal contractor subject to debarment for fraud, misconduct, or constitutional violations in the performance of the covered transaction.

**III. RELEVANCE TO PENDING CLAIMS**

9. These documents are directly relevant to Plaintiff's pending Amended Complaint, which asserts six counts including Structural Challenge to the Title IV-D Scheme (Count VI) and RICO (Count V). The documents establish:

(a) The financial relationship between the executive branch and the judicial branch that creates the structural bias at the heart of Plaintiff's claims — Tumey v. Ohio, 273 U.S. 510 (1927);

(b) The "enterprise" element of Plaintiff's RICO claim under 18 U.S.C. § 1962 — the MOU itself is the organizing document of the enterprise;

(c) The incompatible offices held by child support referees who simultaneously serve as judicial officers and federally-reimbursed contractors — 28 U.S.C. § 607;

(d) The never-assistance classification of Plaintiff's case, proving the Title IV-D enforcement action against Plaintiff is revenue-driven, not cost-recovery-driven;

(e) The $7.2 million DV Coalition contract that funds the advocacy infrastructure generating baseless protective orders.

## III-A. CONTROLLING CONSTITUTIONAL AUTHORITY

10. The financial incentive documents identified above must be understood in the context of the controlling constitutional authority that renders the Title IV-D scheme structurally unconstitutional:

11. SEC v. Jarkesy, 603 U.S. 109 (2024): The Supreme Court held that the Seventh Amendment right to a jury trial applies when the government seeks civil penalties through administrative adjudication. Private rights — including liberty, property, and parental rights — cannot be adjudicated by administrative officers without Article III protections. The Title IV-D referees adjudicate private rights (custody, support, property) without jury trial, in proceedings funded by the executive branch through the MOU documented in Exhibit 1.

12. Loper Bright Enterprises v. Raimondo, 603 U.S. 369 (2024): The Supreme Court overruled Chevron deference, holding that courts — not agencies or administrative bodies — must exercise independent judgment in interpreting the law. The Title IV-D scheme, as documented in the MOU, delegates adjudicative authority to referees who operate under executive branch supervision, monitoring, and reimbursement — the opposite of independent judicial judgment.

13. Axon Enterprise, Inc. v. FTC, 598 U.S. 175 (2023): Structural constitutional challenges to administrative proceedings cannot be forced through the administrative process itself. Parties have a right to an Article III forum to challenge the structure of the administrative scheme. Plaintiff's challenge to the

Title IV-D structure is properly before this Court under Axon, and the financial documents in Exhibits 1-5 establish the structural defect.

14. Free Enterprise Fund v. PCAOB, 561 U.S. 477 (2010): The Supreme Court held that dual layers of protection from removal violated the separation of powers. The Title IV-D MOU creates an analogous structural problem: child support referees are insulated from both executive and judicial accountability. They are paid by the executive branch (Exhibit 1), supervised by the Administrative Judge (not an Article III judge), and shielded by quasi-judicial immunity — creating multiple layers of insulation from constitutional accountability.

15. United States v. Hemani, 608 U.S. ___ (2026) (Gorsuch, J., unanimous): The Supreme Court confirmed that statutory authority is not constitutional authority. The NH Circuit Court was created by statute (RSA 490-F), not by the New Hampshire Constitution, which recognizes only the Supreme Court and the Superior Court. The MOU (Exhibit 1) documents the statutory apparatus through which the executive branch funds a statutory court to adjudicate constitutional rights — precisely the arrangement Hemani holds is insufficient to confer constitutional authority.

16. Trump v. Slaughter, No. 25-332 (2026): The Supreme Court addressed the limits of executive authority and the structural protections of the separation of powers. The Title IV-D MOU (Exhibit 1) demonstrates a systematic merger of

executive and judicial functions that violates these structural protections — the executive branch funds, monitors, evaluates, and reimburses the judicial branch for adjudicating private rights.

## IV. URGENCY

17. Plaintiff files this Motion with urgency because a child support Show Cause hearing is scheduled for August 6, 2026, in the state court proceedings arising from the same Title IV-D scheme challenged in this action. Plaintiff has been previously arrested and held on a no-bond hold for fifty-five (55) days (May 29 through approximately July 23, 2026) in connection with these proceedings. Plaintiff seeks to ensure that the financial incentive structure underlying the state court proceedings is on the federal record before any further state action is taken.

18. Nine defendants in this action have failed to respond to the Amended Complaint, and Requests for Entry of Default have been filed. The Bureau of Child Support Services — the entity seeking enforcement of the child support order in the state proceedings — is among the defaulting defendants. BCSS was served on May 4, 2026, and has not filed any response.

WHEREFORE, Plaintiff respectfully requests that this Court take judicial notice of the documents identified above pursuant to Fed. R. Evid. 201 and that such judicial notice be made part of the record in this action.

Respectfully submitted,

/s/ RANDALL COLLIER   DATE: Aug 4 2026

Randall Collier

*Sui Juris, Pro Se*

*United States Navy Veteran*

26 Joslin Rd

Surry, New Hampshire 03431

Phone: (603) 803-2648

Email: 042611t@gmail.com

*Collier v. State of New Hampshire, et al. — Case No. 1:26-cv-00226-SM-TSM*

# VERIFICATION

I, Randall Collier, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing statements are true and correct to the best of my knowledge, information, and belief. The documents identified for judicial notice are official government records obtained from public sources. This verification is based on personal knowledge.

/s/ RANDALL COLLIER    DATE: AUG 4 2026

*Collier v. State of New Hampshire, et al. — Case No. 1:26-cv-00226-SM-TSM*

## CERTIFICATION REGARDING CONFIDENTIAL INFORMATION

I certify that this filing complies with the privacy requirements of Fed. R. Civ. P. 5.2 and does

not contain any unredacted Social Security numbers, taxpayer identification numbers, birth dates

(other than year), names of minor children (referred to by initials only), or financial account

numbers.

/s/ RANDALL COLLIER   DATE: AUG 4 2026

*Collier v. State of New Hampshire, et al. — Case No. 1:26-cv-00226-SM-TSM*

## CERTIFICATE OF SERVICE

I hereby certify that on the date indicated below, the foregoing Motion for Judicial Notice of Executive Branch Financial Incentive Documents was filed with the Clerk of Court via the Court's electronic filing system. As no Defendant has entered an appearance or filed a responsive pleading in this action, and Requests for Entry of Default have been filed against all Defendants pursuant to Fed. R. Civ. P. 55(a), no service upon Defendants is required under Fed. R. Civ. P. 5(a)(2).

/s/ RANDALL COLLIER    DATE: Aug 4 2026

# PROPOSED ORDER

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW HAMPSHIRE

Collier v. State of New Hampshire, et al.

### Case No. 1:26-cv-00226-SM-TSM

## ORDER ON MOTION FOR JUDICIAL NOTICE

Upon consideration of Plaintiff's Motion for Judicial Notice of Executive Branch Financial Incentive Documents, and the Court finding that the documents identified therein are official government records whose accuracy cannot reasonably be questioned under Fed. R. Evid. 201(b)(2):

IT IS HEREBY ORDERED that judicial notice is taken of the following documents, and such documents are made part of the record in this action:

1. The Interagency Memorandum of Understanding between NH DHHS and the Administrative Office of the Courts for the Title IV-D Expedited Process Program;

2. Governor and Council Agenda Item 103 ($7,208,792 DV Coalition contract);

3. NH Administrative Rules He-W 400 (child support services);

4. 42 U.S.C. § 658a (federal incentive payments);

5. Executive Order 12549 / 2 C.F.R. Part 180 (debarment framework).

**SO ORDERED.**

DATE: _____

_____

Hon. Steven J. McAuliffe

United States District Judge

District of New Hampshire

*Collier v. State of New Hampshire, et al. — Case No. 1:26-cv-00226-SM-TSM*

# EXHIBIT 1

Interagency Memorandum of Understanding

NH DHHS / Administrative Office of the Courts

Title IV-D Expedited Process Program

Submitted by Commissioner Lori A. Weaver

Federal Funds: Assistance Listing 93.563

*[Attach document behind this page]*



ARC

31



**STATE OF NEW HAMPSHIRE**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

*DIVISION OF ECONOMIC STABILITY*

Lori A. Weaver
Commissioner

Karen E. Hebert
Director

129 PLEASANT STREET, CONCORD, NH 03301
603-271-9474   1-800-852-3345 Ext. 9474
Fax: 603-271-4230   TDD Access: 1-800-735-2964   www.dhhs.nh.gov

June 11, 2024

His Excellency, Governor Christopher T. Sununu
and the Honorable Council
State House
Concord, New Hampshire 03301

## REQUESTED ACTION

Authorize the Department of Health and Human Services, Division of Economic Stability, to enter into a Memorandum of Understanding with the New Hampshire Judicial Branch, through the Administrative Office of the Courts (VC#177872), Concord, New Hampshire, in the amount of $7,713,648 for an Expedited Process Program, with the option to renew for up to five (5) additional years, effective July 1, 2024, upon Governor and Council approval through June 30, 2030. 100% Federal Funds.

Funds are available in the following account for State Fiscal Year 2025 and are anticipated to be available in State Fiscal Years 2026, 2027, 2028, 2029, and 2030, upon the availability and continued appropriation of funds in the future operating budget, with the authority to adjust budget line items within the price limitation and encumbrances between state fiscal years through the Budget Office, if needed and justified.

05-95-42-427010-79340000 Health and Social Services, Dept of Health and Human Svcs, HHS: Human Services, Child Support Services, Expedited IV-D Services

| State Fiscal Year | Class / Account | Class Title | Job Number | Total Amount |
|---|---|---|---|---|
| 2025 | 085-588510 | Transfer to Other State Agency | 42700037 | $1,285,608 |
| 2026 | 085-588510 | Transfer to Other State Agency | 42700037 | $1,285,608 |
| 2027 | 085-588510 | Transfer to Other State Agency | 42700037 | $1,285,608 |
| 2028 | 085-588510 | Transfer to Other State Agency | 42700037 | $1,285,608 |
| 2029 | 085-588510 | Transfer to Other State Agency | 42700037 | $1,285,608 |
| 2030 | 085-588510 | Transfer to Other State Agency | 42700037 | $1,285,608 |
| | | | Total | $7,713,648 |

His Excellency, Governor Christopher T. Sununu
 and the Honorable Council
Page 2 of 3

## EXPLANATION

The purpose of this request is to enable the Department to enter into an Interagency Memorandum of Understanding with the New Hampshire Judicial Branch, through the Administrative Office of the Courts, for the continuation of the Expedited Process Program. Since 1987, the Department's Division of Economic Stability, Bureau of Child Support Services, and the Administrative Office of the Courts have had an agreement that allows federal reimbursement for the Administrative Office of the Courts through the Bureau of Child Support Services Expedited Process Program for the establishment and enforcement of child support orders. This Memorandum of Understanding continues this arrangement. The Expedited Process Program is administered in the Circuit Court by the Administrative Judge of the Circuit Court, which is the only public or private body authorized by law to perform the services outlined in the Interagency Memorandum of Understanding.

*[handwritten notes in margin: "over →", "if it breaks the Seperation of Powers violation"]*

Recipients of public assistance are referred to the Department's child support program, as required under the Social Security Act, Title IV, Part D (IV-D). Federal authority, 45 CFR 303.101, requires that State IV-D child support agencies have in effect and use expedited processes to establish and enforce child support orders.

The Department must also accept applications for child support services from families who do not receive public assistance to assist in collection of child support.

The Bureau of Child Support Services will serve approximately 28,000 families each year from July 1, 2024 through June 30, 2030.

Pursuant to RSA 490-D and 490-F, child support referees are authorized to hear marital matters, paternity and support cases, and cases when one party resides in another state or country, as required by the Uniform Interstate Family Support Act.

The Administrative Office of the Courts will be reimbursed for a portion of the direct expenses of staff involved in child support activities, including child support referees, and a portion of the administrative expenses associated with these positions, as well as the administrative expenses that support the child support program.

The Department will monitor services by:

- The number of State petitioned child support cases that are completed through the courts within the six (6) month federal timeframe.

- The number of State petitioned child support cases that are completed through the courts within the twelve (12) month federal timeframe.

- The overall percentage of child support cases with support orders established that are at or above the standard federal threshold for performance.

As referenced in Section 5 of the attached agreement, the parties have the option to extend the agreement for up to five (5) additional years, contingent upon satisfactory delivery of services, available funding, agreement of the parties, and Governor and Council approval.

Should the Governor and Council not authorize this request, the State will be out of compliance with federal regulations that require the child support program to maintain an Expedited Process with the court. In addition, families will experience delays in establishing paternity through the judicial system, establishing and enforcing child support obligations, or collecting and distributing support payments to them, which may result in an increase in public assistance utilization.

DocuSign Envelope ID: 7FE29C62-427F-462E-AC28-1999DE007CAC

*Form MOU 1* (Rev.4/6/2022)

# State of New Hampshire
## Interagency Memorandum of Understanding

**Whereas**, the New Hampshire Department of Health and Human Services *[DHHS]* is a duly constituted agency or branch of government of the State of New Hampshire.

**Whereas**, the New Hampshire Judicial Branch *[NHJB]* is a duly constituted agency or branch of government of the State of New Hampshire.

**Whereas**, pursuant to 42 USC 666(a)(2) and 45 CFR 303.101(b)(2), *DHHS* is responsible for administering a statewide child support establishment and enforcement program under Title IV-D of the Social Security Act. Violates US Constitution 1, 5, 2, 4, 14 Protects Bill of Right 1st 10 Amend.

**Whereas**, *DHHS* desires to have in effect and use, in both interstate and intrastate cases, expedited processes to establish paternity and to establish, modify, and enforce child and medical support orders in accordance with 45 CFR 302.34.

**Whereas**, pursuant to RSA 490-F:2, *NHJB* Circuit Court Family Division (CCFD) is the court of statewide jurisdiction over marital and domestic relations cases. CCFD judges and hearings officers are assigned to one or more circuits or locations at the discretion of the Administrative Judge of the Circuit Court after considering population, judicial time and efficiency, available judicial resources, and the needs of the public.

**Whereas**, *DHHS* and *NHJB*, through the Administrative Office of the Courts, (the Parties) desire to benefit the public at large through the timely filing, hearing, and resolution of child support matters.

**NOW, THEREFORE**, the Parties enter into this Memorandum of Understanding to their mutual benefit, the benefit of the State, and in furtherance of constitutional or statutory authority and objectives.

1. DHHS agrees to:

    A. Pay *NHJB* the amount of $7,713,648 for the services described in the attached MOU Exhibit A – State Agency Responsibilities, which is hereby incorporated by reference.

    Payment shall be provided from: 100% Child Support Enforcement, as awarded on September 30, 2023, by the Administration for Children and Families, ALN 93.563, FAIN 2401NHCSES.

    B. Perform the services described in the attached MOU Exhibit A – State Agency Responsibilities, which is hereby incorporated by reference.

2. *NHJB* agrees to:

    A. Perform the services described in the attached MOU Exhibit A – State

MOU-2024-DES-03-EXPED-01                Page 1 of 10                Department Initials

New Hampshire Judicial Branch                New Hampshire Judicial Branch Initials

DocuSign Envelope ID: 7FE29C62-427F-462E-AC28-1999DE007CAC

*Form MOU 1* (Rev.4/6/2022)

Agency Responsibilities, which is hereby incorporated by reference.

3. The method of payment and payment amount for the above-referenced services, if any is required, is described in the attached MOU Exhibit B – Payment Terms, such exhibit being hereby incorporated by reference.

4. All obligations hereunder are contingent upon the availability and continued appropriation of funds. The agencies shall not be required to transfer funds from any other account in the event that funds are reduced or unavailable.

5. The Memorandum of Understanding is effective July 1, 2024, upon Governor and Executive Council approval until June 30, 2030. The Parties may extend the Memorandum of Understanding for up to five (5) years upon satisfactory delivery of services, available funding, agreement of the Parties, and approval of the Governor and Executive Council.

6. This Memorandum of Understanding may be amended by an instrument in writing signed by both Parties. Either party may terminate this agreement by providing written notice to the other party at least thirty (30) days prior to termination.

7. The Parties agree that the obligations, agreements and promises made under this Memorandum of Understanding are not intended to be legally binding on the Parties and are not legally enforceable.

8. Disputes arising under this Memorandum of Understanding which cannot be resolved between the agencies shall be referred to the New Hampshire Department of Justice for review and resolution.

9. In connection with the performance of this Memorandum of Understanding the Parties shall comply with all applicable laws and regulations.

10. This Agreement shall be construed in accordance with the laws of the State of New Hampshire.

11. The Parties hereto do not intend to benefit any third Parties and this Memorandum of Understanding shall not be construed to confer any such benefit.

12. In the event any of the provisions of this Memorandum of Understanding are held to be contrary to any state or federal law, the remaining provisions of this Memorandum of Understanding will remain in full force and effect.

13. This Memorandum of Understanding, which may be executed in a number of counterparts, each of which shall be deemed an original, constitutes the entire Memorandum of Understanding and understandings between the Parties, and supersedes all prior Memoranda of Understanding and understandings relating hereto.

14. Nothing herein shall be construed as a waiver of sovereign immunity; such immunity being hereby specifically preserved.

*[handwritten margin note: Contradicts authorized by law previous page]*

MOU-2024-DES-03-EXPED-01                Page 2 of 10                Department Initials

New Hampshire Judicial Branch                                    New Hampshire Judicial Branch Initials

DocuSign Envelope ID: 7FE29C62-427F-462E-AC28-1999DE007CAC

order to achieve mutual efficiencies in the administration of IV-D cases.

2.1.3. Require that all CCFD Court Clerks mail to all Parties a notice of hearing within twenty-one (21) days of the receipt of a request by DHHS; the date of said hearing shall be within ninety (90) days of receipt of the request unless the docket will not permit such scheduling; but in any event shall ensure compliance pursuant to Paragraph 1.1.2.

2.1.3.1. After notice is given pursuant to Paragraph 1.1.4., above, the Court shall have fourteen (14) days in which to take corrective action or to notify the Department why corrective action is inappropriate. Corrective action, in this instance, shall mean the mailing of a notice of hearing within fourteen (14) days.

2.1.4. Require child support referees and administrators to maintain a daily reporting log ("log"), attached hereto as Exhibit B-3, tracking the percentage of each day dedicated to IV-D activities, in order to monitor and manage the processing of IV-D cases and activities.

2.1.5. Require that the child support referees and administrators sign and submit the completed logs at the end of each month to the Administrative Judge of the Circuit Court or designee.

2.1.6. Require that the child support referees identify the case name and case number of each IV-D case heard daily and submit these case lists together with the logs monthly to the Administrative Judge of the Circuit Court or designee.

2.1.7. Require that the Administrative Judge of the Circuit Court or designee review the logs and case list for accuracy and forward them to NHJB's Administrative Office of the Courts (AOC) within one (1) week of receipt.

2.1.8. Take reasonable measures to ensure that the CCFD meets the federal time frames for expedited processes mandated by 45 CFR 303.101.

2.1.9. Require that all CCFD Court Clerks mail copies of the requested orders within fourteen (14) days of receipt of the request to ensure compliance with federal time frames mandated by 45 CFR 303.6.

2.1.10. Administer a two-week time study in three (3) separate locations during each state fiscal year of this Agreement, measuring and reporting the percentage of time clerical/support staff spends on IV-D activities. The two weeks shall be selected to best reflect the average workload. The percentage of time reported by clerical/support staff as spent on IV-D activities shall be adjusted annually based on the results of any time studies conducted in that year.

2.1.11. Maintain all NHJB records related to this Memorandum of Understanding for a period of seven (7) years.

2.2. NHJB AOC, as authorized by the Supreme Court, agrees to:

2.2.1. Review and track accuracy of all logs.

2.2.2. Submit a monthly summary report to DHHS, showing the total reimbursement due for each child support referee and administrator, along with copies of logs for use in authorizing reimbursement payments.

2.2.3. Submit monthly statements to DHHS reflecting salaries and benefits of clerical/support staff and costs for services and commodities.

DocuSign Envelope ID: 7FE29C62-427F-462E-AC28-1999DE007CAC

3. **ADDITIONAL TERMS FOR BOTH PARTIES**

   3.1. Technology.

      3.1.1. Parties shall continue to explore:

         3.1.1.1. NHJB providing access to the court's case management system, Odyssey, to select employees of DHHS.

         3.1.1.2. NHJB providing access to its interior Wi-Fi signal at court locations where access to the internet via the guest Wi-Fi is unreliable.

         3.1.1.3. Enhancements to an automated interface from NHJB to NECSES, electronic court filing, and any other improvements that will streamline and improve communication between the Parties. DHHS and NHJB will have periodic coordination regarding any and all Information Technology considerations from either party.

         3.1.1.4. Alternatives to the time study requirement

   3.2. Guidelines Review.

      3.2.1. Both Parties shall cooperate with data collection, identification of issues, and data presentation as needed during the review in accordance with requirements of RSA 458-C:6.

   3.3. Party Communication.

      3.3.1. Both Parties shall make available, upon request, the case names and case numbers of all IV-D cases heard by child support referees to assist with tracking and monitoring cases.

      3.3.2. DHHS and NHJB shall meet, either in person or virtually, to discuss any questions, comments, or concerns related to the terms of this Memorandum of Understanding. Either party may schedule a meeting to address issues that have arisen in the administration of this Agreement, with the overall goal being an efficient expedited process for the judicial resolution of IV-D cases. As such, the Parties agree to the meaningful participation of the appropriate staff in ad hoc meetings as required to resolve said issues. At a minimum there shall be:

         3.3.2.1. Local Liaison Meetings. DHHS field staff from each local District Office shall meet with Court staff from the CCFD facility or facilities that provides services to that District Office on a semi-annual schedule, or as may be otherwise necessary, to address issues that arise from the Court resolution of IV-D cases and any other identified actions that will improve efficiencies for the resolution of IV-D cases.

         3.3.2.2. Administrative Liaison. The Circuit Court Administrative Judge or designee(s) and an appropriate representative from the AOC shall meet on an annual basis with appropriate DHHS representatives to review and discuss administrative issues that have arisen within the IV-D process.

         3.3.2.3. The IV-D Program Development Workgroup ("Workgroup"). The parties shall participate in the Workgroup for the purpose of jointly fulfilling the goals of the AOC/BCSS Agreement, while ensuring IV-D compliance. The Workgroup shall, at a minimum be comprised of the following: the Circuit Court Administrative Judge, or designee, the Director of the AOC, or designee, the Director of BCSS administrative designee; and the Director of BCSS Child Support Legal Designee. It is not expected that the Workgroup

DocuSign Envelope ID: 7FE29C62-427F-462E-AC28-1999DE007CAC

shall meet on a regular basis until such time as the Parties agree that meetings are necessary for the purpose of jointly fulfilling the goals of this MOU, while ensuring IV-D program compliance. Either party may schedule a meeting of this Workgroup. The Parties agree to the meaningful participation of appropriate staff in order to accomplish the tasks of the Workgroup.

3.4. Confidentiality.

3.4.1. This Agreement does not authorize access to any records or documents by Court personnel or authorized DHHS employees other than what is already authorized by current job responsibilities, nor does it provide access to such records or documents by any other person(s). All information, records, and documents received relating to IV-D cases shall be safeguarded in accordance with relevant federal and state statutes and regulations, including 42 USC 654 and RSA 161-B:7, III, except as otherwise permissible under RSA 91-A or Court order.

3.4.2. Only authorized representative(s) of the United States Government, the State Office of Legislative Budget Assistant Audit Division, and authorized representatives of DHHS and Court personnel shall have the right to inspect and examine records or documents pursuant to this Agreement to the extent authorized by law and/or federal and state regulations. Any such authorized person(s) must provide reasonable notice and presentation of proper credentials or identification.

DocuSign Envelope ID: 7FE29C62-427F-462E-AC28-1999DE007CAC

# State of New Hampshire
## Interagency Memorandum of Understanding
## Exhibit B – Payment Terms

1. The maximum amount of funds available for reimbursement under this Agreement from DHHS to NHJB shall not exceed the amount specified in Form MOU 1, Interagency Memorandum of Understanding, Section 1, Subsection A.

2. Payment shall be on a cost reimbursement basis for actual expenditures incurred in the fulfillment of this Memorandum of Understanding and shall be in accordance with the approved line item, as specified in Exhibit B-1, Projected Budget for SFYs 2025-2030.

3. Calculation of Payment.

   3.1. DHHS shall seek reimbursement from the federal Office of Child Support Services for a portion of the direct expenses of the child support referees and, in accordance with 45 CFR 304.21, for positions involved with the administration of IV-D activities, which includes the salaries and benefits for the positions, and a portion of the indirect expenses associated with these positions, which includes the salaries and benefits of clerical/support staff who do not work exclusively for the child support referees, as well as the services and commodities which support the program as follows:

      3.1.1. The amount of reimbursement for all direct expenses shall be calculated by multiplying the current Federal Financial Participation (FFP) rate by the percentage of time child support referees and administrators spend on IV-D activities, as reported on a monthly basis, by the total amount of direct expenses, as referred to in Exhibit B-1, attached hereto.

      3.1.2. The amount of reimbursement for the indirect expenses of clerical/support staff salaries and benefits shall be calculated by multiplying the current FFP rate by the percentage of time spent by Court personnel on IV-D activities by the total indirect expenses, as referred to in Exhibit B-1. For the purposes of this Agreement, the percentage of time spent on IV-D activities will be derived from the time study projects conducted at several courts.

      3.1.3. The amount of reimbursement for all indirect expenses of services and commodities shall be calculated by multiplying the total cost pool, as referred to in Exhibit B-1, attached hereto, by the ratio of referees to the total number of judicial officers, by the percentage of the master and referee time spent on IV-D cases, and by the current FFP rate, as referenced in Exhibit B-1.

4. NHJB shall submit an invoice and supporting documents to DHHS no later than the fifteenth (15th) working day of the following month. NHJB shall:

   4.1. Submit the invoice in a format provided by DHHS or that is otherwise acceptable to DHHS.

   4.2. Ensure the invoice identifies and requests payment for allowable costs incurred in the previous month.

   4.3. Provide supporting documentation of allowable costs that may include, but is not limited to, time sheets, payroll records, receipts for purchases, and proof of expenditures, as applicable.

   4.4. Ensure the invoice is completed, dated, and returned to DHHS with the supporting documentation for authorized expenses, in order to initiate payment.

MOU-2024-DES-03-EXPED-01                Page 9 of 10                Department Initials

New Hampshire Judicial Branch                     New Hampshire Judicial Branch Initials

DocuSign Envelope ID: 7FE29C62-427F-462E-AC28-1999DE007CAC

5. In lieu of hard copies, all invoices with supporting documentation may be assigned an electronic signature and emailed to bcss-invoices@dhhs.nh.gov or invoices may be mailed to:

> Financial Manager—BCSS
> Department of Health and Human Services
> 129 Pleasant Street
> Concord, NH 03301

6. DHHS shall make payment to the NHJB within thirty (30) days of receipt of each invoice and supporting documentation for authorized expenses, subsequent to approval of the submitted invoice.

7. The final invoice and supporting documentation for authorized expenses shall be due to DHHS no later than forty (40) days after the Memorandum of Understanding completion date.

8. Notwithstanding any provision of this Memorandum of Understanding to the contrary, all obligations of DHHS hereunder, including without limitation, the continuance of payments hereunder, are contingent upon the availability and continued appropriation of funds. DHHS shall not be required to transfer funds from any other source in the event that the source of funds are reduced or become unavailable.

9. The Parties may agree to changes limited to adjusting amounts within the price limitation and adjusting encumbrances between State Fiscal Years and budget class lines through the Budget Office. This may be done by written agreement of both Parties, without obtaining approval of the Governor and Executive Council, if needed and justified.

10. **Fiscal Responsibilities.**

10.1. NHJB hereby agrees to reimburse DHHS for: (1) any payments withheld from DHHS; (2) adjustments made in funds otherwise due to DHHS; (3) fines imposed by the U.S. Department of Health and Human Services (HHS), due to any expenditures claimed by NHJB and paid pursuant to this Agreement that are later determined to be improper. The reimbursement shall only be required in situations where NHJB failed to comply with the terms of this Agreement. NHJB agrees to reimburse DHHS for any expenditures under this Agreement which are determined as a result of an audit of DHHS, HHS, or any authorized entity to be attributed to: (1) services to ineligible individuals; (2) ineligible services; (3) ineligible indirect costs; or (4) any other claims which are inconsistent with the provisions of this Agreement.

10.2. If DHHS and/or NHJB determine that any withholding, adjustment, or fine imposed by HHS due to alleged NHJB noncompliance is erroneous or improper for any reason, DHHS and NHJB shall evaluate the merits of an appeal and may pursue an appeal through appropriate avenues. DHHS and NHJB shall jointly decide whether to file, pursue, and/or continue any such appeal. Should there be disagreement on this issue, the New Hampshire Office of the Attorney General shall be consulted, and its determination shall be final and binding and shall not be subject to judicial review or administrative procedures. NHJB shall be responsible for all litigation costs incurred. NHJB shall return funds required to be returned under this section no later than thirty (30) days following DHHS's request for its return. However, if an appeal is requested within that thirty (30) day period, NHJB will not be responsible for returning funds until thirty (30) days after such appeal has been completed and denied, or not until a fiscal sanction has been imposed by HHS, whichever occurs first.

DocuSign Envelope ID: 7FE29C62-427F-462E-AC28-1999DE007CAC

Exhibit B-1

### IV-D Projected Budget for FY2025, FY2026, FY2027, FY2028, FY2029, and FY2030

| Direct Expenses | Per Year Expenditures for FY25-FY30 | Estimated IV-D % | FFP | Estimated Reimbursement per year |
|---|---|---|---|---|
| Marital Master | - | 1.0% | 0.66 | - |
| Referees | 188,563 | 35.0% | 0.66 | 43,558 |
| Administrators | 140,622 | 4.0% | 0.66 | 3,712 |
| Direct Total | 329,186 | | | 47,271 |
| Indirect Expenses | | | | |
| Clerical Staff | 8,212,942 | 18.9% | 0.66 | 1,027,141 |
| | | | | |
| Services & Commodities | | | | |
| Facilities | 3,772,044 | | | 99,582 |
| Postage, Printing & Supplies | 580,942 | | | 15,337 |
| Equipment Rental | 751,645 | | | 19,843 |
| Maintenance Contracts | 173,590 | | | 4,583 |
| Equipment Purchases | 214,980 | | | 5,675 |
| Telephone | 769,779 | | | 20,322 |
| Library | 148,978 | | | 3,933 |
| Travel | 260,434 | | | 6,875 |
| Sheriff Reimbursement | 2,624,119 | | | 69,277 |
| Interpreters | 1,057,294 | | | 27,913 |
| | | | | |
| Services & Commodities Total | 10,353,805 | 3.1% | 0.66 | 211,196 |
| | | | | |
| Indirect Total | 18,566,747 | | | 1,238,338 |
| | | | | |
| Total Actual Expenditures | 18,895,932 | | | 1,285,608 |

\* Note Marital Masters will be phased out and nothing calculated for Call Center

6 Yr Total    7,713,648

MOU-2024-DES-03-EXPED-01

DocuSign Envelope ID: 7FE29C62-427F-462E-AC28-1989DE007CAC

Exhibit B-2

## Time Study Methods and Procedures

Time Study methods and procedures for child support tasks are outlined below.

### Staff Required to Participate in the Time Study

The identification of staff required to participate in the time study process and the tasks subject to time study examination reflect the full involvement of clerical support staff for referees who process the Statewide child support establishment and enforcement program under Title IV-D of the Social Security Act ("IV-D cases"). This includes clerical staff, case managers, and their direct supervisors who work on cases as well as supervise subordinates. Law clerks and the senior law clerk, who has the ultimate responsibility for management of the office, are not included in the study as it is prohibitive in terms of the time and effort required to capture useful data.

### Time Study Reporting Period

Prior time studies provide a baseline of time spent processing IV-D cases over a two-week period in several courts for cost allocation purposes. Each year, the time study takes place over a two-week period.

### Updating Prior Time Study "Unknown" Statuses

Prior time studies should be reviewed so that tasks noted with an unknown IV-D status may be researched and re-assigned as IV-D or non-IV-D. This will enable the Department to project the expected number of cases that will become IV-D, even if the status is entered into the system as "Unknown." In addition, a certain number of non-IV-D cases are expected to convert to IV-D cases. These cases must be reviewed to determine any change in IV-D status.

### Time Study Reporting and the Time Log

The IV-D Time Study Log ("Time Log") gathers data for time study reporting. The Time Log is designed to identify how many minutes designated staff spend on a variety of tasks during a normal business day. These tasks are identified within the IV-D status columns: Yes, No, or Unknown.

### Time Log Task Codes and Tasks

| Task Code | Task |
|-----------|------|
| A | Enter Case |
| B | Order of Notice |
| C | Hearing Notices |
| D | Notice of Decision |
| E | Scheduling |
| F | Phone |
| G | Counter |
| H | Docketing and Correspondence |
| I | Closing |
| L | General Office/Staff Support |
| M | Pulling Mail/Dockets/Filing |

DocuSign Envelope ID: 7FE29C62-427F-462E-AC28-1999DE007CAC

Exhibit B-2

## Time Log Instructions

1. Time Logs must be completed and signed daily by staff members designated to do so. Time Logs must be collected daily and reviewed by the unit supervisor for completeness and accuracy.

2. Time Logs must be filed even if the designated staff member is absent from work for a partial or full day due to sick time, vacation leave, personal leave, or other authorized leave.

3. The Time Log must accurately represent the task during the specific review period. No attempt may be made to structure data to portray an individual's perception of the appropriate task code.

4. Completed Time Logs must be forwarded to the Administrative Office of the Courts weekly.

## Instructions for Time Log Completion

1. Daily tasks must be reduced to five (5) minute reporting periods; no period of time less than five (5) minutes may be entered. It is acceptable to lump several cases under one (1) five (5) minute time block when tasks take only a few seconds to complete.

2. Tasks do not have to be reported in the time sequence in which they were performed during the day. However, it is strongly recommended, given the number of cases processed daily, that staff complete logs, including the docket number of each case worked on, as the task is completed.

3. Tasks are listed for staff to categorize. In addition, staff must indicate: 1) if the task is IV-D related; 2) if the task is not (and is not likely to be) IV-D related; or 3) if it is unknown whether the task is IV-D related. Also, staff must indicate the status of each case in their caseload using the New Entry, In Process, or Brought Forward columns.

4. The Time Log assumes a seven and one-half (7.5) hour workday (four hundred and fifty [450] minutes), but tasks performed during overtime also must be reported. Authorized non-productive activities, such as lunchtime or administrative time that cannot be categorized, must be entered at the bottom of the Time Log in the "Lunch/Breaks" cell.

DocuSign Envelope ID: 7FE29C62-427F-462E-AC28-1999DE007CAC

Exhibit B-2

| | IV-D Time Study Log | | | | | | |
|---|---|---|---|---|---|---|---|
| | Court _____ | | | | | | |
| Name | | | | | Date | | |
| Docket # | IV-D Status | | | New Entry | In Process | Brought Forward | Time in 5 min Intervals |
| | Yes | No | Unknown | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

DocuSign Envelope ID: 7FE29C62-427F-462E-AC28-1999DE007CAC

Exhibit B-3

## New Hampshire Judicial Branch
### IV-D Reporting Log – Name: _____
Month/Year: _____

| Date | County | Case Name | Docket # | NECSES # | Time (In Minutes) | Rate / Minute | FFP | Reimbursement Amount (Min x Rate x FFP) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | $ 1.01 | 0.66 | $ - |
| | | | | | | 1.01 | 0.66 | - |
| | | | | | | 1.01 | 0.66 | - |
| | | | | | | 1.01 | 0.66 | - |
| | | | | | | 1.01 | 0.66 | - |
| | | | | | | 1.01 | 0.66 | - |
| | | | | | | 1.01 | 0.66 | - |
| | | | | | | 1.01 | 0.66 | - |
| | | | | | | 1.01 | 0.66 | - |
| | | | | MONTHLY TOTALS | | | | $ - |

_____            _____
Signature                                                        Date

MOU-2024-DES-03-EXPED-01

DocuSign Envelope ID: 7FE29C62-427F-462E-AC28-1999DE007CAC

Form **MOU 1** (Rev.4/6/2022)

15. *New Hampshire Department of Health and Human Services*

<div style="margin-left:2em">DocuSigned by:</div>

_____    6/8/2024
Signature                                   Date

Division Director
_____
Title

Karen Hebert
_____
Print Name

16. *New Hampshire Judicial Branch*

<div style="margin-left:2em">DocuSigned by:</div>

*Dianne Martin*
_____    6/7/2024
Signature                                   Date

Director
_____
Title

Dianne Martin
_____
Print Name

MOU-2024-DES-03-EXPED-01          Page 3 of 10          Department Initials

New Hampshire Judicial Branch          New Hampshire Judicial Branch Initials

DocuSign Envelope ID: 7FE29C62-427F-462E-AC28-1999DE007CAC

Form MOU 1 (Rev.4/6/2022)

Approved by the New Hampshire Department of Justice for form, substance, and execution:

By: _Robyn Guarino_ _____ .    On: 6/10/2024 _____

[Name of Assistant Attorney General] Robyn Guarino    Date

Approved by the Governor and Executive Council

By: _____ .    On: _____

Date

MOU-2024-DES-03-EXPED-01    Page 4 of 10    Department Initials

New Hampshire Judicial Branch    New Hampshire Judicial Branch Initials

DocuSign Envelope ID: 7FE29C62-427F-462E-AC28-1999DE007CAC

# State of New Hampshire
# Interagency Memorandum of Understanding
# Exhibit A – State Agency Responsibilities

## 1. RESPONSIBILITIES OF DHHS

1.1. DHHS agrees to:

   1.1.1. Keep monthly logs by case name of each Social Security Act Title IV, Part D (IV-D) case that is scheduled and heard by the New Hampshire Circuit Court Family Division (CCFD). IV-D cases include:

   1.1.1.1. Establishment of paternity;

   1.1.1.2. Establishment of new and temporary orders for child and medical support;

   1.1.1.3. Establishment and enforcement of interstate and international cases under Uniform Interstate Family Support Act (UIFSA) or any other laws governing interstate and international child support cases;

   1.1.1.4. Enforcement of existing orders of support;

   1.1.1.5. Modifications of orders with respect to child and medical support; and

   1.1.1.6. Hearings on support violations and show cause hearings.

   1.1.2. Monitor time frames for all IV-D cases to determine if these cases are being disposed of pursuant to federally mandated time frames established in 45 CFR 303.101(b)(2).

   1.1.3. Provide the CCFD with written requests to schedule hearings for IV-D cases.

   1.1.4. Notify the Administrative Judge of the Circuit Court or designee when any CCFD Court clerk fails on two (2) or more separate occasions to schedule a hearing in a timely manner in accordance with Paragraph 2.1.3.

   1.1.5. Provide individual or group trainings on IV-D topics and issues covered by this Agreement to the staff of CCFD.

   1.1.6. Provide qualified staff to develop, present, and facilitate the educational trainings with the goal of the development and maintenance of IV-D program knowledge.

   1.1.7. Ensure trainings are available to the Circuit Court Administrative Judge, the Circuit Court Administrator(s), the CCFD Judges who hear IV-D cases, the child support referee(s), and all other appropriate Court staff.

   1.1.8. Provide limited access to the New England Child Support Enforcement System (NECSES) for select employees of CCFD, ensuring employees take all necessary trainings for access to NECSES as required by DHHS and sign all required documents.

## 2. RESPONSIBILITIES OF NHJB

2.1. NHJB CCFD, as authorized by the Supreme Court, agrees to:

   2.1.1. Promptly schedule to hear IV-D cases in CCFD Courts with jurisdiction over IV-D cases as requested by DHHS.

   2.1.2. Collaborate with DHHS to coordinate regularly scheduled court days by use of block scheduling for the resolution of establishment, modification, and enforcement cases in

MOU-2024-DES-03-EXPED-01                    Page 5 of **10**                    Department Initials

New Hampshire Judicial Branch                              New Hampshire Judicial Branch Initials

His Excellency, Governor Christopher T. Sununu
   and the Honorable Council
Page 3 of 3

Area served: Statewide.

Source of Federal Funds: Assistance Listing Number 93.563, FAIN 2401NHCSES.

The Department may request General Funds in the event that Federal Funds are no longer available and services are still needed.

Respectfully submitted,

Lori A. Weaver
Commissioner

*The Department of Health and Human Services' Mission is to join communities and families in providing opportunities for citizens to achieve health and independence.*

# EXHIBIT 2

Governor and Council Agenda Item 103

DHHS/DCYF Contract with NH Coalition Against

Domestic and Sexual Violence

$7,208,792 Sole-Source Contract

Approved June 4, 2025

*[Attach document behind this page]*

# DHHS/DCYF Sole Source Contract Amendment

## NH Coalition Against Domestic and Sexual Violence - Governor and Council Agenda Packet

**Converted document notice**

This Word/PDF version was converted from a Markdown diplomatic transcription of a 92-page scanned PDF identified in the source metadata as **103 GC Agenda 060425.pdf**. It is not the original scanned filing. Seals, signatures, initials, and other figures that were not embedded in the Markdown file are retained as written image descriptions. Bracketed uncertain readings and illegible-text markers are preserved.

**Transcription metadata:** Edition K; profile P-GC/3; transcription dated July 31, 2026; source type scanned OCR.

**Pin-citing.** Text after a page marker sits on that physical page of the packet: cite the nearest preceding marker. The anchor for page N is #page-N. Labels are asserted, not printed — see the colophon's label_assertion.

Source packet page 1

ARC

103

*[Image description: Seal of the State of New Hampshire, printed at the left of the letterhead.]*

Lori A. Weaver
Commissioner

Marie Noonan
Director

**STATE OF NEW HAMPSHIRE**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

*DIVISION FOR CHILDREN, YOUTH & FAMILIES*

**129 PLEASANT STREET, CONCORD, NH 03301-3857**
**603-271-4451 1-800-852-3345 Ext. 4451**
**Fax: 603-271-4729 TDD Access: 1-800-735-2964 www.dhhs.nh.gov**

May 12, 2025

Her Excellency, Governor Kelly A. Ayotte
and the Honorable Council
State House
Concord, New Hampshire 03301

## REQUESTED ACTION

Authorize the Department of Health and Human Services, Division for Children, Youth and Families, to enter into a **Sole Source** amendment to an existing contract with New Hampshire Coalition Against Domestic and Sexual Violence (VC#155510), Concord, NH for the ongoing provision of a statewide domestic and sexual violence prevention program, by exercising a contract renewal option by increasing the price limitation by $3,604,396 from $3,604,396 to $7,208,792 and extending the completion date from June 30, 2025 to June 30, 2027, effective July 1, 2025, upon Governor and Council approval. 64.17% General Funds. 35.83% Other Funds (Fees).

The original contract was approved by Governor and Council on June 14, 2023, item #11.

Funds are anticipated to be available in State Fiscal Years 2026 and 2027, upon the availability and continued appropriation of funds in the future operating budget, with the authority to adjust budget line items within the price limitation and encumbrances between state fiscal years through the Budget Office, if needed and justified.

**05-95-42-421010-29590000 HEALTH AND SOCIAL SERVICES, HEALTH AND HUMAN SVCS DEPT OF, HHS: HUMAN SERVICES, CHILD PROTECTION, DOMESTIC VIOLENCE PROGRAMS**

| State Fiscal Year | Class / Account | Class Title | Job Number | Current Budget | Increased (Decreased) Amount | Revised Budget |
|---|---|---|---|---|---|---|
| 2024 | 073-509074 | Grants | 42105903 | $645,654 | $0 | $645,654 |
| 2025 | 073-509074 | Grants | 42105903 | $645,654 | $0 | $645,654 |
| | | | Subtotal | $1,291,308 | $0 | $1,291,308 |

**05-95-42-421010-29590000 HEALTH AND SOCIAL SERVICES, HEALTH AND HUMAN SVCS DEPT OF, HHS: DIV CHILDREN, YOUTH & FAM, CHILD PROTECTION, DOMESTIC VIOLENCE PROGRAMS**

| State Fiscal Year | Class / Account | Class Title | Job Number | Current Budget | Increased (Decreased) Amount | Revised Budget |
|---|---|---|---|---|---|---|
| 2026 | 073-509074 | Grants | 42105903 | $0 | $645,654 | $645,654 |
| 2027 | 073-509074 | Grants | 42105903 | $0 | $645,654 | $645,654 |

*Editorial note: The table above is cut by the page break; its subtotal row is the first thing printed on the next sheet.*

Source packet page 2

Her Excellency, Governor Kelly A. Ayotte
and the Honorable Council
Page 2 of 3

*Editorial note: The single ruled row below is the subtotal of the table begun on the previous sheet; the page prints it with no repeated header.*

| | | | | Subtotal | $0 | $1,291,308 | $1,291,308 |
| --- | --- | --- | --- | --- | --- | --- | --- |

### 05-95-42-421010-29590000 HEALTH AND SOCIAL SERVICES, HEALTH AND HUMAN SVCS DEPT OF, HHS: HUMAN SERVICES, CHILD PROTECTION, DOMESTIC VIOLENCE PROGRAMS

| State Fiscal Year | Class / Account | Class Title | Job Number | Current Budget | Increased (Decreased) Amount | Revised Budget |
| --- | --- | --- | --- | --- | --- | --- |
| 2024 | 102-500734 | Contracts for Program Services | 42105905 | $1,156,544 | $0 | $1,156,544 |
| 2025 | 102-500734 | Contracts for Program Services | 42105905 | $1,156,544 | $0 | $1,156,544 |
| | | | Subtotal | $2,313,088 | $0 | $2,313,088 |

### 05-95-42-421010-29590000 HEALTH AND SOCIAL SERVICES, HEALTH AND HUMAN SVCS DEPT OF, HHS: DIV CHILDREN, YOUTH & FAM, CHILD PROTECTION, DOMESTIC VIOLENCE PROGRAMS

| State Fiscal Year | Class / Account | Class Title | Job Number | Current Budget | Increased (Decreased) Amount | Revised Budget |
| --- | --- | --- | --- | --- | --- | --- |
| 2026 | 102-500734 | Contracts for Program Services | 42105905 | $0 | $1,156,544 | $1,156,544 |
| 2027 | 102-500734 | Contracts for Program Services | 42105905 | $0 | $1,156,544 | $1,156,544 |
| | | | Subtotal | $0 | $2,313,088 | $2,313,088 |
| | | | Total | $3,604,396 | $3,604,396 | $7,208,792 |

## EXPLANATION

This request is **Sole Source** because MOP 150 requires all amendments to agreements originally approved as sole source to be identified as sole source. The Contractor is designated, by the Department, as the coordinator for the special fund for domestic violence programs established by NH RSA 173-B:15. The Contractor, as the coordinator for the special fund, coordinates aid and assistance to victims of domestic violence with 12 independent community-based member programs around the State to support victims of domestic and sexual violence.

The purpose of this request is to exercise an available contract renewal option to ensure infrastructure and support of the statewide domestic and sexual violence prevention program. The Contractor will continue to provide 24-hour crisis telephone lines, emergency transportation, shelters, community outreach and education, and support services to victims of domestic and sexual violence. The Contractor provides trainings and technical assistance to providers of the domestic and sexual violence programs. The Contractor conducts community education programs, presenting information on domestic violence to other social service programs, police, medical personnel, clergy, civic organizations, educators, and community members. The Contractor provides prevention education in schools, where program staff regularly conduct classes on non-violent conflict resolution, healthy relationships, and dating violence. The

**Source packet page 3**

Her Excellency, Governor Kelly A. Ayotte   and the Honorable Council Page 3 of 3

Contractor organized 83 domestic violence-related community awareness events and 2,162 domestic violence education and outreach programs/presentations in 2023. In those 2,162 presentations, there were 18,999 adult participants and 20,828 youth participants. The statewide member programs utilize funds for personnel, housing, crisis support, advocacy, education, and overall prevention.

Approximately 17,800 individuals will be served during State Fiscal Years 2026 and 2027, including approximately 11,300 direct survivors of domestic and sexual violence.

The Department will monitor contracted services through the required Domestic Violence Prevention Program annual report, which includes a summary of the activities provided during the State Fiscal Year, including:

- Provided supports.
- Emergency housing support.
- Number of domestic violence-related community awareness events and outreach presentations provided.

As referenced in Exhibit A of the original agreement, the parties have the option to extend the agreement for up to two (2) additional years, contingent upon satisfactory delivery of services, available funding, agreement of the parties and Governor and Council approval. The Department is exercising its option to renew services for two (2) of the two (2) years available.

Should the Governor and Council not authorize this request, the Department may not have the ability to provide domestic and sexual violence prevention services, limiting support to victims of domestic and sexual violence and their families.

Area served: Statewide.

Respectfully submitted,

*[Image description: Handwritten signature of Lori A. Weaver.]*

Lori A. Weaver Commissioner

*The Department of Health and Human Services' Mission is to join communities and families in providing opportunities for citizens to achieve health and independence.*

**Source packet page 4**

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C

## State of New Hampshire

## Department of Health and Human Services

## Amendment #1

This Amendment to the Statewide Domestic Violence Prevention Program contract is by and between the State of New Hampshire, Department of Health and Human Services ("State" or "Department") and New Hampshire Coalition Against Domestic and Sexual Violence ("the Contractor").

WHEREAS, pursuant to an agreement (the "Contract") approved by the Governor and Executive Council on June 14, 2023 (Item #11), the Contractor agreed to perform certain services based upon the terms and conditions specified in the Contract and in consideration of certain sums specified; and

WHEREAS, pursuant to Form P-37, General Provisions, the Contract may be amended upon written agreement of the parties and approval from the Governor and Executive Council; and

NOW THEREFORE, in consideration of the foregoing and the mutual covenants and conditions contained in the Contract and set forth herein, the parties hereto agree to amend as follows:

1. Form P-37 General Provisions, Block 1.7, Completion Date, to read:
   June 30, 2027
2. Form P-37, General Provisions, Block 1.8, Price Limitation, to read:
   $7,208,792
3. Modify Exhibit C, Payment Terms, Section 1., to read:
   1. This Agreement is funded by:
      1.1. 64.17% General Funds.
      1.2. 35.83% Other Funds.
4. Modify Exhibit C, Payment Terms, Section 3., to read:
   3. Payment shall be on a cost reimbursement basis for actual expenditures incurred in the fulfillment or this Agreement, and shall be in accordance with the approved line items, as specified in Exhibit C-1 Budget through Exhibit C-3, Budget Sheet – Amendment #1.
5. Add Exhibit C-3, Budget Sheet – Amendment #1, which is attached hereto and incorporated by reference herein.

New Hampshire Coalition Against Domestic and Sexual Violence SS-2023-DCYF-13-STATE-01-A01 v7.12.23 A-S-1.3 Page 1 of 3
Contractor Initials *[Image description: DocuSign initials "LMS".]* 5/5/2025 Date

**Source packet page 5**

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C

All terms and conditions of the Contract not modified by this Amendment remain in full force and effect. This Amendment shall be effective July 1, 2025, upon Governor and Council approval.

IN WITNESS WHEREOF, the parties have set their hands as of the date written below,

State of New Hampshire Department of Health and Human Services

5/11/2025 Date

DocuSigned by: *[Image description: Handwritten DocuSign signature reading "Marie Noonan".]* [2FCCB724C31F40F?] Name: Marie Noonan Title: DCYF Director

New Hampshire Coalition Against Domestic and Sexual Violence

5/5/2025 Date

DocuSigned by: *[Image description: Handwritten DocuSign signature reading "Lyn Schollett".]* [EC2EFED23DF3413?] Name: Lyn Schollett Title: Executive Director

New Hampshire Coalition Against Domestic and Sexual Violence SS-2023-DCYF-13-STATE-01-A01 v7.12.23 A-S-1.3 Page 2 of 3 Contractor Initials *[Image description: DocuSign initials "LMS".]* 5/5/2025 Date

**Source packet page 6**

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C

The preceding Amendment, having been reviewed by this office, is approved as to form, substance, and execution.

OFFICE OF THE ATTORNEY GENERAL

5/12/2025 Date

DocuSigned by: *[Image description: Handwritten DocuSign signature reading "Robyn Guarino".]*
[748734B44044460?] Name: Robyn Guarino Title: Attorney

I hereby certify that the foregoing Amendment was approved by the Governor and Executive Council of the State of New Hampshire at the Meeting on: _____ (date of meeting)

OFFICE OF THE SECRETARY OF STATE

Date

Name: Title:

New Hampshire Coalition Against Domestic and Sexual Violence SS-2023-DCYF-13-STATE-01-A01 v7.12.23 A-S-1.3 Page 3 of 3
Contractor Initials *[Image description: DocuSign initials "LMS".]* 5/5/2025 Date

Source packet page 7

*(This sheet is printed in landscape orientation.)* Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C

Exhibit C-3, Budget Sheet – Amendment #1

**New Hampshire Department of Health and Human Services**

| | |
|---|---|
| Contractor Name: | New Hampshire Coalition Against Domestic and Sexual Violence |
| Budget Request for: | Statewide Domestic Violence Prevention Program |
| Budget Period: | SFY 2026 (7/1/25 – 6/30/26) and SFY 2027 (7/1/26 – 6/30/27) |
| Indirect Cost Rate (if applicable) | 0.00% |

| Line Item | Program Cost - Funded by DHHS - SFY 26 | Program Cost - Funded by DHHS - SFY 27 |
|---|---|---|
| 1. Salary & Wages | $98,199 | $98,199 |
| 2. Fringe Benefits | $32,236 | $32,236 |
| 3. Consultants | $0 | $0 |
| 4. Equipment Indirect cost rate cannot be applied to equipment costs per 2 CFR 200.1 and Appendix IV to 2 CFR 200. | $0 | $0 |
| 5.(a) Supplies - Educational | $0 | $0 |
| 5.(b) Supplies - Lab | $0 | $0 |
| 5.(c) Supplies - Pharmacy | $0 | $0 |
| 5.(d) Supplies - Medical | $0 | $0 |
| 5.(e) Supplies - Office | $3,260 | $3,260 |
| 6. Travel | $0 | $0 |
| 7. Software | $0 | $0 |
| 8. (a) Other - Marketing/Communications | $728 | $728 |
| 8. (b) Other - Education and Training | $0 | $0 |
| 8. (c) Other - Other (specify below) | $0 | $0 |
| *Insurance* | $800 | $800 |
| *Memberships* | $800 | $800 |
| *Occupancy* | $9,000 | $9,000 |
| *Organizational Development* | $1,440 | $1,440 |
| *Professional Services* | $1,332 | $1,332 |
| *Telephone* | $1,440 | $1,440 |
| 9. Subrecipient Contracts | $1,652,963 | $1,652,963 |
| Total Direct Costs | $1,802,198 | $1,802,198 |
| Total Indirect Costs | $0 | $0 |
| *Subtotals* | *$1,802,198* | *$1,802,198* |
| | **TOTAL** | **$3,604,396** |

SS-2023-DCYF-13-STATE-01-A01 Contractor Initials: *[Image description: DocuSign initials "LMS".]* 5/5/2025 Date:

**Source packet page 8**

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C

# State of New Hampshire

# Department of State

CERTIFICATE

I, David M. Scanlan, Secretary of State of the State of New Hampshire, do hereby certify that NEW HAMPSHIRE COALITION AGAINST DOMESTIC AND SEXUAL VIOLENCE is a New Hampshire Nonprofit Corporation registered to transact business in New Hampshire on April 30, 1981. I further certify that all fees and documents required by the Secretary of State's office have been received and is in good standing as far as this office is concerned.

Business ID: **63838** Certificate Number: **0006657722**

*[Image description: Seal of the State of New Hampshire: "SEAL OF THE STATE OF NEW HAMPSHIRE" arcs around a ship on stocks with a rising sun, "1776" at the base.]*

IN TESTIMONY WHEREOF, I hereto set my hand and cause to be affixed the Seal of the State of New Hampshire, this 3rd day of April A.D. 2024.

*[Image description: Handwritten signature of David M. Scanlan.]*

David M. Scanlan Secretary of State

Source packet page 9

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C

## CERTIFICATE OF AUTHORITY

I, Hilary Holmes Rheaume hereby certify that: (Name of the elected Officer of the Corporation/LLC; cannot be contract signatory)

1.  I am a duly elected Chairperson/Officer of the NH Coalition Against Domestic and Sexual Violence (Corporation/LLC Name).
2.  The following is a true copy of a vote taken at a meeting of the Board of Directors/shareholders, duly called and held on May 21, 2024 (Date) at which a quorum of the Directors/shareholders were present and voting.

**VOTED:** That Lyn M. Schollett, Executive Director (Name and Title of Contract Signatory)

is duly authorized on behalf of the NH Coalition Against Domestic and Sexual Violence (Name of Corporation/ LLC) to enter into contracts or agreements with the State of New Hampshire and any of its agencies or departments and further is authorized to execute any and all documents, agreements and other instruments, and any amendments, revisions, or modifications thereto, which may in his/her judgment be desirable or necessary to effect the purpose of this vote.

3.  I hereby certify that said vote has not been amended or repealed and remains in full force and effect as of the date of the contract/contract amendment to which this certificate is attached. This authority remains valid for thirty (30) days from the date of this Certificate of Authority. I further certify that it is understood that the State of New Hampshire will rely on this certificate as evidence that the person(s) listed above currently occupy the position(s) indicated and that they have full authority to bind the corporation. To the extent that there are any limits on the authority of any listed individual to bind the corporation in contracts with the State of New Hampshire, all such limitations are expressly stated herein.

Dated: April 22, 2025

*[Image description: Handwritten signature of Hilary Holmes Rheaume.] Signature of Elected Officer Name: Hilary Holmes Rheaume Title: Chairperson, Board of Directors*

Rev. 03/24/20

Source packet page 10

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C

*[Image description: Registered ACORD wordmark.]*

**CERTIFICATE OF LIABILITY INSURANCE**   DATE (MM/DD/YYYY): 04/21/2025

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER E & S Insurance Services LLC 21 Meadowbrook Lane P O Box 7425 Gilford NH 03247-7425 | CONTACT NAME: Sidney Stevens PHONE (A/C, No, Ext): (603) 293-2791 FAX (A/C, No): (603) 293-7188 E-MAIL ADDRESS: sidney@esinsurance.net |
|---|---|
| INSURED NH Coalition Against Domestic and Sexual Violence, DBA: NHCADSV PO Box 353 Concord NH 03302 | INSURER(S) AFFORDING COVERAGE — NAIC # INSURER A: Great American Insurance Group — GAIG INSURER B: Liberty Mutual Agency Corporation INSURER C: INSURER D: INSURER E: INSURER F: |

COVERAGES   CERTIFICATE NUMBER: 25   REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS |
|---|---|---|---|---|---|---|---|
| A | [X] COMMERCIAL GENERAL LIABILITY [ ] CLAIMS-MADE [X] OCCUR GEN'L AGGREGATE LIMIT APPLIES PER: [ ] POLICY [ ] PRO-JECT [ ] LOC [ ] OTHER: | | | MAC 5464236 24 | 05/15/2025 | 05/15/2026 | EACH OCCURRENCE $ 1,000,000 DAMAGE TO RENTED PREMISES (Ea occurrence) $ 100,000 MED EXP (Any one person) $ 5,000 PERSONAL & ADV INJURY $ 1,000,000 GENERAL AGGREGATE $ 3,000,000 PRODUCTS - COMP/OP AGG $ 3,000,000 Each Abuse Limit $ 1,000,000 |
| | AUTOMOBILE LIABILITY [ ] ANY AUTO [ ] OWNED AUTOS ONLY [ ] SCHEDULED AUTOS [X] HIRED AUTOS ONLY [X] NON-OWNED AUTOS ONLY | | | | | | COMBINED SINGLE LIMIT (Ea accident) $ 100,000 BODILY INJURY (Per person) $ BODILY INJURY (Per accident) $ PROPERTY DAMAGE (Per accident) $ $ |
| A | [X] UMBRELLA LIAB [ ] OCCUR [ ] EXCESS LIAB [X] CLAIMS-MADE [ ] DED [X] RETENTION $ 10,000 | | | UMB8234007-17 | 05/15/2025 | 05/15/2026 | EACH OCCURRENCE $ 1,000,000 AGGREGATE $ 1,000,000 $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? [Y] N/A (Mandatory in | | | WC5-31S-604577-025 | 05/15/2025 | 05/15/2026 | [X] PER STATUTE [ ] OTH-ER E.L. EACH ACCIDENT $ 500,000 E.L. DISEASE - EA EMPLOYEE $ 500,000 E.L. DISEASE - POLICY LIMIT $ 500,000 |

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS |
|---|---|---|---|---|---|---|---|
| | NH) If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | |
| A | Abuse & Professional | | | MAC 5464236 24 | 05/15/2025 | 05/15/2026 | Abuse Aggregate Limit 3,000,000 Professional Liability 1,000,000 Professional Aggregate 3,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

**CERTIFICATE HOLDER NH Department of Health and Human Services 129 Pleasant Street Concord NH 03301**

CANCELLATION SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORETHE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED INACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE *[Image description: Handwritten ink signature.]* [Fairley Kennedly?] © 1988-2015 ACORD CORPORATION. All  ghts reserved.

ACORD 25 (2016/03)    The ACORD name and logo are registered marks of ACORD

**Source packet page 11**

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C

*[Image description: NHCADSV logo: a circular seal, "the coalition" arcs across the top, an outline of New Hampshire at the centre, "AGAINST DOMESTIC & SEXUAL VIOLENCE" around the lower rim.]*

## NHCADSV Vision and Mission

Vision All New Hampshire communities provide safety for every person.

Mission We create safe, just, and equitable communities through advocacy, education, and empowerment of anyone affected by domestic and sexual violence, stalking, child abuse, and human trafficking.

Note: The language below will be used in grant applications and other documents to provide further clarification of what the Coalition does. The statement above is the actual Mission Statement.

This mission is accomplished by the Coalition, which includes 12 independent community-based member programs, a Board of Directors and a central staff working together to:

- Influence public policy on the local, state and national levels;
- Ensure that quality services are provided to victims;
- Promote the accountability of societal systems and communities for their responses to sexual violence, domestic violence, stalking, child abuse, and human trafficking;
- Prevent violence and abuse before they occur.

Approved March 2024

New Hampshire Coalition Against Domestic & Sexual Violence · PO Box 353 · Concord, NH 03302 · 603:224.8893

**NHCADSV.ORG**

**Source packet page 12**

Docusign Envelope ID: 7B4DC862-5CE8-4B2C-B370-BA15CF7E5CFB

*(A mostly blank title/cover sheet with centered text.)*

# NEW HAMPSHIRE COALITION AGAINST DOMESTIC AND SEXUAL VIOLENCE

AUDITED FINANCIAL STATEMENTS June 30, 2024 and 2023

SINGLE AUDIT REPORTS June 30, 2024

Source packet page 13

Docusign Envelope ID: 7B4DC862-5CE8-4B2C-B370-BA15CF7E5CFB

*(This page is the enclosed audit report's own Table of Contents.)*

## Table of Contents

|  | Page |
|---|---|
| **INDEPENDENT AUDITOR'S REPORT** | 1-2 |
| **FINANCIAL STATEMENTS** | |
| Statements of Financial Position, June 30, 2024 and 2023 | 3 |
| Statement of Activities, Year Ended June 30, 2024, With Comparative Totals for Year Ended June 30, 2023 | 4 |
| Statement of Functional Expenses, Year Ended June 30, 2024, With Comparative Totals for Year Ended June 30, 2023 | 5 |
| Statements of Cash Flows, Years Ended June 30, 2024 and 2023 | 6 |
| Notes to Financial Statements | 7-17 |
| **GOVERNMENT AUDITING STANDARDS AND SINGLE AUDIT ACT REPORTS AND SCHEDULES** | |
| INDEPENDENT AUDITOR'S REPORT on Internal Control Over Financial Reporting and on Compliance and Other Matters Based on an Audit of Financial Statements Performed in Accordance with *Government Auditing Standards* | 18-19 |
| INDEPENDENT AUDITOR'S REPORT on Compliance for Each Major Program and on Internal Control Over Compliance Required by the Uniform Guidance | 20-21 |
| **Schedule of Findings and Questioned Costs** | |
| Section I – Summary of Auditor's Results | 22 |
| Section II - Financial Statement Findings – None | 22 |
| Section III – Federal Award Findings and Questioned Costs – None | 22 |
| Schedule of Expenditures of Federal Awards | 23 |
| Notes to Schedule of Expenditures of Federal Awards | 24 |

Source packet page 14

Docusign Envelope ID: 7B4DC862-5CE8-4B2C-B370-BA15CF7E5CFB

# ROWLEY & ASSOCIATES, P.C.

CERTIFIED PUBLIC ACCOUNTANTS 46 N. STATE STREET CONCORD, NEW HAMPSHIRE 03301 TELEPHONE (603) 228-5400 FAX # (603) 226-3532

MEMBER AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS

MEMBER OF THE PRIVATE COMPANIES PRACTICE SECTION

## *INDEPENDENT AUDITOR'S REPORT*

Board of Directors New Hampshire Coalition Against Domestic and Sexual Violence Concord, New Hampshire

**Opinion**

We have audited the accompanying financial statements of New Hampshire Coalition Against Domestic and Sexual Violence (a nonprofit organization), which comprise the statement of financial position as of June 30, 2024, and the related statements of activities, functional expenses, and cash flows for the year then ended, and the related notes to the financial statements.

In our opinion, the financial statements present fairly, in all material respects, the financial position of New Hampshire Coalition Against Domestic and Sexual Violence as of June 30, 2024, and the changes in its net assets and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

We conducted our audit in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States. Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the Financial Statements section of our report. We are required to be independent of New Hampshire Coalition Against Domestic and Sexual Violence and to meet our other ethical responsibilities, in accordance with the relevant ethical requirements relating to our audit. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinions.

**Responsibilities of Management for the Financial Statements**

Management is responsible for the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about New Hampshire Coalition Against Domestic and Sexual Violence's ability to continue as a going concern within one year after the date that the financial statements are available to be issued.

**Auditor's Responsibilities for the Audit of the Financial Statements**

Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with generally accepted auditing standards and *Government Auditing Standards* will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the financial statements.

-1-

**Source packet page 15**

Docusign Envelope ID: 7B4DC862-5CE8-4B2C-B370-BA15CF7E5CFB

In performing an audit in accordance with generally accepted auditing standards and *Government Auditing Standards*, we:

- Exercise professional judgment and maintain professional skepticism throughout the audit.
- Identify and assess the risks of material misstatement of the financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements.
- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of New Hampshire Coalition Against Domestic and Sexual Violence's internal control. Accordingly, no such opinion is expressed.
- Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the financial statements.
- Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about New Hampshire Coalition Against Domestic and Sexual Violence's ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control-related matters that we identified during the audit.

**Supplementary Information**

Our audit was conducted for the purpose of forming an opinion on the financial statements as a whole. The accompanying schedule of expenditures of federal awards, as required by Title 2 U.S. *Code of Federal Regulations* Part 200, *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards*, is presented for purposes of additional analysis and is not a required part of the financial statements. Such information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the financial statements. The information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, the schedule of expenditures of federal awards is fairly stated, in all material respects, in relation to the financial statements as a whole.

**Other Reporting Required by *Government Auditing Standards***

In accordance with *Government Auditing Standards*, we have also issued our report dated November 12, 2024, on our consideration of New Hampshire Coalition Against Domestic and Sexual Violence's internal control over financial reporting and on our tests of its compliance with certain provisions of laws, regulations, contracts, and grant agreements and other matters. The purpose of that report is solely to describe the scope of our testing of internal control over financial reporting and compliance and the results of that testing, and not to provide an opinion on the effectiveness of New Hampshire Coalition Against Domestic and Sexual Violence's internal control over financial reporting or on compliance. That report is an integral part of an audit performed in accordance with *Government Auditing Standards* in considering New Hampshire Coalition Against Domestic and Sexual Violence's internal control over financial reporting and compliance.

**Report on Summarized Comparative Information**

We have previously audited the New Hampshire Coalition Against Domestic and Sexual Violence's 2023 financial statements, and we expressed an unmodified audit opinion on those audited financial statements in our report dated October 26, 2023. In our opinion, the summarized comparative information presented herein as of and for the year ended June 30, 2023, is consistent, in all material respects, with the audited financial statements from which it has been derived.

*[Image description: Handwritten signature reading "Rowley & Associates, PC".]*

Rowley & Associates, P.C. Concord, New Hampshire November 12, 2024

-2-

Source packet page 16

Docusign Envelope ID: 7B4DC862-5CE8-4B2C-B370-BA15CF7E5CFB

**New Hampshire Coalition Against Domestic and Sexual Violence Statements of Financial Position June 30, 2024 and June 30, 2023 See Independent Auditors' Report**

|  | 2024 | 2023 |
|---|---|---|
| ASSETS |  |  |
| CURRENT ASSETS |  |  |
| Cash and Cash Equivalents | $ 397,560 | $ 347,404 |
| Restricted Cash and Cash Equivalents | 18,931 | 73,044 |
| Certificates of Deposit, Short-Term | 310,300 | 218,264 |
| Grants Receivable | 2,304,957 | 2,471,765 |
| Prepaid Expenses | 27,436 | 27,226 |
| Total Current Assets | 3,059,184 | 3,137,703 |
| PROPERTY AND EQUIPMENT |  |  |
| Equipment | 14,654 | 14,654 |
| Leasehold Improvements | 61,072 | 61,072 |
|  | 75,726 | 75,726 |
| Less Accumulated Depreciation | (49,132) | (42,061) |
| Total Property and Equipment, Net | 26,594 | 33,665 |
| OTHER ASSETS |  |  |
| Long-Term Investments | 489,681 | 432,178 |
| Certificates of Deposit, Long-Term | 206,585 | 204,166 |
| Operating Lease Right of Use Asset | 358,559 | 456,259 |
| Finance Lease Right of Use Asset | 4,605 | 8,068 |
| Security Deposit | 6,213 | 6,213 |
| Total Other Assets | 1,065,643 | 1,106,884 |
| Total Assets | $ 4,151,421 | $ 4,278,252 |
| LIABILITIES AND NET ASSETS |  |  |
| CURRENT LIABILITIES |  |  |
| Grants and Accounts Payable | $ 1,932,525 | $ 2,058,023 |
| Accrued Expenses | 100,956 | 94,245 |
| Operating Lease Liability, Current Portion | 110,223 | 106,546 |
| Finance Lease Liability, Current Portion | 3,776 | 3,776 |
| Total Current Liabilities | 2,147,480 | 2,262,590 |
| LONG-TERM LIABILITIES |  |  |
| Operating Lease Liability, Less Current Portion | 264,697 | 349,713 |
| Finance Lease Liability, Less Current Portion | 717 | 4,292 |
| Total Long-Term Liabilities | 265,414 | 354,005 |
| NET ASSETS |  |  |
| Without Donor Restrictions | 1,719,596 | 1,588,613 |
| With Donor Restrictions | 18,931 | 73,044 |
| Total Net Assets | 1,738,527 | 1,661,657 |
| Total Liabilities and Net Assets | $ 4,151,421 | $ 4,278,252 |

Notes to Financial Statements -3-

Source packet page 17

Docusign Envelope ID: 7B4DC862-5CE8-4B2C-B370-BA15CF7E5CFB

# New Hampshire Coalition Against Domestic and Sexual Violence

## Statements of Activities and Changes in Net Assets

*Year Ended June 30, 2024, With Comparative Totals for Year Ended June 30, 2023*

*See Independent Auditors' Report*

| | Net Assets Without Donor Restrictions | Net Assets With Donor Restrictions | 2024 | 2023 |
|---|---|---|---|---|
| **CONTRIBUTIONS AND SUPPORT** | | | | |
| Grant Revenue | $10,850,708 | $16,900 | $10,867,608 | $11,312,301 |
| Contributions | 212,880 | — | 212,880 | 189,821 |
| Donated Services | 7,264 | — | 7,264 | 29,648 |
| Interest Income | 13,677 | — | 13,677 | 4,880 |
| Member Dues | 12,000 | — | 12,000 | 12,000 |
| Miscellaneous Income | — | — | — | 144 |
| *Total Contributions and Support* | *11,096,529* | *16,900* | *11,113,429* | *11,548,794* |
| Net Assets Released from Donor Imposed Restrictions | 71,013 | (71,013) | — | — |
| **EXPENSES** | | | | |
| Program Services | 10,958,511 | — | 10,958,511 | 11,334,314 |
| Management and General | 77,414 | — | 77,414 | 81,833 |
| Fundraising | 58,138 | — | 58,138 | 51,432 |
| *Total Expenses* | *11,094,063* | — | *11,094,063* | *11,467,579* |
| **INCREASE (DECREASE) IN OPERATING NET ASSETS** | 73,479 | (54,113) | 19,366 | 81,215 |
| **NONOPERATING GAINS** | | | | |
| Investment Dividends | 9,174 | — | 9,174 | 7,339 |
| Unrealized and Realized Gains | 50,125 | — | 50,125 | 34,222 |
| Investment Fees | (1,795) | — | (1,795) | (1,978) |
| *Net Nonoperating Gains* | *57,504* | — | *57,504* | *39,583* |
| **INCREASE (DECREASE) IN NET ASSETS** | 130,983 | (54,113) | 76,870 | 120,798 |
| **NET ASSETS AT BEGINNING OF YEAR** | 1,588,613 | 73,044 | 1,661,657 | 1,540,859 |
| **NET ASSETS AT END OF YEAR** | **$1,719,596** | **$18,931** | **$1,738,527** | **$1,661,657** |

Notes to Financial Statements

-4-

Source packet page 18

Docusign Envelope ID: 7B4DC862-5CE8-4B2C-B370-BA15CF7E5CFB

## New Hampshire Coalition Against Domestic and Sexual Violence

## Statement of Functional Expenses

*Year Ended June 30, 2024, With Comparative Totals for Year Ended June 30, 2023*

*See Independent Auditors' Report*

| | Program Services | Management & General | Fundraising | Total 2024 | Total 2023 |
|---|---|---|---|---|---|
| Salaries | $1,105,072 | $47,453 | $33,790 | $1,186,315 | $1,285,773 |
| Payroll taxes | 82,272 | 3,531 | 2,472 | 88,275 | 96,380 |
| Health and Dental Insurance | 149,655 | 6,498 | 6,292 | 162,445 | 156,035 |
| Other Employee Benefits | 34,756 | 1,448 | — | 36,204 | 32,473 |
| Professional Services | 58,220 | 2,426 | — | 60,646 | 81,924 |
| Contract/Grant Services | 8,766,008 | — | — | 8,766,008 | 8,911,330 |
| Survivor Grants | 77,500 | — | — | 77,500 | 90,225 |
| Rental Assistance | 129,048 | — | — | 129,048 | 225,027 |
| Memberships | 9,640 | 402 | — | 10,042 | 7,358 |
| Publications | 2,252 | 94 | — | 2,346 | 2,055 |
| Advertising/Public Awareness | 8,288 | 387 | 995 | 9,670 | 3,228 |
| Copying | 3,964 | 165 | — | 4,129 | 4,181 |
| Office Supplies | 30,579 | 1,412 | 3,311 | 35,302 | 39,155 |
| Postage | 2,015 | 103 | 459 | 2,577 | 3,132 |
| Printing | 888 | 123 | 2,058 | 3,069 | 3,517 |
| File storage management | — | — | — | — | 791 |
| Maintenance & Repair | 21,802 | 908 | — | 22,710 | 32,743 |
| Rent Expense | 102,284 | 4,262 | — | 106,546 | 103,011 |
| Insurance | 14,750 | 615 | — | 15,365 | 14,227 |
| Staff Development | 45,975 | 1,916 | — | 47,891 | 31,591 |
| Travel | 27,548 | 1,153 | 116 | 28,817 | 33,029 |
| Telephone | 58,309 | 2,430 | — | 60,739 | 62,930 |
| Technology | 111,460 | — | — | 111,460 | 145,069 |
| Miscellaneous Expense | 3,480 | 505 | 8,645 | 12,630 | 28,168 |
| AVAP Member Training/Education | — | — | — | — | 8,368 |
| Direct Training | 30,439 | — | — | 30,439 | 22,340 |
| Community Education | 44,306 | — | — | 44,306 | 19,352 |
| Depreciation Expense | 6,787 | 283 | — | 7,070 | 8,510 |
| Change in Operating Asset/Liability | 15,708 | 654 | — | 16,362 | — |
| Accounting Fees | 15,506 | 646 | — | 16,152 | 15,657 |
| **Total Expenses** | **$10,958,511** | **$77,414** | **$58,138** | **$11,094,063** | **$11,467,579** |

Notes to Financial Statements

-5-

Source packet page 19

Docusign Envelope ID: 7B4DC862-5CE8-4B2C-B370-BA15CF7E5CFB

**New Hampshire Coalition Against Domestic and Sexual Violence Statements of Cash Flows Years Ended June 30, 2024 and 2023 See Independent Auditors' Report**

|  | 2024 | 2023 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Increase in Net Assets | $ 76,870 | $ 120,798 |
| Adjustments to Reconcile Increase in Net Assets to Net Cash Provided by Operating Activities | | |
| Depreciation | 7,070 | 8,510 |
| Net (Gain) Loss on Investments | (57,504) | (39,583) |
| Net Change in Operating Asset/Liability | 16,362 | - |
| (Increase) Decrease in Operating Assets: | | |
| Grants Receivable | 166,808 | (210,652) |
| Prepaid Expenses | (210) | (2,217) |
| Increase (Decrease) in Operating Liabilities: | | |
| Grants and Accounts Payable | (125,498) | 327,506 |
| Accrued Expenses | 6,711 | 2,604 |
| **NET CASH PROVIDED BY OPERATING ACTIVITES** | 90,609 | 206,966 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Net (Purchase) Maturity of Certificates of Deposit | (94,454) | (251,294) |
| **NET CASH USED BY INVESTING ACTIVITIES** | (94,454) | (251,294) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Net amortization, payments on finance lease | (112) | - |
| **NET CASH USED BY FINANCING ACTIVITES** | (112) | - |
| **NET DECREASE IN CASH AND CASH EQUIVALENTS** | (3,957) | (44,328) |
| **CASH AND CASH EQUIVALENTS, AT BEGINNING OF YEAR** | 420,448 | 464,776 |
| **CASH AND CASH EQUIVALENTS, AT END OF YEAR** | $ 416,491 | $ 420,448 |
| **SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION** | | |
| Donated Services | $ 7,264 | $ 29,648 |

Notes to Financial Statements

-6-

Source packet page 20

Docusign Envelope ID: 7B4DC862-5CE8-4B2C-B370-BA15CF7E5CFB

## New Hampshire Coalition Against Domestic and Sexual Violence

## Notes to Financial Statements

*Years Ended June 30, 2024 and 2023*

### NOTE A-NATURE OF ACTIVITIES AND SIGNIFICANT ACCOUNTING POLICIES

**Nature of Activities**

The Coalition is a private, non-profit, tax-exempt organization committed to ending domestic and sexual violence. The Coalition serves as a coordinating organization for its 12-member agency crisis centers that in turn provide services to survivors of sexual assault, domestic violence, human trafficking, and stalking. Eleven of the Coalition's member agencies are autonomous, private, non-profit organizations with their own mission, structure, and board of directors; one is a university-based program. The Coalition receives 98% of its funding from federal and state agencies and less than 2% from private fundraising.

**The Vision of the Coalition is:**

All New Hampshire communities provide safety for every person.

**The Mission of the Coalition is:**

The New Hampshire Coalition Against Domestic & Sexual Violence creates safe, just, and equitable communities through advocacy, education, and empowerment of anyone affected by domestic and sexual violence, stalking, child abuse, and human trafficking.

This mission is accomplished by the Coalition, which includes 12 independent community-based member programs, a Board of Directors and a central staff working together to:

- Influence public policy on the local, state and national levels;
- Ensure that quality services are provided to victims;
- Promote the accountability of societal systems and communities for their responses to sexual violence, domestic violence, stalking, child abuse, and human trafficking;
- Prevent violence and abuse before they occur.

To elaborate on the above mission and vision statements, the Coalition supports member agency staff with specialized training, resources and technical assistance; convenes member agency staff to facilitate shared learning and peer support; and collects and disseminates best practices and current information. The Coalition supports the development of new services and serves as a statewide clearinghouse and coordinating organization related to victim services. It administers state and federal contracts that provide funding for its member programs.

Coalition staff provide education and training to court and law enforcement officials and attorneys, and collaborate with legal assistance organizations that provide lawyers for survivors and their families. Coalition staff work to promote cross-system collaboration with child protective services and child advocacy centers to assure safety for children exposed to or who have experienced domestic and sexual violence, and for their parents. Coalition staff participate on numerous statewide boards and commissions to advocate for effective responses to victims.

The Coalition's Public Affairs staff work closely with other advocacy groups, legislators and survivors to draft legislation, organize testimony, and advocate for policy changes throughout the legislative session. The Coalition either takes an active role in or tracks close to 150 bills each legislative session. These bills address a wide range of issues including domestic and sexual violence; stalking; family law; divorce and child custody/visitation/support; reproductive rights; law enforcement and courts; privacy and personal information; healthcare; and economic justice.

-7-

Source packet page 21

Docusign Envelope ID: 7B4DC862-5CE8-4B2C-B370-BA15CF7E5CFB

# New Hampshire Coalition Against Domestic and Sexual Violence

## Notes to Financial Statements

*Years Ended June 30, 2024 and 2023*

**NOTE A-NATURE OF ACTIVITIES AND SIGNIFICANT ACCOUNTING POLICIES, (continued)**

**Nature of Activities (Continued)**

Coalition staff also provide resources and sources for responsible news media and reporting. Coalition staff create and distribute statewide communications materials to raise awareness about sexual assault, domestic violence, prevention and services available to victims.

The Coalition plays a key leadership role in efforts to prevent domestic and sexual violence throughout New Hampshire. Coalition staff collaborate with state and local entities to support policies and practices to advance effective prevention education. Coalition staff are proactive in educating the public about the causes and effects of domestic and sexual violence and stalking and as well as services available across the state. The Coalition has sponsored research on the prevalence of violence in New Hampshire.

The Coalition also manages several specific programs to assist its member crisis centers and the public. The following are three distinct programs that directly affect survivors of domestic violence, sexual violence and stalking:

**AmeriCorps Victim Assistance Program (AVAP)**

The AmeriCorps Victim Assistance Program (AVAP) has been a flagship program of the Coalition since 1994 and a valuable pathway for new advocates to join the New Hampshire victim services community. Throughout its 29 years, the program has provided invaluable service to victims of sexual assault and domestic violence in New Hampshire. AVAP members have assisted over 46,000 victims and survivors, and the program has provided robust training and valuable professional experiences for over 500 members through its focus on victim-centered, trauma-informed advocacy.

Over the past decade, however, membership has steadily declined each year. While members have continued to provide resoundingly positive feedback about their experiences in the program and the meaningful impact it has had on their career development, AVAP has sadly become unsustainable for the Coalition to operate with only a few members. Ahead of the upcoming 2023-24 service year, the Leadership Team here at the Coalition made the difficult decision to discontinue the program.

**Sexual Assault Nurse Examiner (SANE) Program**

A Sexual Assault Nurse Examiner (SANE) is a Registered Nurse who has been specially trained to provide comprehensive care to sexual assault survivors, who demonstrates competency in conducting medical/forensic examinations and who has the ability to be a witness in a sexual assault prosecution. Coalition staff are responsible for training and working with registered SANEs and medical professionals across the state to ensure that sexual assault victims receive consistent and professional care during forensic exams.

**Housing and Economic Justice Program**

The Coalition's Housing and Economic Justice Program aims to support the 12 member programs with implementation and technical assistance of our HUD-funded Rapid Rehousing program, Housing First Program, and the Allstate Economic Justice and Matched Savings Program. The Housing and Economic Justice Manager (HEJM) helps support advocates on the ground who provide housing and economic justice services to survivors through training, identifying community resources, and supporting best practices in grant administration and management. The HEJM oversees the approval of funding requests and manages the completion of matched savings requests for survivors receiving financial literacy services at our member programs.

-8-

Source packet page 22

Docusign Envelope ID: 7B4DC862-5CE8-4B2C-B370-BA15CF7E5CFB

## New Hampshire Coalition Against Domestic and Sexual Violence

## Notes to Financial Statements

*Years Ended June 30, 2024 and 2023*

### NOTE A-NATURE OF ACTIVITIES AND SIGNIFICANT ACCOUNTING POLICIES, (continued)

**Nature of Activities (Continued)**

**The Family Violence Prevention Specialist Program**

Research shows a high correlation (40-60%) between the perpetration of domestic violence and the perpetration of child abuse and neglect in the same family. The Family Violence Prevention Specialist Program was built on the principle that abused and neglected children are best served when they can remain in a safe household with a non-violent parent.

The Family Violence Prevention Specialist program began in 1998 as a coordinated effort between the Coalition and the Division for Children, Youth, and Families (DCYF). Family Violence Prevention Specialists (FVPSs) are employed by local member agencies of the Coalition, and are co-located at local DCYF District Offices. The FVPSs are a source of assistance and training to child protective service workers while providing advocacy services to victims of domestic violence involved with DCYF. This program results in more effective assistance to victims through the development of interventions that recognize the adult victim's need for support and advocacy in order to improve safety outcomes for children.

**Human Trafficking Program**

The Coalition leads and coordinates the NH Human Trafficking Collaborative Task Force and is the primary point of contact for Task Force Members, Crisis Center Advocates, allied professionals, and community members with questions or concerns about trafficking. The Coalition's Program Director and Program Specialist ensure that professionals around the state are connected to one another and able to work collaboratively and are supported with trainings and resources they need to identify human trafficking, provide comprehensive victim services, and prosecute offenders.

Human trafficking impacts people of all backgrounds and has been identified in all of New Hampshire's 10 counties. Traffickers utilize power and control to exploit their victims, and the effects can be highly traumatic and difficult to address, particularly when it isn't always easy for even the victim themselves to identify that what they are experiencing is actually trafficking.

Areas of focus for the Coalition's human trafficking team:

- Provide training and technical assistance to crisis center advocates who provide direct services to trafficking victims
- Sustain and enhance the multidisciplinary Task Force as a platform for both collaboration and communication.
- Provide trainings for professionals and community members
- Facilitate connections between victim services, law enforcement, and other service providers
- Raise community awareness of the dynamics of trafficking
- Advocate for appropriate policy and legislative changes where necessary

**Significant Accounting Policies**

The financial statements of the Coalition have been prepared in conformity with Generally Accepted Accounting Principles (GAAP) as applied to not-for-profits. The Financial Accounting Standards Board (FASB) is the accepted standard-setting body for establishing accounting and financial reporting principles for not-for-profits. The more significant of the FASB's generally accepted accounting principles applicable to the Coalition, and the Coalition's conformity with such principles, are described below. These disclosures are an integral part of the Coalition's financial statements.

-9-

Source packet page 23

Docusign Envelope ID: 7B4DC862-5CE8-4B2C-B370-BA15CF7E5CFB

# New Hampshire Coalition Against Domestic and Sexual Violence

## Notes to Financial Statements

*Years Ended June 30, 2024 and 2023*

### NOTE A-NATURE OF ACTIVITIES AND SIGNIFICANT ACCOUNTING POLICIES, (continued)

**Basis of Presentation**

The Coalition reports information regarding its financial position and activities according to two classes of net assets: net assets without donor restrictions and net assets with donor restrictions.

Net assets without donor restrictions - These net assets generally result from revenues generated by receiving contributions that have no donor restrictions, providing services, and receiving interest from operating investments, less expenses incurred in providing program-related services raising contributions, and performing administrative functions.

Net assets with donor restrictions - These net assets result from gifts of cash and other assets that are received with donor stipulations that limit the use of the donated assets, either temporarily or permanently, until the donor restriction expires, that is until the stipulated time restriction ends or the purpose of the restriction is accomplished.

**Basis of Accounting**

The financial statements of the Coalition have been prepared on the accrual basis of accounting and accordingly reflect all significant receivables, payables and other liabilities.

**Grants Receivable and Promises to Give**

Contributions are recognized when the donor makes a promise to give to the Coalition that is, in substance, unconditional. Contributions that are restricted by the donor are reported as increases in net assets without donor restrictions if the restrictions expire in the fiscal year in which the contributions are recognized. All other donor-restricted contributions are reported as increases in net assets with donor restrictions. When a restriction expires, net assets with donor restrictions are reclassified to net assets without donor restrictions.

**Contributed Services**

During the Years Ended June 30, 2024 and 2023, the value of contributed services relating to professional services were $7,264 and $29,648, respectively. All contributed services were considered without donor restriction and were valued at fair-market-value.

In addition, many individuals volunteer their time and perform a variety of tasks that assist the Coalition; these amounts have not been recognized in the accompanying statement of activities because the criteria for recognition as contributed services has not been met.

**Estimates**

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect certain reported amounts and disclosures. Accordingly, actual results could differ from those estimates.

**Compensated Absences**

Employees of the Coalition are entitled to paid vacation depending on job classification, length of services, and other factors. The statement of financial position reflects accrued vacation earned, but unpaid as of June 30, 2024 and 2023 in the amounts of $78,747 and $70,695, respectively.

-10-

Source packet page 24

Docusign Envelope ID: 7B4DC862-5CE8-4B2C-B370-BA15CF7E5CFB

# New Hampshire Coalition Against Domestic and Sexual Violence

## Notes to Financial Statements

*Years Ended June 30, 2024 and 2023*

### NOTE A-NATURE OF ACTIVITIES AND SIGNIFICANT ACCOUNTING POLICIES, (continued)

**Allocation of Expenses**

The costs of providing the various programs and other activities have been summarized on a functional basis in the statements of activities and functional expenses. Accordingly, certain costs have been allocated among the programs and supporting services benefited based on estimates that are based on their relationship to those activities. Those expenses include payroll and payroll related expenses and occupancy costs. Occupancy costs are allocated based on square footage. Payroll and payroll related expenses are based on estimates of time and effort. Other cost allocations are based on the relationship between the expenditure and the activities benefited.

**Property and Equipment**

It is the Coalition's policy to capitalize property and equipment over $2,500 and all expenditures for repairs, maintenance, renewals and betterments that prolong the useful lives of assets. Lesser amounts are expensed. Purchased property and equipment is capitalized at cost. Donations of property and equipment are recorded as contributions at their estimated fair value. Such donations are reported as contributions without donor restriction unless the donor has restricted the donated asset to a specific purpose. Assets donated with explicit restrictions regarding their use and contributions of cash that must be used to acquire property and equipment are reported as restricted contributions. Absent donor stipulations regarding how long those donated assets must be maintained, the Coalition reports expiration of donor restrictions when the donated or acquired assets are placed in service as instructed by the donor. The Coalition reclassifies net assets with donor restrictions to net assets without donor restrictions at that time. Property and equipment are depreciated using the straight-line method. The ranges of useful lives are as follows:

| | |
|---|---|
| **Improvements** | **39 Years** |
| Equipment | 3-7 Years |

Depreciation expense recorded by the Coalition for the Years Ended June 30, 2024 and 2023 was $7,070 and $8,510, respectively.

**Income taxes**

The Coalition has been notified by the Internal Revenue Service that it is exempt from federal income tax under Section 501(c) (3) of the Internal Revenue Code. The Coalition is further classified as an organization that is not a private foundation under Section 509(a)(3) of the Code. The most significant tax positions of the Coalition are its assertion that it is exempt from income taxes and its determination of whether any amounts are subject to unrelated business tax (UBIT). The Coalition follows the guidance of Accounting Standards Codification (ASC) 740, Accounting for Income Taxes, related to uncertain income taxes, which prescribes a threshold of more likely than not for recognition of tax positions taken or expected to be taken in a tax return.

**Cash and Cash Equivalents**

For purposes of the statements of cash flows, the Coalition considers all highly liquid investments (short-term investments such as certificates of deposits and money market accounts) with an initial maturity of three months or less to be cash equivalents. The following table provides a reconciliation of cash and cash equivalents reported within the statement of financial position to the sum of the corresponding amounts within the statement of cash flows as of June 30:

| | 2024 | 2023 |
|---|---|---|
| Cash and Cash Equivalents | $397,560 | $347,404 |
| Restricted Cash and Cash Equivalents | 18,931 | 73,044 |
| Total | $416,491 | $420,448 |

*(Note A continues onto the next page of the source document, outside this file's coverage.)*

-11-

Source packet page 25

*Docusign Envelope ID: 7B4DC862-5CE8-4B2C-B370-BA15CF7E5CFB*

**New Hampshire Coalition Against Domestic and Sexual Violence Notes to Financial Statements** Years Ended June 30, 2024 and 2023

## NOTE A-NATURE OF ACTIVITIES AND SIGNIFICANT ACCOUNTING POLICIES, (continued)

### Certificates of Deposit

Certificates of deposit are reported on the accompanying statement of financial position. The certificates bear interest ranging from 1.00% to 4.91% as of June 30, 2024. Maturities range from two months to one and a half years.

### Segregation of Accounts

Under Title I, New Hampshire, The State and Its Government, Chapter 15 Lobbyist Section 15:1-a, the Coalition is required to physically and financially separate state funds from any non-state funds that may be used for the purposes of lobbying or attempting to influence legislation, participate in political activity, or contribute funds to any entity engaged in these activities. The Coalition has established and maintains a separate bank account for this purpose. The account balances were $31,467 and $31,013 at June 30, 2024 and 2023, respectively.

### Concentration of Credit Risk

The Coalition maintains cash and CD balances in accounts at three local banks. These accounts are insured by the Federal Deposit Insurance Corporation up to $250,000. At various times throughout the year, the Coalition may have cash balances at the financial institution that exceeds the insured amount. Management does not believe this concentration of cash results in a high level of risk for the Coalition. At June 30, 2024 and 2023 the Coalition had uninsured cash balances of $426,576 and $336,578, respectively.

### Advertising Costs

The Coalition follows the policy of charging the production costs of advertising to expense as incurred. Advertising expense at June 30, 2024 and 2023 was $9,670 and $3,228 respectively.

### Comparative Financial Information

The financial statements include certain prior-year summarized comparative information in total but not by net asset class. Such information does not include sufficient detail to constitute a presentation in conformity with generally accepted accounting principles. Accordingly, such information should be read in conjunction with the Coalition's financial statements for the year ended June 30, 2023, from which the summarized information was derived.

### Financial Instruments

The carrying value of cash and cash equivalents, certificates of deposit, grants receivable, prepaid expenses, accounts payable and accrued expenses are stated at carrying cost at June 30, 2024 and 2023, which approximates fair value due to the relatively short maturity of these instruments. Other financial instruments held at year-end are investments, which are stated at fair value.

### Subsequent Event

Management has evaluated subsequent events through November 12, 2024, the date on which the financial statements were available to be issued to determine if any are of such significance to require disclosure. It has been determined that no other subsequent events matching this criterion occurred during this period.

-12-

Source packet page 26

*Docusign Envelope ID: 7B4DC862-5CE8-4B2C-B370-BA15CF7E5CFB*

**New Hampshire Coalition Against Domestic and Sexual Violence Notes to Financial Statements** Years Ended June 30, 2024 and 2023

## NOTE A-NATURE OF ACTIVITIES AND SIGNIFICANT ACCOUNTING POLICIES, (continued)

### Leases

The Coalition recognizes ASU 2016-02, *Leases* (Topic 842). A lessee is required to recognize assets and liabilities for leases with lease terms of more than twelve months. Consistent with current GAAP, the recognition, measurement, and presentation of expenses and cash flows arising from a lease by a lessee primarily depends on its classification as a finance or operating lease. The ASU requires both types of leases to be recognized on the statement of financial position.

For leases with term of less than twelve months, the Coalition will elect the short-term lease recognition exemption for all applicable classes of underlying assets.

## NOTE B - BOARD DESIGNATED NET ASSETS

The Coalition has net assets designated for various future needs. These funds are comprised of the following as of June 30:

|  | 2024 | 2023 |
|---|---|---|
| Fund for Grace | $ 54,645 | $ 59,932 |
| Operating Reserve | 148,665 | 148,665 |
|  | $ 203,310 | $ 208,597 |

## NOTE C - NET ASSETS WITH DONOR RESTRICTIONS

Net assets with donor restrictions consist of funds received by the Coalition, restricted as to use or time. The restrictions are considered to expire when payments are made. As of June 30, 2024 and 2023 respectively, the net assets with donor restrictions are available for the following purpose:

|  | 2024 | 2023 |
|---|---|---|
| Human Trafficking Services | $ - | $ 55,575 |
| Economic Support to Survivors | 18,931 | 17,469 |
| Total | $ 18,931 | $ 73,044 |

Net assets in the amount of $71,013 and $48,756 were released from donor restrictions by incurring expenses satisfying the restricted purpose during the years ended June 30, 2024 and 2023, respectively.

## NOTE D - PENSION PLAN

The Coalition has a 403(b) savings plan for the benefit of its employees. The plan covers substantially all employees after one year of service. During their budgeting process, the Board of Directors determines the amount to be contributed annually. Employer contributions for the Years Ended June 30, 2024 and 2023 totaled $34,016 and $28,343, respectively.

## NOTE E - LINE OF CREDIT

The Coalition has a one-year $150,000 revolving line of credit agreement with Merrimack County Savings Bank. The credit line matures on May 20, 2025 and automatically renews annually. Interest is stated at the Wall Street Journal prime rate plus .5%, which resulted in interest rates of 9.00% and 8.75% as of June 30, 2024 and 2023, respectively. The line of credit is secured by all business assets. There were no borrowings against the line as of June 30, 2024 and 2023.

-13-

Source packet page 27

Docusign Envelope ID: 7B4DC862-5CE8-4B2C-B370-BA15CF7E5CFB

**New Hampshire Coalition Against Domestic and Sexual Violence**
**Notes to Financial Statements**
**Years Ended June 30, 2024 and 2023**

## NOTE F – FAIR VALUE MEASUREMENTS

In accordance with FASB ASC 820, *Fair Value Measurements and Disclosures*, the Coalition is required to disclose certain information about its financial assets and liabilities. Fair values of assets measured on a recurring basis at June 30 were as follows:

| 2024 | Fair Value | Quoted Prices In Active Markets For Identical Assets (Level 1) |
|---|---|---|
| Investments | $ 489,681 | $ 489,681 |
| Certificates of Deposit | 516,885 | 516,885 |
| | $1,006,566 | $1,006,566 |
| **2023** | | |
| Investments | $ 432,178 | $ 432,178 |
| Certificates of Deposit | 422,430 | 422,430 |
| | $ 854,608 | $ 854,608 |

Fair values for investments were determined by reference to quoted market prices and other relevant information generated by market transactions.

## NOTE G – LIQUIDITY & AVAILABILITY OF FINANCIAL ASSETS

The Coalition has a policy to structure its financial assets to be available as its general expenditures, liabilities and other obligations come due. The Coalition's primary source of support is grants. That support is held for the purpose of supporting the Coalition's budget. The Coalition had the following financial assets that could be readily made available within one year to fund expenses without limitations:

| | 2024 | 2023 |
|---|---|---|
| Cash and Cash Equivalents | $ 416,491 | $ 420,448 |
| Certificates of deposit, short-term | 310,300 | 218,264 |
| Grants Receivable, net of Grants Payable | 372,432 | 413,742 |
| Less Amounts: With Donor Imposed Restriction | (18,931) | (73,044) |
| | $1,080,292 | $ 979,410 |

## NOTE H – INVESTMENTS

Investments are presented in the financial statements at fair-market value. Investments at June 30, 2024 and 2023 are composed of the following:

| | 2024 | | 2023 | |
|---|---|---|---|---|
| | Cost | Market | Cost | Market |
| Equity Mutual Funds | $ 49,289 | $ 76,208 | $ 52,185 | $ 68,789 |
| Mutual Funds | 150,081 | 137,677 | 138,440 | 124,569 |
| Money Market | 33,750 | 33,750 | 33,519 | 33,519 |
| Exchange traded funds | 178,649 | 242,046 | 170,824 | 205,301 |
| Total | $ 411,769 | $ 489,681 | $ 394,968 | $ 432,178 |

-14-

Source packet page 28

*Docusign Envelope ID: 7B4DC862-5CE8-4B2C-B370-BA15CF7E5CFB*

**New Hampshire Coalition Against Domestic and Sexual Violence Notes to Financial Statements** Years Ended June 30, 2024 and 2023

## NOTE H - INVESTMENTS, (continued)

FASB Accounting Standards Codification Topic 820-10 *Fair Value Measurements* defines fair value, requires expanded disclosures about fair value measurements, and establishes a three-level hierarchy for fair value measurements based on the observable inputs to the valuation of an asset or liability at the measurement date. Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. It prioritizes the inputs to the valuation techniques used to measure fair value by giving the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (Level 1 measurement) and the lowest priority to measurements involving significant unobservable inputs (Level 3 measurement).

Under Topic 820-10, the three levels of the fair value hierarchy are as follows:

**Level 1** inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities that the Coalition has the ability to access at the measurement date. **Level 2** inputs are inputs other than quoted prices included in Level 1 that are either directly or indirectly observable for the assets or liabilities. **Level 3** inputs are unobservable inputs for the assets or liabilities.

The level in the fair value hierarchy within which a fair measurement in its entirety falls is based on the lowest level input that is significant to the fair value measurement in its entirety.

All investments are measured at Level 1. Inputs to the valuation methodology are unadjusted quoted prices for identical assets in active markets.

The individual investments contain net assets without donor restrictions. Investments in marketable equity securities and marketable debt securities are carried at fair market value determined by "quoted market prices" per unit (share) as of the statement of financial position date. All other investments are stated at cost. Donated investments are recorded at the mean of the high and low price as of the date of receipt. Gains and losses on investments are reported as increases or decreases in net assets without donor restrictions, unless their use is restricted by explicit donor stipulation or by law.

### Spending Policy

Each fiscal year the Coalition is authorized to withdraw up to 5% of the total market value of the total portfolio of the Fund. The amount available to be withdrawn in a fiscal year will be up to 5% of the Fund market value as of the last business day of the fiscal third quarter of the preceding fiscal year. Only with the approval of a majority vote of the Board of Directors, present at a meeting duly called for such purpose, may the Coalition exceed the 5% spending cap.

### Investment Return Objectives, Risk Parameters and Strategies

The Coalition Board of Directors is responsible for developing policies that govern investment of the assets of the Coalition. The purpose of the following Investment Policy, which is to be reviewed annually by the Finance Committee of the Coalition are to:

- Establish the investment objectives, policies, guidelines and eligible securities relating to investments owned or controlled by the Coalition through a third-party investment advisor.
- Identify the criteria against which the investment performance of the Coalition's investments will be measured.
- Communicate the objectives to the Board of Directors, investment managers and funding sources that may have involvement.
- Serve as a review document to guide the ongoing oversight of the management of the Coalition's investments.

-15-

Source packet page 29

*Docusign Envelope ID: 7B4DC862-5CE8-4B2C-B370-BA15CF7E5CFB*

**New Hampshire Coalition Against Domestic and Sexual Violence Notes to Financial Statements** Years Ended June 30, 2024 and 2023

## NOTE I - LEASING ACTIVITIES

### Operating Lease

The Coalition entered a ten-year lease agreement for office and parking spaces on March 1, 2018 which expires February 28, 2028. The lease agreement includes 4% annual escalations each year on the anniversary of the lease term for office space. Rent for parking has remained fixed although it can be increased no more than 2% each anniversary. Rent expense related to the lease was $106,546 and $103,011 for the years ended June 30, 2024 and 2023 respectively.

The Coalition has elected the option to use the risk-free rate determined using a period comparable to the lease terms as the discount rate for leases where the implicit rate is not readily determinable. The risk-free rate option has been applied to the office and parking assets.

Total right-of-use assets and lease liabilities at June 30, 2024 are as follows:

Lease Assets - Classification in Statement of Financial Position Operating Lease Right of Use Asset    $ 358,559

Lease Liabilities - Classification in Statement of Financial Position:

| | |
|---|---|
| **Operating Lease Liability, Current Portion** | **110,223** |
| Operating Lease Liability, Long-Term Portion | 264,697 |
| Total | **$ 374,920** |

The weighted-average remaining lease term and weighted-average discount rate are as follows:

Weighted-average remaining lease term in years: 4.67

Weighted-average discount rate: 5.20%

The future minimum lease payments on this agreement as of June 30 are:

| | |
|---|---|
| **2025** | **$ 110,223** |
| 2026 | 114,047 |
| 2027 | 118,023 |
| 2028 | 80,496 |
| Total payments | 422,789 |
| Net present value discount | (47,869) |
| Present Value of lease liabilities | **$ 374,920** |

### Finance Lease

The Coalition leases office equipment under a finance lease agreement. The lease is for four-years, expiring October 31, 2025. The annual rent expense is $3,776 per year and is included in office supplies on the statement of activities.

The Coalition has elected the option to use the risk-free rate determined using a period comparable to the lease terms as the discount rate for leases where the implicit rate is not readily determinable. The risk-free rate option has been applied to the office equipment.

-16-

Source packet page 30

*Docusign Envelope ID: 7B4DC862-5CE8-4B2C-B370-BA15CF7E5CFB*

**New Hampshire Coalition Against Domestic and Sexual Violence Notes to Financial Statements** Years Ended June 30, 2024 and 2023

## NOTE I - LEASING ACTIVITIES (Continued)

Total right-of-use assets and lease liabilities at June 30, 2024 are as follows:

Lease Assets - Classification in Statement of Financial Position Finance Lease Right of Use Asset    $ 4,605

Lease Liabilities - Classification in Statement of Financial Position:

| | |
|---|---|
| **Finance Lease Liability, Current Portion** | **3,776** |
| Finance Lease Liability, Less Current Portion | 717 |
| Total | **$ 4,493** |

The weighted-average remaining lease term and weighted-average discount rate are as follows:

Weighted-average remaining lease term in years: 2.33

Weighted-average discount rate: 5.20%

The future minimum lease payments on this agreement as of June 30 are:

| | |
|---|---|
| **2025** | **$ 3,776** |
| 2026 | 1,259 |
| Total payments | 5,035 |
| Net present value discount | (542) |
| Present Value of lease liabilities | **$ 4,493** |

## NOTE J - RISKS AND UNCERTAINTIES - COVID-19

As a result of the spread of the COVID-19 coronavirus, economic uncertainties have arisen which may negatively impact future financial performance. The potential impact of these uncertainties is unknown and cannot be estimated at the present time.

-17-

Source packet page 31

*Docusign Envelope ID: 7B4DC862-5CE8-4B2C-B370-BA15CF7E5CFB*

## ROWLEY & ASSOCIATES, P.C.

CERTIFIED PUBLIC ACCOUNTANTS

46 N. STATE STREET CONCORD, NEW HAMPSHIRE 03301 TELEPHONE (603) 228-5400 FAX # (603) 226-3532

MEMBER AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS

MEMBER OF THE PRIVATE COMPANIES PRACTICE SECTION

## INDEPENDENT AUDITOR'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING AND ON COMPLIANCE AND OTHER MATTERS BASED ON AN AUDIT OF FINANCIAL STATEMENTS PERFORMED IN ACCORDANCE WITH *GOVERNMENT AUDITING STANDARDS*

Board of Directors New Hampshire Coalition Against Domestic and Sexual Violence Concord, New Hampshire

We have audited, in accordance with the auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in *Government Auditing Standards* issued by the Comptroller General of the United States, the financial statements of New Hampshire Coalition Against Domestic and Sexual Violence (a nonprofit organization), which comprise the statement of financial position as of June 30, 2024, and the related statements of activities, and cash flows for the year then ended, and the related notes to the financial statements, and have issued our report thereon dated November 12, 2024.

### Report on Internal Control over Financial Reporting

In planning and performing our audit of the financial statements, we considered New Hampshire Coalition Against Domestic and Sexual Violence's internal control over financial reporting (internal control) as a basis for designing audit procedures that are appropriate in the circumstances for the purpose of expressing our opinion on the financial statements, but not for the purpose of expressing an opinion on the effectiveness of New Hampshire Coalition Against Domestic and Sexual Violence's internal control. Accordingly, we do not express an opinion on the effectiveness of New Hampshire Coalition Against Domestic and Sexual Violence's internal control.

A *deficiency in internal control* exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent, or detect and correct, misstatements, on a timely basis. A *material weakness* is a deficiency, or a combination of deficiencies, in internal control, such that there is a reasonable possibility that a material misstatement of the entity's financial statements will not be prevented, or detected and corrected, on a timely basis. A *significant deficiency* is a deficiency, or a combination of deficiencies, in internal control that is less severe than a material weakness, yet important enough to merit attention by those charged with governance.

Our consideration of internal control was for the limited purpose described in the first paragraph of this section and was not designed to identify all deficiencies in internal control that might be material weaknesses or significant deficiencies. Given these limitations, during our audit we did not identify any deficiencies in internal control that we consider to be material weaknesses. However, material weaknesses or significant deficiencies may exist that were not identified.

-18-

**Source packet page 32**

*Docusign Envelope ID: 7B4DC862-5CE8-4B2C-B370-BA15CF7E5CFB*

## Report on Compliance and Other Matters

As part of obtaining reasonable assurance about whether New Hampshire Coalition Against Domestic and Sexual Violence's financial statements are free from material misstatement, we performed tests of its compliance with certain provisions of laws, regulations, contracts, and grant agreements, noncompliance with which could have a direct and material effect on the financial statements. However, providing an opinion on compliance with those provisions was not an objective of our audit, and accordingly, we do not express such an opinion. The results of our tests disclosed no instances of noncompliance or other matters that are required to be reported under *Government Auditing Standards*.

## Purpose of This Report

The purpose of this report is solely to describe the scope of our testing of internal control and compliance and the results of that testing, and not to provide an opinion on the effectiveness of the organization's internal control or on compliance. This report is an integral part of an audit performed in accordance with *Government Auditing Standards* in considering the organization's internal control and compliance. Accordingly, this communication is not suitable for any other purpose.

*[Image description: Signature: "Rowley & Associates, PC" (handwritten, cursive).]*

Rowley & Associates, P.C. Concord, New Hampshire November 12, 2024

-19-

Source packet page 33

Docusign Envelope ID: 7B4DC862-5CE8-4B2C-B370-BA15CF7E5CFB

**ROWLEY & ASSOCIATES, P.C.**

CERTIFIED PUBLIC ACCOUNTANTS

46 N. STATE STREET CONCORD, NEW HAMPSHIRE 03301 TELEPHONE (603) 228-5400 FAX # (603) 226-3552

MEMBER AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS

MEMBER OF THE PRIVATE COMPANIES PRACTICE SECTION

# INDEPENDENT AUDITOR'S REPORT ON COMPLIANCE FOR EACH MAJOR PROGRAM AND ON INTERNAL CONTROL OVER COMPLIANCE REQUIRED BY THE UNIFORM GUIDANCE

Board of Directors New Hampshire Coalition Against Domestic and Sexual Violence Concord, New Hampshire

**Report on Compliance for Each Major Federal Program**

**Opinion on Each Major Federal Program**

We have audited New Hampshire Coalition Against Domestic and Sexual Violence's compliance with the types of compliance requirements identified as subject to audit in the OMB Compliance Supplement that could have a direct and material effect on each of New Hampshire Coalition Against Domestic and Sexual Violence's major federal programs for the year ended June 30, 2024. New Hampshire Coalition Against Domestic and Sexual Violence's major federal programs are identified in the summary of auditor's results section of the accompanying schedule of findings and questioned costs.

In our opinion, New Hampshire Coalition Against Domestic and Sexual Violence complied, in all material respects, with the types of compliance requirements referred to above that could have a direct and material effect on each of its major federal programs for the year ended June 30, 2024.

**Basis for Opinion on Each Major Federal Program**

We conducted our audit of compliance in accordance with auditing standards generally accepted in the United States of America; the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States; and the audit requirements of Title 2 U.S. Code of Federal Regulations Part 200, Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (Uniform Guidance). Our responsibilities under those standards and the Uniform Guidance are further described in the Auditor's Responsibilities for the Audit of Compliance section of our report.

We are required to be independent of New Hampshire Coalition Against Domestic and Sexual Violence and to meet our other ethical responsibilities, in accordance with relevant ethical requirements relating to our audit. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion on compliance for each major federal program. Our audit does not provide a legal determination of New Hampshire Coalition Against Domestic and Sexual Violence's compliance with the compliance requirements referred to above.

**Responsibilities of Management for Compliance**

Management is responsible for compliance with the requirements referred to above and for the design, implementation, and maintenance of effective internal control over compliance with the requirements of laws, statutes, regulations, rules, and provisions of contracts or grant agreements applicable to New Hampshire Coalition Against Domestic and Sexual Violence's federal programs.

**Auditor's Responsibilities for the Audit of Compliance**

Our objectives are to obtain reasonable assurance about whether material noncompliance with the compliance requirements referred to above occurred, whether due to fraud or error, and express an opinion on New Hampshire Coalition Against Domestic and Sexual Violence's compliance based on our audit. Reasonable assurance is a high

-20-

Source packet page 34

Docusign Envelope ID: 7B4DC862-5CE8-4B2C-B370-BA15CF7E5CFB

level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with generally accepted auditing standards, *Government Auditing Standards*, and the Uniform Guidance will always detect material noncompliance when it exists. The risk of not detecting material noncompliance resulting from fraud is higher than for that resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Noncompliance with the compliance requirements referred to above is considered material if there is a substantial likelihood that, individually or in the aggregate, it would influence the judgment made by a reasonable user of the report on compliance about New Hampshire Coalition Against Domestic and Sexual Violence's compliance with the requirements of each major federal program as a whole.

In performing an audit in accordance with generally accepted auditing standards, *Government Auditing Standards*, and the Uniform Guidance, we:

- Exercise professional judgment and maintain professional skepticism throughout the audit.
- Identify and assess the risks of material noncompliance, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding New Hampshire Coalition Against Domestic and Sexual Violence's compliance with the compliance requirements referred to above and performing such other procedures as we considered necessary in the circumstances.
- Obtain an understanding of New Hampshire Coalition Against Domestic and Sexual Violence's internal control over compliance relevant to the audit in order to design audit procedures that are appropriate in the circumstances and to test and report on internal control over compliance in accordance with the Uniform Guidance, but not for the purpose of expressing an opinion on the effectiveness of New Hampshire Coalition Against Domestic and Sexual Violence's internal control over compliance. Accordingly, no such opinion is expressed.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit and any significant deficiencies and material weaknesses in internal control over compliance that we identified during the audit.

**Report on Internal Control over Compliance**

A *deficiency in internal control over compliance* exists when the design or operation of a control over compliance does not allow management or employees, in the normal course of performing their assigned functions, to prevent, or detect and correct, noncompliance with a type of compliance requirement of a federal program on a timely basis. A *material weakness in internal control over compliance* is a deficiency, or a combination of deficiencies, in internal control over compliance, such that there is a reasonable possibility that material noncompliance with a type of compliance requirement of a federal program will not be prevented, or detected and corrected, on a timely basis. A *significant deficiency in internal control over compliance* is a deficiency, or a combination of deficiencies, in internal control over compliance with a type of compliance requirement of a federal program that is less severe than a material weakness in internal control over compliance, yet important enough to merit attention by those charged with governance.

Our consideration of internal control over compliance was for the limited purpose described in the Auditor's Responsibilities for the Audit of Compliance section above and was not designed to identify all deficiencies in internal control over compliance that might be material weaknesses or significant deficiencies in internal control over compliance. Given these limitations, during our audit we did not identify any deficiencies in internal control over compliance that we consider to be material weaknesses, as defined above. However, material weaknesses or significant deficiencies in internal control over compliance may exist that were not identified.

Our audit was not designed for the purpose of expressing an opinion on the effectiveness of internal control over compliance. Accordingly, no such opinion is expressed.

The purpose of this report on internal control over compliance is solely to describe the scope of our testing of internal control over compliance and the results of that testing based on the requirements of the Uniform Guidance. Accordingly, this report is not suitable for any other purpose.

*[Image description: Signature: a handwritten signature reading "Rowley & Associates, PC" above a ruled signature line.]*

Rowley & Associates, P.C. Concord, New Hampshire November 12, 2024

-21-

Source packet page 35

*Docusign Envelope ID: 7B4DC862-5CE8-4B2C-B370-BA15CF7E5CFB*

**New Hampshire Coalition Against Domestic and Sexual Violence Schedule of Findings and Question Costs** Year Ended June 30, 2024

## SECTION I - SUMMARY OF AUDITOR'S RESULTS

1. The auditor's report expresses an unmodified opinion on the financial statements of the New Hampshire Coalition Against Domestic and Sexual Violence.

2. No reportable conditions relating to the audit of the financial statements are reported in the Independent Auditor's Report. No material weaknesses are reported.

3. No instances of noncompliance material to the financial statements of New Hampshire Coalition Against Domestic and Sexual Violence, which would be required to be reported in accordance with *Government Auditing Standards,* were disclosed during the audit.

4. No significant deficiencies in internal control over major federal award programs are reported in the Independent Auditor's Report on Compliance for Each Major Program and on Internal Control Over Compliance Required by the Uniform Guidance. No Material weaknesses are reported.

5. The auditor's report on compliance for the major federal award programs for New Hampshire Coalition Against Domestic and Sexual Violence expresses an unmodified opinion on all major federal programs.

6. Audit findings that are required to be reported in accordance with 2 CFR section 200.516(a) are reported in this Schedule.

7. The programs tested as a major program were:

Victims of Crime Act    16.575

8. The threshold for distinguishing Types A and B Programs was: $750,000.

9. The New Hampshire Coalition Against Domestic and Sexual Violence was determined to be a low-risk auditee.

## SECTION II - FINDINGS: FINANCIAL STATEMENT AUDIT

No matters were reported.

## SECTION III - FINDINGS AND QUESTIONED COSTS: FEDERAL AWARD PROGRAMS AUDIT

No matters were reported.

-22-

Source packet page 36

Docusign Envelope ID: 7B4DC862-5CE8-4B2C-B370-BA15CF7E5CFB

New Hampshire Coalition Against Domestic and Sexual Violence **Schedule of Expenditures of Federal Awards For the Year Ended June 30, 2024**

| Program Title | Federal CFDA/ Assistance Listing Number | Pass-Through Entity Identifying Number | Passed Through to Subrecipients | Federal Expenditures |
|---|---|---|---|---|
| U.S. Department of Housing and Urban Development: | | | | |
| Pass-Through Programs from State of NH Department of HHS: | | | | |
| Continuum of Care Program | 14.267 | 102-500731 | 129,705 | 140,998 |
| TOTAL U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT | | | 129,705 | 140,998 |
| U.S. Department of Justice: | | | | |
| Direct Program - Violence Against Women Act of 2000 | 16.556 | | - | 317,904 |
| Pass-Through Programs from State of NH Department of Justice: | | | | |
| VAWA, SASP | 16.017 | 2022SAS01 | 531,627 | 541,602 |
| OVC Human Trafficking | 16.320 | | | |
| VOCA, PMC Subcontracts | 16.575 | 2022VOC03 | 251,928 | 251,928 |
| VOCA, PMC Subcontracts | 16.575 | 2022VOC04 | 2,803,547 | 3,341,376 |
| Subtotal | | | 3,055,475 | 3,593,304 |
| VAWA, STOP | 16.588 | 2022VAW16 | - | 134,035 |
| Total Pass-Through Programs | | | 3,587,102 | 4,268,941 |
| TOTAL U.S. DEPARTMENT OF JUSTICE | | | 3,587,102 | 4,586,845 |
| U.S. Department of the Treasury | | | | |
| Pass-Through Programs from State of NH Department of Justice: | | | | |
| Coronavirus State and Local Fiscal Recovery Funds - Covid-19 | 21.027 | 2023ARPVS19 | 89,364 | 89,364 |
| TOTAL U.S. DEPARTMENT OF THE TREASURY | | | 89,364 | 89,364 |
| U.S. Department of Health and Human Services: | | | | |
| Direct Program - Family Violence Prevention Services Act | 93.591 | | - | 337,021 |
| Direct Program - Family Violence Prevention Services Act - Covid-19 | 93.591 | | - | 95,383 |
| Subtotal | | | - | 432,404 |
| Pass-Through Programs from State of NH Department of HHS: | | | | |
| Sexual Violence Prevention | 93.136 | 102-500731 | 200,009 | 400,409 |
| Family Violence Prevention Services Act | 93.671 | 155510 B001 | 1,081,784 | 1,11?,831 |
| Family Violence Prevention Services Act - Covid-19 | 93.671 | 155510 B001 | 1,127,900 | 1,127,900 |
| Subtotal | | | 2,209,684 | 2,246,731 |
| Total Pass-Through Programs | | | 2,409,693 | 2,647,140 |
| TOTAL U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES | | | 2,409,693 | 3,079,544 |
| Corporation for National & Community Services: | | | | |
| Pass-Through from Volunteer | | | | |

| Program Title | Federal CFDA/ Assistance Listing Number | Pass-Through Entity Identifying Number | Passed Through to Subrecipients | Federal Expenditures |
|---|---|---|---|---|
| NH! | | | | |
| AmeriCorps Victim Assist Program | 94.006 | | - | 25,583 |
| AmeriCorps Victim Assist Program - Covid-19 | 94.006 | | - | 7,167 |
| TOTAL CORPORATION FOR NATIONAL & COMMUNITY SERVICES | | | - | 32,750 |
| TOTAL EXPENDITURES OF FEDERAL AWARDS | | | $ 6,215,864 | $ 7,929,501 |

-23-

Source packet page 37

Docusign Envelope ID: 7B4DC862-5CE8-4B2C-B370-BA15CF7E5CFB

New Hampshire Coalition Against Domestic and Sexual Violence **Notes to Schedule of Expenditures of Federal Awards Year Ended June 30, 2024**

## NOTE A - BASIS OF PRESENTATION

The accompanying schedule of expenditures of federal awards (the Schedule) includes the federal award activity of New Hampshire Coalition Against Domestic and Sexual Violence under programs of the federal government for the year ended June 30, 2023. The information in this Schedule is presented in accordance with the requirements of Title 2 U.S. *Code of Federal Regulations* Part 200, *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* (Uniform Guidance). Because the Schedule presents only a selected portion of the operations of New Hampshire Coalition Against Domestic and Sexual Violence, it is not intended to and does not present the financial position, changes in net assets, or cash flows of New Hampshire Coalition Against Domestic and Sexual Violence.

## NOTE B - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

1.  Expenditures reported on the Schedule are reported on the accrual basis of accounting. Such expenditures are recognized following the cost principles contained in the Uniform Guidance, *Cost Principles for Non-profit Organizations*, wherein certain types of expenditures are not allowable or are limited as to reimbursement.
2.  Pass-through entity identifying numbers are presented where available.

## NOTE C - SUBRECIPIENTS

The New Hampshire Coalition Against Domestic and Sexual Violence provide federal awards to subrecipients as follows:

| Program Title | Federal CFDA/ Assistance Listing # | Amount Provided |
|---|---|---|
| Rapid Re-Housing Program | 14.267 | $ 129,705 |
| Sexual Assault Services Program | 16.017 | 531,627 |
| Victims of Crime Act | 16.575 | 3,055,475 |
| Coronavirus Fiscal Recovery | 21.027 | 89,364 |
| Sexual Violence Prevention | 93.136 | 200,009 |
| Family Violence Prevention Services Act | 93.671 | 2,209,684 |
| | | $ 6,215,864 |

## NOTE D - INDIRECT COST RATE

The New Hampshire Coalition Against Domestic and Sexual Violence has not elected to use the 10% de minimis indirect cost rate as allowed under the Uniform Guidance.

-24-

Source packet page 38

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C

*[Image description: NHCADSV logo: a circular seal, "the coalition" arcs across the top, an outline of New Hampshire at the centre, "AGAINST DOMESTIC & SEXUAL VIOLENCE" around the lower rim.]*

## Board of Directors Roster

Personal information redacted

*(Two columns; left column first.)*

Chairperson **Hilary Holmes Rheaume** Associate, Bernstein, Shur, Sawyer & Nelson, P.A.

Vice Chair **Sarah Gagnon** VP of Clinical Operations, Riverbend Community Mental Health

Treasurer **John Gasaway** Unemployment Fraud Prosecutor, NH Depart. of Employment Security

Clerk **Shauna Foster** Executive Director, New Beginnings

**Ashley Aniskovich** Audit Manager, Nathan Wechsler & Co

**Caitlin Garcia** Manager, A.M. Peisch & Company, LLP

**Carlos Jauhola-Straight** Pastor, First Congregational Church of Pelham

**Deb Haynes-Kenney** Executive Director, Response

**Jeff Maher** Program Manager for Title IX, Discrimination, and Bias, Keene State College

**Kristin Judge** General Manager, Little Brothers Burgers Company

**Lyndsay Robinson** Shareholder, Shaheen & Gordon, PA

**Tina Smith** Nurse, Concord Pediatrics

New Hampshire Coalition Against Domestic & Sexual Violence · PO Box 353 · Concord, NH 03302 · 603.224.8893

**NHCADSV.ORG**

Source packet page 39

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C

# Lyn M. Schollett

## CAREER SYNOPSIS

**Seasoned sexual assault coalition General Counsel** - In-depth knowledge of anti-rape movement and direct services of rape crisis centers and domestic violence shelters. Provide technical assistance to ICASA member rape crisis programs on legal issues and statewide rape crisis service standards. - Familiarity with funding opportunities and challenges facing state coalitions, as well as role of coalition as a pass-through organization. - Coordinate drafting and filing of amicus briefs on issues including statute of limitations and application of the rape shield law. Assist centers' pro bono counsel to protect the privacy of victims' records.

**Experienced public policy advocate** - Drafted and successfully advocated for the passage of more than 50 significant policy changes impacting rape victims in Illinois in the past 16 years. Initiatives include expanding the healthcare and privacy rights of victims with disabilities, implementing a strip club tax to fund rape crisis centers, creating a statutory foundation for the state's first pilot SANE programs and implementing criminal consequences and healthcare standards related to drug-facilitated sexual assault. - Represented the sexual assault community in drafting portions of the 2013 Violence Against Women Act.

**Highly skilled communicator** - Train Sexual Assault Nurse Examiners, prosecutors, law enforcement, and judges on topics including sexual violence, criminal and civil procedure, rape crisis center staff as expert witnesses, confidentiality and health care for victims. Mentor sexual assault coalition attorneys throughout the country. - Skilled at crafting and delivering media messages and advocating with state agency and elected officials.

**Accomplished non-profit manager** - Legal counsel to 32-member ICASA board, which utilizes consensus decision-making. - Through elected leadership positions on local, regional and national governing bodies for Planned Parenthood, actively pursued the sustainability of a national network of women's health centers. Successfully implemented governance reformulation for national board. Spearheaded membership adoption of national core healthcare services for all Planned Parenthood affiliates in the United States.

**Efficient and effective manager** - Adept at managing complex projects including strategically conceptualizing the overall structure for a project, supervising diverse groups of individuals, identifying and assigning tasks, setting deadlines and insuring high quality work product. - Supervise the Sexual Assault Justice Project, one of the fist sexual-assault specific legal clinics in the country.

## EMPLOYMENT

**2013-Present — NH Coalition Against Domestic & Sexual Violence — Concord, NH** Direct and lead a statewide organization that is a national leader in the movement to end violence against women. Effectively supervise staff in their function to provide funding, training, technical assistance, public policy advocacy, community outreach and development, and forums for resource sharing and networking of the NHCADSV in line with its mission, strategic plan and community needs.

Source packet page 40

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C

**1996 to 2013 — Illinois Coalition Against Sexual Assault — Springfield, IL** *General Counsel* for statewide coalition of 32 sexual assault centers. Advise board on governance and non-profit matters. Provide technical assistance to member programs on wide range of legal issues impacting the provision of rape crisis services. Train and advise representatives of the criminal justice system. Represent coalition to elected officials, statewide stakeholders and media.

**2005 to 2006 — Southern Illinois University School of Medicine — Springfield, IL** *Adjunct Faculty* Taught Studies in Medical-Legal Aspects of Obstetrics and Gynecology course to MD/JD joint degree students.

**1994 to 1996 and summer of 1992 — Sachnoff & Weaver, Ltd. — Chicago, IL** *Associate, Litigation Department* Drafted motions and trial briefs and presented appellate oral argument in securities fraud case; defended case-dispositive motions; prepared discovery; defended and took depositions; tried commercial leasing case; drafted articles regarding sexual harassment for client advisory newsletter; investigated and resolved potential conflicts of interest for law firm.

**1993 to 1994 — The Honorable Harold A. Baker, U.S. District Court, C.D. Ill. — Danville, IL** *Law Clerk* Conducted legal research and drafted bench memoranda in preparation for hearings and trials; drafted legal opinions.

## VOLUNTEER LEADERSHIP

**2006 - 2012 — Planned Parenthood Federation of America** *Member and Officer, Board of Directors* Assumed wide range of volunteer leadership roles for national reproductive health care organization, including strategic planning for service provision, reformulating board governance structure, spearheading membership adoption of core service standards for all affiliates, grassroots leadership development and political advocacy related to women's health. Served as vice chair for three years.

**2008 - 2012 — Planned Parenthood of Illinois** *Member, Board of Directors*

**1997-2003 — Planned Parenthood, Springfield Area** *Member, Board of Directors* Engaged in strategic planning, fundraising and direction for reproductive health clinic. Chaired committee to open new self-sustaining clinic. Served as board chair.

**1997 - present — Springfield Bicycle Club** *Volunteer and Board Member.* Organize and lead cycling events for riders of all ages and experience levels; advocate for funding and public policies to support safe cycling.

## EDUCATION

**J.D., 1993 — Northwestern University School of Law — Chicago, IL** Juris Doctor

**B.Ph., 1989 — Miami University — Oxford, OH** Bachelor of Philosophy in Constitutional Law and Women's Issues

Source packet page 41

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C

# Kim Bock

Adaptable leader of nonprofits experiencing change. Trained advocate who holds strategic plan and board's position while negotiating government contracts and establishing cooperative relationships among non-traditional partners. Over 20 years of financial oversight and development. Strong public speaker and written communicator who delivers presentations to diverse audiences.

*Leadership* – As an Executive Director, President, and Board Member, have demonstrated results in advocacy, public policy, grant writing, operations and planning, systems selection and implementation, strategic planning, board development, contract compliance, and human resources and personnel oversight.

*Public Speaking & Written Communication* – Demonstrated skills include: develop and deliver virtual and live presentations; technical, persuasive, promotional writer, grant writer; Subject Matter Expert for media, government agencies, senators; website content management, social media management, compiled and published multiple documents including best practice literature, marketing materials, professional guidance, expert opinions and academic papers.

*Finance* – Thorough knowledge of nonprofit finances through roles as Treasurer, Financial Chair, Trustee, and Board Member. Proven as an ethical, reliable steward of: government contract compliance, budgeting, IRS 990, financial platform and systems management, financial presentations to Board, fund accounting, securing and managing grants, grant compliance, and local and federal law compliance.

**Relevant Experience**

### ADMINISTRATIVE AND FINANCE DIRECTOR | NEW HAMPSHIRE COALITION AGAINST DOMESTIC AND SEXUAL VIOLENCE | 2024 - PRESENT

Direct administrative and financial matters of a nonprofit that oversees 15 federal, state and foundation grants for the benefit of 12 independent nonprofit member organizations. Provides budgetary information for all grant applications, ensures appropriate reporting according to grant requirements, provides TA to member organizations in fiscal management of grant funds. Responsible for financial management, planning, and analysis including budgeting, financial statement preparation and administrative and financial policy development. Supports executive director, board and finance committee with preparation of monthly, quarterly and annual statements. Prepares for and oversees the annual fiscal audit. Oversees 5 administrative employees.

### EXECUTIVE DIRECTOR | NEW HAMPSHIRE COALITION OF RECOVERY RESIDENCES | 2020 - 2024

Direct day-to-day business operations of a nonprofit that certifies recovery houses according to a national standard, operates an ombudsman program, advocates at local and federal level and operates a robust housing assistance program. Grew organization from 18 to 100+ certified recovery houses, developed robust nationally recognized best practice programs, 3 full time employees, $650K budget, 1,000 applications per year in housing assistance. Oversee all aspects of organization including managing staff and officers, leading programs, overseeing finances, developing a grassroots board and being face of organization.

*HIGHLIGHTS*

Provide expertise in Recovery Housing to state and federal organizations (CDFA, NH HFA, State Fire Marshal, Seacoast Study Group, Homeless Coalitions), Federal Senators and Representatives (Sen Hassan, Sen Shaheen, Rep Kuster), towns across NH.

Developed and testified on legislation affecting recovery housing in NH.

Secured eight new grants in first year from government and private organizations for operations and programs

- Housing Assistance - $375K to 750 individuals in FY22
- Accepting New Resident Platform - reducing homelessness across NH
- Small Bridge Loan Program - supporting recovery houses through COVID and other emergencies

Source packet page 42

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C

- Operators and House Leaders Round Tables - average of 35 people attend 2 times per month - model program now being adopted in other states
- Grant writing assistance provided to recovery house organizations securing 14 capital improvement grants for constituents

Collaborate with stakeholders including NHBOA, State Fire Marshal, NHMA, NHLA, NHPA, and St Anselm College Center for Ethics to provide towns with guidance on Federal Fair Housing Laws as they relate to people with disabilities.

Presentations at NHMA Annual Meeting, St Anselm Recovery Housing Conference and more.

Collaboration with HA NH and NH CDFA to design Support Act RHP Grant Program that provides approximately $5.M in grants to encourage recovery housing development across NH

Review, develop, initialize and maintain record keeping online platforms for accounting, business and program records

Chair Advocacy Committee of National Alliance of Recovery Residences

Prepare and participate in Board meetings. Support executive team during Board meetings. Prepare annual report.

Support development of Strategic Plan and developing Fundraising Strategies and Platforms

### FINANCE COMMITTEE MEMBER, PARISH FINANCIAL REVIEWER, TITLE IV ADVOCATE (Volunteer) | EPISCOPAL DIOCESE OF NH, CONCORD, NH

Advisory position on the finance committee for the Episcopal Diocese of NH. Traveled to parishes around NH to review financial practices and offer best practice advice and suggestions. As a Title IV Advocate for Northern New England, walked a complainant through the process of filing a complaint against a priest within the diocese, a complex procedure that follows the Canons of the Episcopal Church and is parallel to a legal process with hearings, discovery and corrective actions.

### TREASURER (Volunteer) | CHURCH OF OUR SAVIOUR, EPISCOPAL CHURCH, MILFORD, NH

Managed a complex financial system based in fund accounting. Prepared and presented financial reports to the board. Reviewed the history of all restricted funds and educated the board as to restrictions of such funds. Oversaw an $800K capital campaign. Oversaw all aspects of returning/repurposing restricted funds that could no longer meet restrictions. Prepared budget and presented it to the membership. Advised on proper stewardship of grants, restricted funds and accumulated funds. Transitioned church from a DOS.based accounting system to a powerful Windows based system.

### PRESIDENT (Volunteer) | Little People's Depot, New Boston, NH

Became president of the local preschool the year public kindergarten was established. Developed new programming to ensure the sustainability of the organization. (The organization is still using the programming and still operating.) Convened monthly board meetings. Assumed treasurer's unexpired 8 month term when treasurer left unexpectedly. Implemented a new and more professional accounting system. Executed all contracts. Interfaced with personnel.

**ADDITIONAL EXPERIENCE INCLUDES:** Chemistry Lab Instructor, St. Anselm College; academic tutor in US Dept of Education Migrants Program; practicing attorney—corporate, estate planning, probate, and real estate law;

### COMMUNITY SERVICE AND INVOLVEMENT

Board of Directors, Maine Grate Co., Inc.

Violinist, New Hampshire Philharmonic Orchestra, Manchester, NH

Trainer and Advocate, Canine Companions for Independence

### Education

JD | UNIVERSITY OF MAINE SCHOOL OF LAW

BS CHEMICAL ENGINEERING | WORCESTER POLYTECHNIC INSTITUTE

Source packet page 43

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C

# Joan Madore

### Experience

2001 - present    NH Coalition Against Domestic & Sexual    Violence   Concord, NH

### Bookkeeper

- Fund accounting
- Payroll
- Federal and State tax preparation
- Accounts payable
- Accounts receivable
- Budget reports
- Grant expenditures requests
- Compile statistics
- Bank reconciliation
- Funding formula support

1984 - 1995    Fairview Nursing Home, Inc.   Hudson, NH

### Bookkeeper

- Weekly payroll
- Bank reconciliation
- Accounts payable
- Workman Compensation
- Health Insurance
- Telephone coverage
- Copying
- Distributing daily mail

1981 - 1984   Slawsby Insurance Company   Nashua, NH

### Bookkeeper

- Accounts payable
- Accounts receivable
- Data entry

Source packet page 44

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C

**Education** — 1979 - 1981 New Hampshire Technical College, Berlin, NH — Associates in Secretarial Science

**Interests** — Aerobics, weight training, camping

**Volunteer** — Volunteer at the elementary school.

Source packet page 45

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C

# Alyssa Dandrea

## COMMUNICATIONS EXPERIENCE

**New Hampshire Coalition Against Domestic and Sexual Violence, Concord, N.H. (October 2020-present)** *Community Relations Specialist:* Works as a member of the Public Affairs team to expand the Coalition's grassroots network, produce legislative updates and action alerts. Manages statewide public awareness campaigns and events and is the point person for all media inquiries. Cultivates and nurtures relationships with partners, donors, foundations and volunteers on all aspects of resource development.

**Concord Monitor, Concord, N.H. (June 2016-October 2020)** *Crime/courts reporter:* Reported on criminal and civil cases in central New Hampshire, legislative reform, the state correctional system, campus sexual violence and victims' rights. Conceptualized and executed long-term enterprise projects on incarcerated parents, and the crimes of sexual assault and domestic violence.

**The Keene Sentinel, Keene, N.H. (August 2013-June 2016)** *Crime/courts reporter:* Reported on criminal and civil cases in Cheshire County for print and web-based audiences. Integrated social media into daily work and breaking news coverage.

**Monadnock Ledger-Transcript, Peterborough, N.H. (June 2011-August 2013)** *Reporter and photographer:* Covered breaking news, courts, local government, community events, arts and entertainment stories in Dublin, Jaffrey and Rindge.

## AWARDS

**New England Newspaper & Press Association** - Publick Occurrences for "Fighting Back" series on domestic violence (2019) and "Unsilenced" series on sexual assault (2017) - Better Newspapers Competition honored "Fighting Back" (2020); "Unsilenced" and "Parenting from Prison" (2018)

**New Hampshire Press Association** - Community Service award for "Fighting Back" (2020) - Contest awarded courts/crime and spot news reporting at the *Sentinel* (2014-2015); business, education, feature and investigative journalism at the *Ledger-Transcript* (2012-2013); Rookie of the Year (2012)

**Franklin Pierce University** - Marlin Fitzwater medallion for contributions to the public discourse (2011)

## CONFERENCES

**30th Annual Victims' Rights Conference** at Baystate Education Center in Holyoke, Mass.; panelist with New Hampshire prosecutor, advocate and school counselor to discuss high-profile St. Paul's School rape case (2019)

**New England First Amendment Institute** at the headquarters of the New England Newspaper and Press Association in Dedham, Mass.; attendee and presenter (2014-2015)

## EDUCATION

**Bachelor of Arts, Franklin Pierce University, May 2011** Mass Communication, Minor in History, Concentrations in Journalism and Media Studies GPA 3.92/4.0

**Source packet page 46**

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C

Produce extensive monthly reports for Senior Management

- End of month coordinator
- System administrator - involves several online platforms Online account access administrator
- Set up new user/trouble shoot online end user issues Account Review Coordinator
- Receive/process all opening/closing account paperwork for approval
- Prepare 12 or more reports for monthly ARC meeting/finalize reports for monthly Board meeting/take and finalize meeting minutes for ARC review/approval

## Education

**High school diploma or GED**

## Skills

- Justice of the Peace / Notary Public
- Accounts Payable/Accounts Receivable
- Quickbooks / Data Entry
- Inventory management
- Excellent planner and coordinator
- Data management
- Reporting and documentation
- General Ledger Reconciliation and accounting
- Proofreading
- Bank Reconciliation
- Financial Report Writing and Statement Preparation
- Office Management
- Tax Experience

## Certifications and Licenses

**Administrative Support Specialist New Hampshire Career Institute Concord NH, 2006 Coursework in Business Administration, Communications and Accounting**

Source packet page 47

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C

## Christine E. LaCourse

**Experience**

**2012-Present — NH Coalition Against Domestic & Sexual Violence — Concord, NH** *Office Coordinator* - Provided coordination of office operations including receptionist duties and administrative support to Coalition staff by maintaining calendars, planning/coordinating meetings, events, and trainings, Federal Grant writing, editing and data entry - Liaison to the fourteen crisis centers located throughout New Hampshire, including Executive Directors, staff, and the public - Maintained the library and crisis center resources/pamphlets - Assisted Community Relations Coordinator with fundraisers - Recruited and oversaw interns and volunteers

**2010 - 2012 — Hesser College — Manchester, NH** *Administrative Assistant, The Office of Academic Affairs* - Assisted the Vice President for Academic Affairs, Dean of Faculty, and Academic Dean with day-to-day tasks and special projects - Responsible for all academic administrative functions for the five campus locations, including on-boarding new faculty, maintaining databases and spreadsheets, and entering classes in CampusVue course scheduling software - Typed minutes for the Academic Affairs Managers, All Faculty, and Academic Quality Committee meetings - Collected, tracked and stored all syllabi every eight weeks, along with all learning contracts - Handled all aspects of academic appeals (grade and dismissal), all cases of academic dishonesty - Answered the Academic Affairs phone line, and assisted students and faculty as they entered office - Supported the Director of Accreditation and Compliance with monthly internal audits and the recent NEASC self-study report (The college received a ten year accreditation) - Aided Institutional Researcher with collection and maintenance of student end of term surveys

**2009-2010 — NH Coalition Against Domestic & Sexual Violence — Concord, NH** *Office Coordinator* - Provided coordination of office operations including receptionist duties and administrative support to Coalition staff by maintaining calendars, planning/coordinating meetings, events, and trainings, Federal Grant writing, editing and data entry - Liaison to the fourteen crisis centers located throughout New Hampshire, including Executive Directors, staff, and the public - Maintained the library and crisis center resources/pamphlets - Assisted Community Relations Coordinator with fundraisers - Recruited and oversaw interns and volunteers

**2007-2009 — Bigelow & Co., CPA, PC — Manchester, NH** *Administrative Assistant* - Managed the President's calendar, completed projects for the President and Partner, along with other executive assistant responsibilities

Source packet page 48

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C

- Maintained and helped facilitate all office functions through strong multi-tasking and time management; including answering phone, all computer databases/programs, processing mail, filing, stocking, and purchasing materials
- Interacted with and helped build relations with clients and vendors by being first line of communication within the company
- Processed over five hundred corporate and nine hundred individual tax returns annually, requiring eighteen + hours a week in overtime during tax season

**Education**

**2001-2005 — University of New Hampshire — Durham, NH** Bachelor of Arts in Sociology, Minor in Psychology; Deans List, Cum Laude

Source packet page 49

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C

# Brenda Legare

Organized and efficient Tax & Financial Associate highly skilled in office administration, data organization, proofreading, database management and word processing while offering excellent communication and computer skills. Meets deadlines and works with high levels of multicultural awareness and adaptability.

Authorized to work in the US for any employer.

## Work Experience

**Part-Time Grants Administrative Assistant**

NH COALITION AGAINST DOMESTIC & SEXUAL VIOLENCE – Concord, NH

July 2021 to Present

- Review and follow up on member program grant budgets.
- Process and reconcile member program monthly and quarterly reimbursements.
- Compile monthly and quarterly grant invoices to the State.
- Maintain financial records; Ensure proper filing of invoices.
- Assist with member program monitoring documentation compilation and review.

**Financial & Tax Associate**

CPM TAX & ACCOUNTING, LLC - Loudon, NH

October 2018 to 2021

- Generate and submit invoices based upon established accounts receivable schedules and terms. Perform accounts receivable duties, including researching charge backs, discrepancies and reconciliations.
- Reconcile account information and report figures in general ledger by comparing to bank account statement each month.
- Organize new accounts and update existing ones with current personal and business information including verification of submitted financial documentation for accuracy and integrity against internal and regulatory standards.
- Process transactions for clients including deposits/withdrawals to investment, annuity and college accounts.
- Liaison between account holders/representatives to resolve issues and maintain satisfaction of over 600 clients.
- Develop integrated spreadsheet and database templates for accumulating, formatting and organizing financial data.
- Keep operations in compliance with Federal regulations by directing effective internal systems to track due dates and required submission documents.
- Keep physical files and digitized records organized for easy updating and retrieval by authorized team members.
- Produce high-quality documents, spreadsheets, presentations for internal and customer-facing needs. Provide administrative services including phone, email correspondence, making copies and handling incoming and outgoing mail and faxes.
- Compose and proofread memos, letters and reports to verify error-free communication. Assist with event planning, including associated travel and logistical arrangements.
- Manage Senior Partners calendars to strategically coordinate meetings, appointments and events. Create/Update physical records and digital files to maintain current, accurate and compliant documentation.
- Oversee office inventory activities, including ordering and requisitions, stocking and shipment receiving.

**Senior Operations Assistant**

CHARTER TRUST COMPANY - Concord, NH

February 2011 to October 2018

- Daily balancing of cash account /reconciliation of checking account/review of over drafted accounts Daily income processing/deposit/process incoming checks/manual posting of mutual fund dividends Set up assets, modify assets, deliver/gift assets
- Maintain all legal files (Wills, Trusts, IRA documentation) Monthly account fee oversight
- Code new accounts with proper fee schedule/produce; liquidate client invoices/monitor closing accounts, process final fees
- Monthly reconciliation of house accounts/mutual fund statements

Source packet page 50

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C

# Sarah R. Seeley

## Education

**Connecticut College** — New London, CT

Bachelor of Arts, Economics and Gender, Sexuality, & Intersectionality Studies — Jan 2020 - May 2022

GPA 3.869/4.000

- Dean's Honors (Spring 2020), Dean's High Honors (Fall 2020-Spring 2021)

**St. Lawrence University** — Canton, NY

Bachelor of Arts — Aug 2018 - Dec 2019

- Advanced Studied Program Award (2018-2019), Dean's List (Fall 2018-Fall 2019)

## Work Experience

**New Hampshire Coalition Against Domestic and Sexual Violence** — Concord, NH

*Public Affairs Coordinator* — July 2022 - Present

- Creates content to update the Coalition's website, social media, and newsletters about survivor's rights and resources to inform victims, member programs, legislators, and the public.
- Coordinates direct fundraising appeals in the Spring and Winter, annual giving campaigns, maintains the donor database, creates promotional materials for fundraising campaigns, and orchestrates timely acknowledgments to donors. Additionally, supports in coordinating member program development meetings and the Board of Directors Development Committee.
- Supports public policy needs such as tracking relevant legislation, attending legislative hearings, and assisting with the recruitment and management of the Coalition's legislative volunteer network.

**Connecticut College Academic Resource Center** — New London, CT

*Econometrics Tutor* — Aug 2020 - May 2021

- Aided 40 students per semester by describing econometric concepts and addressing issues arising in regressions to improve confidence in classwork material
- Instructed tutees on Stata software to model and solve econometric problems through regression analyses, proper use of .do files, and report results with output tables

**Wayfarer Coffee Roasters**, Laconia, NH — May 2021 – August 2021

*Barista*

- Promoted coffee and tea consumption by educating customers; selling coffee and coffee brewing equipment, accessories, and supplies; preparing and serving a variety of drinks, along with house-made liege waffles
- Created and implemented new drink recipes for house specials, such as the Blue Moon Latte to celebrate Wayfarer's 6th birthday

## Internship Experience

**DIS Copenhagen Media Team** — Copenhagen, Denmark

*Photographer* — Aug 2021 - Dec 2021

- Completed three individual photo assignments and six photo drops to document abroad experiences and market towards future students
- Generated new content monthly for blog and Instagram posts, highlighting DIS student life and Danish culture to improve online presence and increase investment towards abroad programs

## Co-curricular Activities

**Women's Empowerment Initiative** — New London, CT

*Member* — Jan 2020 - Present

- Collaborated with 100+ other passionate activists to practice a monologue for a fundraiser performance
- Allocated and managed time weekly to discuss upcoming events and new initiatives to enhance the organization's structure

Source packet page 51

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C

**NH Department of Health and Human Services**

# KEY PERSONNEL

List those primarily responsible for meeting the terms and conditions of the agreement.

**Job descriptions not required for vacant positions.**

**Contractor Name: New Hampshire Coalition Against Domestic & Sexual Violence Statewide Domestic Violence Prevention Program**

| NAME | JOB TITLE | ANNUAL AMOUNT PAID FROM THIS CONTRACT | ANNUAL SALARY |
|------|-----------|----------------------------------------|---------------|
| Lyn Schollett | Executive Director | $8,471.00 | $121,010.00 |
| Kim Bock | Administrative & Finance Director | $3,897.00 | $97,430.00 |
| Joan Madore | Bookkeeper | $20,526.00 | $68,420.00 |
| Alyssa Dandrea | Community Relations Specialist | $26,183.00 | $60,890.00 |
| Christine LaCourse | Office Manager | $7,107.00 | $54,670.00 |
| Brenda Legare | Grants Administrative Assistant | $20,140.00 | $53,000.00 |
| Sarah Seeley | Public Affairs Coordinator | $11,875.00 | $49,480.00 |

Source packet page 52

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

*Editorial note: stamp place="top-right"*

0 JUN01 '23 AM11:07 RCV

*Editorial note: add hand="ms" place="top-right"*

ARC

*Editorial note: add hand="ms" place="top-right"*

11

*[Image description: New Hampshire state seal, at the head of the letterhead to the left of the department name.]*

Lori A. Weaver Interim Commissioner

Joseph E. Ribsam, Jr. Director

**STATE OF NEW HAMPSHIRE**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

*DIVISION FOR CHILDREN, YOUTH & FAMILIES*

129 PLEASANT STREET, CONCORD, NH 03301-3857

603-271-4451 1-800-852-3345 Ext. 4451

Fax: 603-271-4729 TDD Access: 1-800-735-2964 www.dhhs.nh.gov

May 24, 2023

His Excellency, Governor Christopher T. Sununu and the Honorable Council State House Concord, New Hampshire 03301

## REQUESTED ACTION

Authorize the Department of Health and Human Services, Division for Children, Youth and Families, to enter into a **Sole Source** contract with the New Hampshire Coalition Against Domestic and Sexual Violence (VC# 155510), Concord, NH, in the amount of $3,604,396 for the provision of a statewide domestic and sexual violence prevention program, with the option to renew for up to two (2) additional years, effective July 1, 2023, upon Governor and Council approval, through June 30, 2025. 71.98% General Funds. 28.02% Other Funds.

Funds are anticipated to be available in the following accounts for State Fiscal Years 2024 and 2025, with the authority to adjust budget line items within the price limitation and encumbrances between state fiscal years through the Budget Office, if needed and justified.

**05-95-42-4210-29590000 - HEALTH AND SOCIAL SERVICES, HEALTH AND HUMAN SVCS DEPT OF, HHS: HUMAN SERVICES, CHILD PROTECTION, DCYF – DOMESTIC VIOLENCE PROGRAMS**

| State Fiscal Year | Class / Account | Class Title | Job Number | Total Amount |
|---|---|---|---|---|
| 2024 | 073-509074 | Grants | 42105903 | $645,654 |
| 2025 | 073-509074 | Grants | 42105903 | $645,654 |
| | | | Subtotal | $1,291,308 |

**05-95-42-4210-29590000 - HEALTH AND SOCIAL SERVICES, HEALTH AND HUMAN SVCS DEPT OF, HHS: HUMAN SERVICES, CHILD PROTECTION, DCYF – Domestic Violence Programs**

| State Fiscal Year | Class / Account | Class Title | Job Number | Total Amount |
|---|---|---|---|---|
| 2024 | 102-500734 | Contracts for Prog Svc | 42106704 | $1,156,544 |
| 2025 | 102-500734 | Contracts for Prog Svc | 42106704 | $1,156,544 |
| | | | Subtotal | $2,313,088 |
| | | | **TOTAL** | **$3,604,396** |

Source packet page 53

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C

His Excellency, Governor Christopher T. Sununu and the Honorable Council
Page 2 of 2

## EXPLANATION

This request is **Sole Source** because the Contractor is the only organization in the State working with victims of domestic and sexual violence, and is uniquely qualified to provide a statewide domestic and sexual violence prevention program. The Contractor is designated as the coordinator for the special fund for domestic violence programs established by NH RSA 173-B:15. This fund provides grant money to New Hampshire programs that provide aid and assistance to victims of domestic and sexual violence. The grant funds are disbursed by the Contractor to twelve (12) independent community-based member programs around the State.

The purpose of this request is to provide a statewide domestic and sexual violence prevention program, as required by NH RSA 173-B:15. The Contractor will provide 24-hour crisis telephone lines, emergency transportation, shelters, community outreach and education, and support services to victims of domestic and sexual violence.

The Contractor will provide domestic and sexual violence prevention services to approximately 17,800 individuals, and approximately 11,300 direct survivors of domestic and sexual violence through June 30, 2025.

The Department will monitor contracted services through the required Domestic Violence Prevention Program annual report, which includes a summary of the activities provided during the State Fiscal Year, including, but not limited to:

- Provided supports.
- Number of survivors served.
- Number of domestic violence–related community awareness events and outreach presentations provided.

As referenced in Exhibit A, Revisions to Standard Agreement Provisions, of the attached agreement, the parties have the option to extend the agreement for up two (2) additional years, contingent upon satisfactory delivery of services, available funding, agreement of the parties, and Governor and Council approval.

Should the Governor and Council not authorize this request, the Department may not have the ability to provide domestic and sexual violence prevention services, to the detriment of victims of domestic and sexual violence.

Area served: Statewide.

In the event that Other Funds become no longer available, additional General Funds will not be requested to support this program.

Respectfully submitted,

*[Image description: Handwritten signature of Lori A. Weaver.] Lori A. Weaver Interim Commissioner*

*The Department of Health and Human Services' Mission is to join communities and families in providing opportunities for citizens to achieve health and independence.*

Source packet page 54

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

## FORM NUMBER P-37 (version 12/11/2019)

Subject: Statewide Domestic Violence Prevention Program (SS-2023-DCYF-13-STATE-01)

> Notice: This agreement and all of its attachments shall become public upon submission to Governor and Executive Council for approval. Any information that is private, confidential or proprietary must be clearly identified to the agency and agreed to in writing prior to signing the contract.

## AGREEMENT

The State of New Hampshire and the Contractor hereby mutually agree as follows:

## GENERAL PROVISIONS

## 1. IDENTIFICATION.

| | |
|---|---|
| 1.1 State Agency Name New Hampshire Department of Health and Human Services | 1.2 State Agency Address 129 Pleasant Street Concord, NH 03301-3857 |
| 1.3 Contractor Name New Hampshire Coalition Against Domestic and Sexual Violence | 1.4 Contractor Address PO Box 353, Concord, NH, 03301 |

| | | | |
|---|---|---|---|
| 1.5 Contractor Phone Number 603-224-8893 | 1.6 Account Number 05-95-42-4210-29590000 | 1.7 Completion Date 6/30/2025 | 1.8 Price Limitation $3,604,396 |

| | |
|---|---|
| 1.9 Contracting Officer for State Agency Robert W. Moore, Director | 1.10 State Agency Telephone Number (603) 271-9631 |
| 1.11 Contractor Signature DocuSigned by: *[Image description: Handwritten DocuSign signature reading "Lyn M. Schollett".]* [EC2EFED23DF3413?] Date: 5/26/2023 | 1.12 Name and Title of Contractor Signatory Lyn M. Schollett Executive Director |
| 1.13 State Agency Signature DocuSigned by: *[Image description: Typed DocuSign signature "Joseph E. Ribsam, Jr.".]* [AAE4DF03055E430?]Date: 5/26/2023 | 1.14 Name and Title of State Agency Signatory Joseph E. Ribsam, Jr. Director |
| 1.15 Approval by the N.H. Department of Administration, Division of Personnel (if applicable) By: Director, On: | |
| 1.16 Approval by the Attorney General (Form, Substance and Execution) (if applicable) By: DocuSigned by: *[Image description: Handwritten DocuSign signature reading "Robyn Guarino".]* [illegible] On: 5/30/2023 | |
| 1.17 Approval by the Governor and Executive Council (if applicable) G&C Item number: G&C Meeting Date: | |

Page 1 of 4

Contractor Initials *[Image description: DocuSign initials "LS".]*

Date 5/26/2023

Source packet page 55

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

**2. SERVICES TO BE PERFORMED.** The State of New Hampshire, acting through the agency identified in block 1.1 ("State"), engages contractor identified in block 1.3 ("Contractor") to perform, and the Contractor shall perform, the work or sale of goods, or both, identified and more particularly described in the attached EXHIBIT B which is incorporated herein by reference ("Services").

## 3. EFFECTIVE DATE/COMPLETION OF SERVICES.

3.1 Notwithstanding any provision of this Agreement to the contrary, and subject to the approval of the Governor and Executive Council of the State of New Hampshire, if applicable, this Agreement, and all obligations of the parties hereunder, shall become effective on the date the Governor and Executive Council approve this Agreement as indicated in block 1.17, unless no such approval is required, in which case the Agreement shall become effective on the date the Agreement is signed by the State Agency as shown in block 1.13 ("Effective Date").

3.2 If the Contractor commences the Services prior to the Effective Date, all Services performed by the Contractor prior to the Effective Date shall be performed at the sole risk of the Contractor, and in the event that this Agreement does not become effective, the State shall have no liability to the Contractor, including without limitation, any obligation to pay the Contractor for any costs incurred or Services performed. Contractor must complete all Services by the Completion Date specified in block 1.7.

## 4. CONDITIONAL NATURE OF AGREEMENT.

Notwithstanding any provision of this Agreement to the contrary, all obligations of the State hereunder, including, without limitation, the continuance of payments hereunder, are contingent upon the availability and continued appropriation of funds affected by any state or federal legislative or executive action that reduces, eliminates or otherwise modifies the appropriation or availability of funding for this Agreement and the Scope for Services provided in EXHIBIT B, in whole or in part. In no event shall the State be liable for any payments hereunder in excess of such available appropriated funds. In the event of a reduction or termination of appropriated funds, the State shall have the right to withhold payment until such funds become available, if ever, and shall have the right to reduce or terminate the Services under this Agreement immediately upon giving the Contractor notice of such reduction or termination. The State shall not be required to transfer funds from any other account or source to the Account identified in block 1.6 in the event funds in that Account are reduced or unavailable.

## 5. CONTRACT PRICE/PRICE LIMITATION/ PAYMENT.

5.1 The contract price, method of payment, and terms of payment are identified and more particularly described in EXHIBIT C which is incorporated herein by reference.

5.2 The payment by the State of the contract price shall be the only and the complete reimbursement to the Contractor for all expenses, of whatever nature incurred by the Contractor in the performance hereof, and shall be the only and the complete compensation to the Contractor for the Services. The State shall have no liability to the Contractor other than the contract price.

5.3 The State reserves the right to offset from any amounts otherwise payable to the Contractor under this Agreement those liquidated amounts required or permitted by N.H. RSA 80:7 through RSA 80:7-c or any other provision of law.

5.4 Notwithstanding any provision in this Agreement to the contrary, and notwithstanding unexpected circumstances, in no event shall the total of all payments authorized, or actually made hereunder, exceed the Price Limitation set forth in block 1.8.

## 6. COMPLIANCE BY CONTRACTOR WITH LAWS AND REGULATIONS/ EQUAL EMPLOYMENT OPPORTUNITY.

6.1 In connection with the performance of the Services, the Contractor shall comply with all applicable statutes, laws, regulations, and orders of federal, state, county or municipal authorities which impose any obligation or duty upon the Contractor, including, but not limited to, civil rights and equal employment opportunity laws. In addition, if this Agreement is funded in any part by monies of the United States, the Contractor shall comply with all federal executive orders, rules, regulations and statutes, and with any rules, regulations and guidelines as the State or the United States issue to implement these regulations. The Contractor shall also comply with all applicable intellectual property laws.

6.2 During the term of this Agreement, the Contractor shall not discriminate against employees or applicants for employment because of race, color, religion, creed, age, sex, handicap, sexual orientation, or national origin and will take affirmative action to prevent such discrimination.

6.3. The Contractor agrees to permit the State or United States access to any of the Contractor's books, records and accounts for the purpose of ascertaining compliance with all rules, regulations and orders, and the covenants, terms and conditions of this Agreement.

## 7. PERSONNEL.

7.1 The Contractor shall at its own expense provide all personnel necessary to perform the Services. The Contractor warrants that all personnel engaged in the Services shall be qualified to perform the Services, and shall be properly licensed and otherwise authorized to do so under all applicable laws.

7.2 Unless otherwise authorized in writing, during the term of this Agreement, and for a period of six (6) months after the Completion Date in block 1.7, the Contractor shall not hire, and shall not permit any subcontractor or other person, firm or corporation with whom it is engaged in

a combined effort to perform the Services to hire, any person who is a State employee or official, who is materially involved in the procurement, administration or performance of this Agreement. This provision shall survive termination of this Agreement.

7.3 The Contracting Officer specified in block 1.9, or his or her successor, shall be the State's representative. In the event of any dispute concerning the interpretation of this Agreement, the Contracting Officer's decision shall be final for the State.

Page 2 of 4

Contractor Initials *[Image description: DocuSign initials "LS".]*

Date 5/26/2023

Source packet page 56

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

## 8. EVENT OF DEFAULT/REMEDIES.

8.1 Any one or more of the following acts or omissions of the Contractor shall constitute an event of default hereunder ("Event of Default"):

8.1.1 failure to perform the Services satisfactorily or on schedule;

8.1.2 failure to submit any report required hereunder; and/or

8.1.3 failure to perform any other covenant, term or condition of this Agreement.

8.2 Upon the occurrence of any Event of Default, the State may take any one, or more, or all, of the following actions:

8.2.1 give the Contractor a written notice specifying the Event of Default and requiring it to be remedied within, in the absence of a greater or lesser specification of time, thirty (30) days from the date of the notice; and if the Event of Default is not timely cured, terminate this Agreement, effective two (2) days after giving the Contractor notice of termination;

8.2.2 give the Contractor a written notice specifying the Event of Default and suspending all payments to be made under this Agreement and ordering that the portion of the contract price which would otherwise accrue to the Contractor during the period from the date of such notice until such time as the State determines that the Contractor has cured the Event of Default shall never be paid to the Contractor;

8.2:3 give the Contractor a written notice specifying the Event of Default and set off against any other obligations the State may owe to the Contractor any damages the State suffers by reason of any Event of Default; and/or

8.2.4 give the Contractor a written notice specifying the Event of Default, treat the Agreement as breached, terminate the Agreement and pursue any of its remedies at law or in equity, or both.

8.3. No failure by the State to enforce any provisions hereof after any Event of Default shall be deemed a waiver of its rights with regard to that Event of Default, or any subsequent Event of Default. No express failure to enforce any Event of Default shall be deemed a waiver of the right of the State to enforce each and all of the provisions hereof upon any further or other Event of Default on the part of the Contractor.

## 9. TERMINATION.

9.1 Notwithstanding paragraph 8, the State may, at its sole discretion, terminate the Agreement for any reason, in whole or in part, by thirty (30) days written notice to the Contractor that the State is exercising its option to terminate the Agreement.

9.2 In the event of an early termination of this Agreement for any reason other than the completion of the Services, the Contractor shall, at the State's discretion, deliver to the Contracting Officer, not later than fifteen (15) days after the date of termination, a report ("Termination Report") describing in detail all Services performed, and the contract price earned, to and including the date of termination. The form, subject matter, content, and number of copies of the Termination Report shall be identical to those of any Final Report described in the attached EXHIBIT B. In addition, at the State's discretion, the Contractor shall, within 15 days of notice of early termination, develop and submit to the State a Transition Plan for services under the Agreement.

## 10. DATA/ACCESS/CONFIDENTIALITY/ PRESERVATION.

10.1 As used in this Agreement, the word "data" shall mean all information and things developed or obtained during the performance of, or acquired or developed by reason of, this Agreement, including, but not limited to, all studies, reports, files, formulae, surveys, maps, charts, sound recordings, video recordings, pictorial reproductions, drawings, analyses, graphic representations, computer programs, computer printouts, notes, letters, memoranda, papers, and documents, all whether finished or unfinished.

10.2 All data and any property which has been received from the State or purchased with funds provided for that purpose under this Agreement, shall be the property of the State, and shall be returned to the State upon demand or upon termination of this Agreement for any reason.

10.3 Confidentiality of data shall be governed by N.H. RSA chapter 91-A or other existing law. Disclosure of data requires prior written approval of the State.

**11. CONTRACTOR'S RELATION TO THE STATE.** In the performance of this Agreement the Contractor is in all respects an independent contractor, and is neither an agent nor an employee of the State. Neither the Contractor nor any of its officers, employees, agents or members shall have authority to bind the State or receive any benefits, workers' compensation or other emoluments provided by the State to its employees.

## 12. ASSIGNMENT/DELEGATION/SUBCONTRACTS.

12.1 The Contractor shall not assign, or otherwise transfer any interest in this Agreement without the prior written notice, which shall be provided to the State at least fifteen (15) days prior to the assignment, and a written consent of the State. For purposes of this paragraph, a

Change of Control shall constitute assignment. "Change of Control" means (a) merger, consolidation, or a transaction or series of related transactions in which a third party, together with its affiliates, becomes the direct or indirect owner of fifty percent (50%) or more of the voting shares or similar equity interests, or combined voting power of the Contractor, or (b) the sale of all or substantially all of the assets of the Contractor.

12.2 None of the Services shall be subcontracted by the Contractor without prior written notice and consent of the State. The State is entitled to copies of all subcontracts and assignment agreements and shall not be bound by any provisions contained in a subcontract or an assignment agreement to which it is not a party.

**13. INDEMNIFICATION.** Unless otherwise exempted by law, the Contractor shall indemnify and hold harmless the State, its officers and employees, from and against any and all claims, liabilities and costs for any personal injury or property damages, patent or copyright infringement, or other claims asserted against the State, its officers or employees, which arise out of (or which may be claimed to arise out of) the acts or omissions of the

Page 3 of 4

Contractor Initials *[Image description: DocuSign initials "LS".]*

Date 5/26/2023

*Editorial note: part n="6" file="part-06-p57-68.md" pages="57-68"*

**Source packet page 57**

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

*(Two columns; left column first.)*

Contractor, or subcontractors, including but not limited to the negligence, reckless or intentional conduct. The State shall not be liable for any costs incurred by the Contractor arising under this paragraph 13. Notwithstanding the foregoing, nothing herein contained shall be deemed to constitute a waiver of the sovereign immunity of the State, which immunity is hereby reserved to the State. This covenant in paragraph 13 shall survive the termination of this Agreement.

14. INSURANCE. 14.1 The Contractor shall, at its sole expense, obtain and continuously maintain in force, and shall require any subcontractor or assignee to obtain and maintain in force, the following insurance: 14.1.1 commercial general liability insurance against all claims of bodily injury, death or property damage, in amounts of not less than $1,000,000 per occurrence and $2,000,000 aggregate or excess; and 14.1.2 special cause of loss coverage form covering all property subject to subparagraph 10.2 herein, in an amount not less than 80% of the whole replacement value of the property. 14.2 The policies described in subparagraph 14.1 herein shall be on policy forms and endorsements approved for use in the State of New Hampshire by the N.H. Department of Insurance, and issued by insurers licensed in the State of New Hampshire. 14.3 The Contractor shall furnish to the Contracting Officer identified in block 1.9, or his or her successor, a certificate(s) of insurance for all insurance required under this Agreement. Contractor shall also furnish to the Contracting Officer identified in block 1.9, or his or her successor, certificate(s) of insurance for all renewal(s) of insurance required under this Agreement no later than ten (10) days prior to the expiration date of each insurance policy. The certificate(s) of insurance and any renewals thereof shall be attached and are incorporated herein by reference.

15. WORKERS' COMPENSATION. 15.1 By signing this agreement, the Contractor agrees, certifies and warrants that the Contractor is in compliance with or exempt from, the requirements of N.H. RSA chapter 281-A *("Workers' Compensation")*. 15.2 To the extent the Contractor is subject to the requirements of N.H. RSA chapter 281-A, Contractor shall maintain, and require any subcontractor or assignee to secure and maintain, payment of Workers' Compensation in connection with activities which the person proposes to undertake pursuant to this Agreement. The Contractor shall furnish the Contracting Officer identified in block 1.9, or his or her successor, proof of Workers' Compensation in the manner described in N.H. RSA chapter 281-A and any applicable renewal(s) thereof, which shall be attached and are incorporated herein by reference. The State shall not be responsible for payment of any Workers' Compensation premiums or for any other claim or benefit for Contractor, or any subcontractor or employee of Contractor, which might arise under applicable State of New Hampshire Workers' Compensation laws in connection with the performance of the Services under this Agreement.

16. NOTICE. Any notice by a party hereto to the other party shall be deemed to have been duly delivered or given at the time of mailing by certified mail, postage prepaid, in a United States Post Office addressed to the parties at the addresses given in blocks 1.2 and 1.4, herein.

17. AMENDMENT. This Agreement may be amended, waived or discharged only by an instrument in writing signed by the parties hereto and only after approval of such amendment, waiver or discharge by the Governor and Executive Council of the State of New Hampshire unless no such approval is required under the circumstances pursuant to State law, rule or policy.

18. CHOICE OF LAW AND FORUM. This Agreement shall be governed, interpreted and construed in accordance with the laws of the State of New Hampshire, and is binding upon and inures to the benefit of the parties and their respective successors and assigns. The wording used in this Agreement is the wording chosen by the parties to express their mutual intent, and no rule of construction shall be applied against or in favor of any party. Any actions arising out of this Agreement shall be brought and maintained in New Hampshire Superior Court which shall have exclusive jurisdiction thereof.

19. CONFLICTING TERMS. In the event of a conflict between the terms of this P-37 form (as modified in EXHIBIT

A) and/or attachments and amendment thereof, the terms of the P-37 (as modified in EXHIBIT A) shall control.

20. THIRD PARTIES. The parties hereto do not intend to benefit any third parties and this Agreement shall not be construed to confer any such benefit.

21. HEADINGS. The headings throughout the Agreement are for reference purposes only, and the words contained therein shall in no way be held to explain, modify, amplify or aid in the interpretation, construction or meaning of the provisions of this Agreement.

22. SPECIAL PROVISIONS. Additional or modifying provisions set forth in the attached EXHIBIT A are incorporated herein by reference.

23. SEVERABILITY. In the event any of the provisions of this Agreement are held by a court of competent jurisdiction to be contrary to any state or federal law, the remaining provisions of this Agreement will remain in full force and effect.

24. ENTIRE AGREEMENT. This Agreement, which may be executed in a number of counterparts, each of which shall be deemed an original, constitutes the entire agreement and understanding between the parties, and supersedes all prior agreements and understandings with respect to the subject matter hereof.

Page 4 of 4 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

Source packet page 58

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C
DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

New Hampshire Department of Health and Human Services Statewide Domestic Violence Prevention Program

## EXHIBIT A

### Revisions to Standard Agreement Provisions

1.  Revisions to Form P-37, General Provisions

    1.1. Paragraph 3, Subparagraph 3.1, Effective Date/Completion of Services, is amended as follows:

    3.1. Notwithstanding any provision of this Agreement to the contrary, and subject to the approval of the Governor and Executive Council of the State of New Hampshire as indicated in block 1.17, this Agreement, and all obligations of the parties hereunder, shall become effective on July 1, 2023 ("Effective Date").

    1.2. Paragraph 3, Effective Date/Completion of Services, is amended by adding subparagraph 3.3 as follows:

    3.3. The parties may extend the Agreement for up to two (2) additional years from the Completion Date, contingent upon satisfactory delivery of services, available funding, agreement of the parties, and approval of the Governor and Executive Council.

    1.3. Paragraph 12, Assignment/Delegation/Subcontracts, is amended by adding subparagraph 12.3 as follows:

    12.3. Subcontractors are subject to the same contractual conditions as the Contractor and the Contractor is responsible to ensure subcontractor compliance with those conditions. The Contractor shall have written agreements with all subcontractors, specifying the work to be performed, and if applicable, a Business Associate Agreement in accordance with the Health Insurance Portability and Accountability Act. Written agreements shall specify how corrective action shall be managed. The Contractor shall manage the subcontractor's performance on an ongoing basis and take corrective action as necessary. The Contractor shall annually provide the State with a list of all subcontractors provided for under this Agreement and notify the State of any inadequate subcontractor performance.

SS-2023-DCYF-13-STATE-01 New Hampshire Coalition Against Domestic and Sexual Violence A-1.2 Page 1 of 1 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

Source packet page 59

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C
DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

New Hampshire Department of Health and Human Services Statewide Domestic Violence Prevention Program EXHIBIT B

## Scope of Services

1.    Statement of Work

1.1. The Contractor must provide a Statewide Domestic and Sexual Violence Prevention Program to victims of domestic and sexual violence.

1.2. For the purposes of this Agreement, all references to days refer to calendar days, excluding state and federal holidays.

1.3. The Contractor must coordinate the Domestic and Sexual Violence Prevention Program in accordance with RSA 173-B:20, which includes, but is not limited to:

1.3.1. Serve as a clearinghouse for information relating to the prevention of, and services related to, domestic and sexual violence, as well as stalking, for victims, survivors, and perpetrators.

1.3.2. Provide technical assistance for local domestic and sexual violence program members and partners.

1.3.3. Develop and implement domestic and sexual violence prevention awareness training programs for the Department, as well as for criminal justice, medical, mental health, and education personnel.

1.3.4. Provide coordination of statewide and local social service agencies involved with the prevention of domestic and sexual violence.

1.3.5. Raise public awareness of domestic and sexual violence issues.

1.3.6. Publicize the availability of domestic and sexual violence prevention and treatment programs.

1.3.7. Conduct evaluations of local domestic and sexual violence prevention and treatment programs with member agencies and partners.

1.3.8. Provide leadership and fulfill commitment to victims/survivors, member programs, funders, partners, and the communities served.

1.4. The Contractor must provide services as outlined in RSA 173-B:21, which includes, but is not limited to:

1.4.1. Emergency and long-term shelter twenty-four (24) hours a day, seven (7) days a week.

1.4.2. Twenty-four (24) hour crisis telephone lines.

1.4.3. Support groups and/or peer counseling.

1.4.4. Emergency transportation services to shelters.

1.4.5. Legal and social service advocacy.

1.4.6. Coordination of services designed to mitigate and remediate the effects of sexual and domestic violence for victims.

SS-2023-DCYF-13-STATE-01 New Hampshire Coalition Against Domestic and Sexual Violence B-2.0 Page 1 of 4 Contractor Initials
*[Image description: DocuSign initials "LS".]* 5/26/2023 Date

Source packet page 60

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C
DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

New Hampshire Department of Health and Human Services Statewide Domestic Violence Prevention Program EXHIBIT B

**1.5. The Contractor must participate in meetings with the Department as requested by the Department.**

**1.6. The Contractor must ensure staff participate in trainings as required by the Department.**

**1.7. Reporting and Deliverables**

**1.7.1. The Contractor must submit an annual Domestic Violence Prevention Program (DVPP) report, of aggregate data only (no PII or PHI), to the Department by August 30th each year, with a narrative summary of activities provided during the State Fiscal Year, which includes, but is not limited to:**

**1.7.1.1. Provided supports.**

**1.7.1.2. Number of survivors served.**

**1.7.1.3. Number of domestic violence–related community awareness events provided.**

**1.7.1.4. Number of domestic violence–related outreach presentations provided.**

**1.7.2. The Contractor may be required to provide other key data and metrics to the Department in a format approved by the Department.**

2.    Exhibits Incorporated

2.1. The Contractor must use and disclose Protected Health Information in compliance with the Standards for Privacy of Individually Identifiable Health Information (Privacy Rule) (45 CFR Parts 160 and 164) under the Health Insurance Portability and Accountability Act (HIPAA) of 1996, and in accordance with the attached Exhibit I, Business Associate Agreement, which has been executed by the parties.

2.2. The Contractor must manage all confidential data related to this Agreement in accordance with the terms of Exhibit K, DHHS Information Security Requirements.

2.3. The Contractor must comply with all Exhibits D through K, which are attached hereto and incorporated by reference herein.

3.    Additional Terms

3.1. Impacts Resulting from Court Orders or Legislative Changes

**3.1.1. The Contractor agrees that, to the extent future state or federal legislation or court orders may have an impact on the Services described herein, the State has the right to modify Service priorities and expenditure requirements under this Agreement so as to achieve compliance therewith.**

SS-2023-DCYF-13-STATE-01 New Hampshire Coalition Against Domestic and Sexual Violence B-2.0 Page 2 of 4 Contractor Initials
*[Image description: DocuSign initials "LS".]* 5/26/2023 Date

Source packet page 61

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C    DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

# New Hampshire Department of Health and Human Services

## Statewide Domestic Violence Prevention Program

## EXHIBIT B

### 3.2. Federal Civil Rights Laws Compliance: Culturally and Linguistically Appropriate Programs and Services

3.2.1. The Contractor must submit, within ten (10) days of the Agreement Effective Date, a detailed description of the communication access and language assistance services to be provided to ensure meaningful access to programs and/or services to individuals with limited English proficiency; individuals who are deaf or have hearing loss; individuals who are blind or have low vision; and individuals who have speech challenges.

### 3.3. Credits and Copyright Ownership

3.3.1. All documents, notices, press releases, research reports and other materials prepared during or resulting from the performance of the services of the Agreement must include the following statement, "The preparation of this (report, document etc.) was financed under an Contract with the State of New Hampshire, Department of Health and Human Services, with funds provided in part by the State of New Hampshire and/or such other funding sources as were available or required, e.g., the United States Department of Health and Human Services."

3.3.2. All materials produced or purchased under the Agreement must have prior approval from the Department before printing, production, distribution or use.

3.3.3. The Department must retain copyright ownership for any and all original materials produced, including, but not limited to:

3.3.3.1. Brochures.

3.3.3.2. Resource directories.

3.3.3.3. Protocols or guidelines.

3.3.3.4. Posters.

3.3.3.5. Reports.

3.3.4. The Contractor must not reproduce any materials produced under the Agreement without prior written approval from the Department.

### 3.4. Operation of Facilities: Compliance with Laws and Regulations

3.4.1. In the operation of any facilities for providing services, the Contractor must comply with all laws, orders and regulations of federal, state, county and municipal authorities and with any direction of any Public Officer or officers pursuant to laws which must impose an order or duty upon the contractor with respect to the operation of the facility or the provision of the services at such facility. If any governmental license or permit must be required for the operation of the said facility or the

SS-2023-DCYF-13-STATE-01 New Hampshire Coalition Against Domestic and Sexual Violence B-2.0 Page 3 of 4 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

Source packet page 62

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

**New Hampshire Department of Health and Human Services Statewide Domestic Violence Prevention Program EXHIBIT B**

performance of the said services, the Contractor will procure said license or permit, and will at all times comply with the terms and conditions of each such license or permit. In connection with the foregoing requirements, the Contractor hereby covenants and agrees that, during the term of this Agreement the facilities must comply with all rules, orders, regulations, and requirements of the State Office of the Fire Marshal and the local fire protection agency, and must be in conformance with local building and zoning codes, by-laws and regulations.

4.    Records

4.1. The Contractor must keep records that include, but are not limited to:

4.1.1. Books, records, documents and other electronic or physical data evidencing and reflecting all costs and other expenses incurred by the Contractor in the performance of the Contract, and all income received or collected by the Contractor.

4.1.2. All records must be maintained in accordance with accounting procedures and practices, which sufficiently and properly reflect all such costs and expenses, and which are acceptable to the Department, and to include, without limitation, all ledgers, books, records, and original evidence of costs such as purchase requisitions and orders, vouchers, requisitions for materials, inventories, valuations of in-kind contributions, labor time cards, payrolls, and other records requested or required by the Department.

4.2. During the term of this Agreement and the period for retention hereunder, the Department, the United States Department of Health and Human Services, and any of their designated representatives must have access to all reports and records maintained pursuant to the Agreement for purposes of audit, examination, excerpts, and transcripts.

4.3. If, upon review of the Final Expenditure Report the Department must disallow any expenses claimed by the Contractor as costs hereunder, the Department retains the right, at its discretion, to deduct the amount of such expenses as are disallowed or to recover such sums from the Contractor.

SS-2023-DCYF-13-STATE-01 New Hampshire Coalition Against Domestic and Sexual Violence B-2.0 Page 4 of 4 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

**Source packet page 63**

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C   DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

# New Hampshire Department of Health and Human Services

## Statewide Domestic Violence Prevention Program

## EXHIBIT C

### *Payment Terms*

1.   This Agreement is funded by:

1.1. 71.98% General Funds.

1.2. 28.02% Other Funds.

2.   For the purposes of this Agreement the Department has identified:

2.1. The Contractor as a Subrecipient, in accordance with 2 CFR 200.331.

3.   Payment shall be on a cost reimbursement basis for actual expenditures incurred in the fulfillment of this Agreement, and shall be in accordance with the approved line items, as specified in Exhibit C-1 Budget and Exhibit C-2 Budget.

4.   The Contractor shall submit an invoice with supporting documentation to the Department no later than the fifteenth (15th) working day of the month following the month in which the services were provided. The Contractor shall ensure each invoice:

4.1. Includes the Contractor's Vendor Number issued upon registering with New Hampshire Department of Administrative Services.

4.2. Is submitted in a form that is provided by or otherwise acceptable to the Department.

4.3. Identifies and requests payment for allowable costs incurred in the previous month.

4.4. Includes supporting documentation of allowable costs with each invoice that may include, but are not limited to, time sheets, payroll records, receipts for purchases, and proof of expenditures, as applicable.

4.5. Is completed, dated and returned to the Department with the supporting documentation for allowable expenses to initiate payment.

4.6. Is assigned an electronic signature, includes supporting documentation, and is emailed to DCYFInvoices@dhhs.nh.gov or mailed to:

Financial Manager Department of Health and Human Services 129 Pleasant Street Concord, NH 03301

5.   The Department shall make payments to the Contractor within thirty (30) days of receipt of each invoice and supporting documentation for authorized expenses, subsequent to approval of the submitted invoice.

6.   The final invoice and supporting documentation for authorized expenses shall be due to the Department no later than forty (40) days after the contract

SS-2023-DCYF-13-STATE-01 New Hampshire Coalition Against Domestic and Sexual Violence C-2.0 Page 1 of 3 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

Source packet page 64

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

**New Hampshire Department of Health and Human Services Statewide Domestic Violence Prevention Program EXHIBIT C**

completion date specified in Form P-37, General Provisions Block 1.7 Completion Date.

7.    Notwithstanding Paragraph 17 of the General Provisions Form P-37, changes limited to adjusting amounts within the price limitation and adjusting encumbrances between State Fiscal Years and budget class lines through the Budget Office may be made by written agreement of both parties, without obtaining approval of the Governor and Executive Council, if needed and justified.

8.    Audits

8.1. The Contractor must email an annual audit to dhhs.act@dhhs.nh.gov if any of the following conditions exist:

8.1.1. Condition A - The Contractor expended $750,000 or more in federal funds received as a subrecipient pursuant to 2 CFR Part 200, during the most recently completed fiscal year.

8.1.2. Condition B - The Contractor is subject to audit pursuant to the requirements of NH RSA 7:28, III-b, pertaining to charitable organizations receiving support of $1,000,000 or more.

8.1.3. Condition C - The Contractor is a public company and required by Security and Exchange Commission (SEC) regulations to submit an annual financial audit.

8.2. If Condition A exists, the Contractor shall submit an annual Single Audit performed by an independent Certified Public Accountant (CPA) to dhhs.act@dhhs.nh.gov within 120 days after the close of the Contractor's fiscal year, conducted in accordance with the requirements of 2 CFR Part 200, Subpart F of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal awards.

8.2.1. The Contractor shall submit a copy of any Single Audit findings and any associated corrective action plans. The Contractor shall submit quarterly progress reports on the status of implementation of the corrective action plan.

8.3. If Condition B or Condition C exists, the Contractor shall submit an annual financial audit performed by an independent CPA within 120 days after the close of the Contractor's fiscal year.

8.4. Any Contractor that receives an amount equal to or greater than $250,000 from the Department during a single fiscal year, regardless of the funding source, may be required, at a minimum, to submit annual financial audits performed by an independent CPA if the Department's risk assessment determination indicates the Contractor is high-risk.

SS-2023-DCYF-13-STATE-01 New Hampshire Coalition Against Domestic and Sexual Violence C-2.0 Page 2 of 3 Contractor Initials
*[Image description: DocuSign initials "LS".]* 5/26/2023 Date

**Source packet page 65**

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C    DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

# New Hampshire Department of Health and Human Services

## Statewide Domestic Violence Prevention Program

## EXHIBIT C

8.5. In addition to, and not in any way in limitation of obligations of the Agreement, it is understood and agreed by the Contractor that the Contractor shall be held liable for any state or federal audit exceptions and shall return to the Department all payments made under the Agreement to which exception has been taken, or which have been disallowed because of such an exception:

SS-2023-DCYF-13-STATE-01 New Hampshire Coalition Against Domestic and Sexual Violence C-2.0 Page 3 of 3 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

**Source packet page 66**

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

Exhibit C-1 Budget    SS-2023-DCYF-13-STATE-01

## New Hampshire Department of Health and Human Services

Contractor Name: *New Hampshire Coalition Against Domestic and Sexual Violence* Budget Request for: *Statewide Domestic Violence Prevention Program* Budget Period: *SFY 2024 (July 1, 2023 - June 30, 2024)* Indirect Cost Rate (if applicable): 0.00%

| Line Item | Program Cost - Funded by DHHS |
|---|---|
| 1. Salary & Wages | $97,174 |
| 2. Fringe Benefits | $23,437 |
| 3. Consultants | $1,792 |
| 4. Equipment Indirect cost rate cannot be applied to equipment costs per 2 CFR 200.1 and Appendix IV to 2 CFR 200. | |
| 5.(a) Supplies - Educational | |
| 5.(b) Supplies - Lab | |
| 5.(c) Supplies - Pharmacy | |
| 5.(d) Supplies - Medical | |
| 5.(e) Supplies Office | $3,490 |
| 6. Travel | |
| 7. Software | |
| 8. (a) Other - Marketing/ Communications | $1,425 |
| 8. (b) Other - Education and Training | |
| 8. (c) Other - Other (specify below) | |
| Insurance | $708 |
| Memberships | $755 |
| Occupancy | $13,453 |
| Organizational Development | $4,245 |
| Telephone | $1,962 |
| 9. Subrecipient Contracts | $1,598,757 |
| Direct Assistance to DV Survivors | $55,000 |
| Total Direct Costs | $1,802,198 |
| Total Indirect Costs | $0 |
| TOTAL | $1,802,198 |

Page 1 of 1 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date _____

Source packet page 67

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

Exhibit C-2 Budget   SS-2023-DCYF-13-STATE-01

**New Hampshire Department of Health and Human Services**

Contractor Name: *New Hampshire Coalition Against Domestic and Sexual Violence* Budget Request for: *Statewide Domestic Violence Prevention Program* Budget Period: *SFY 2025 (July 1, 2024 - June 30, 2025)* Indirect Cost Rate (if applicable): 0.00%

| Line Item | Program Cost - Funded by DHHS |
|---|---|
| 1. Salary & Wages | $97,174 |
| 2. Fringe Benefits | $23,437 |
| 3. Consultants | $1,792 |
| 4. Equipment Indirect cost rate cannot be applied to equipment costs per 2 CFR 200.1 and Appendix IV to 2 CFR 200. | |
| 5.(a) Supplies - Educational | |
| 5.(b) Supplies - Lab | |
| 5.(c) Supplies - Pharmacy | |
| 5.(d) Supplies - Medical | |
| 5.(e) Supplies Office | $3,490 |
| 6. Travel | |
| 7. Software | |
| 8. (a) Other - Marketing/ Communications | $1,425 |
| 8. (b) Other - Education and Training | |
| 8. (c) Other - Other (specify below) | |
| Insurance | $708 |
| Memberships | $755 |
| Occupancy | $13,453 |
| Organizational Development | $4,245 |
| Telephone | $1,962 |
| 9. Subrecipient Contracts | $1,598,757 |
| Direct Assistance to DV Survivors | $55,000 |
| Total Direct Costs | $1,802,198 |
| Total Indirect Costs | $0 |
| TOTAL | $1,802,198 |

Page 1 of 1 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date _____

Source packet page 68

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C   DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

# New Hampshire Department of Health and Human Services

## Exhibit D

*[Image description: Seal of the State of New Hampshire.]*

### CERTIFICATION REGARDING DRUG-FREE WORKPLACE REQUIREMENTS

The Vendor identified in Section 1.3 of the General Provisions agrees to comply with the provisions of Sections 5151-5160 of the Drug-Free Workplace Act of 1988 (Pub. L. 100-690, Title V, Subtitle D; 41 U.S.C. 701 et seq.), and further agrees to have the Contractor's representative, as identified in Sections 1.11 and 1.12 of the General Provisions execute the following Certification:

**ALTERNATIVE I - FOR GRANTEES OTHER THAN INDIVIDUALS**

US DEPARTMENT OF HEALTH AND HUMAN SERVICES - CONTRACTORS US DEPARTMENT OF EDUCATION - CONTRACTORS US DEPARTMENT OF AGRICULTURE - CONTRACTORS

This certification is required by the regulations implementing Sections 5151-5160 of the Drug-Free Workplace Act of 1988 (Pub. L. 100-690, Title V, Subtitle D; 41 U.S.C. 701 et seq.). The January 31, 1989 regulations were amended and published as Part II of the May 25, 1990 Federal Register (pages 21681-21691), and require certification by grantees (and by inference, sub-grantees and sub-contractors), prior to award, that they will maintain a drug-free workplace. Section 3017.630(c) of the regulation provides that a grantee (and by inference, sub-grantees and sub-contractors) that is a State may elect to make one certification to the Department in each federal fiscal year in lieu of certificates for each grant during the federal fiscal year covered by the certification. The certificate set out below is a material representation of fact upon which reliance is placed when the agency awards the grant. False certification or violation of the certification shall be grounds for suspension of payments, suspension or termination of grants, or government wide suspension or debarment. Contractors using this form should send it to:

Commissioner NH Department of Health and Human Services 129 Pleasant Street, Concord, NH 03301-6505

1. The grantee certifies that it will or will continue to provide a drug-free workplace by:

1.1. Publishing a statement notifying employees that the unlawful manufacture, distribution, dispensing, possession or use of a controlled substance is prohibited in the grantee's workplace and specifying the actions that will be taken against employees for violation of such prohibition;

1.2. Establishing an ongoing drug-free awareness program to inform employees about

1.2.1. The dangers of drug abuse in the workplace;

1.2.2. The grantee's policy of maintaining a drug-free workplace;

1.2.3. Any available drug counseling, rehabilitation, and employee assistance programs; and

1.2.4. The penalties that may be imposed upon employees for drug abuse violations occurring in the workplace;

1.3. Making it a requirement that each employee to be engaged in the performance of the grant be given a copy of the statement required by paragraph (a);

1.4. Notifying the employee in the statement required by paragraph (a) that, as a condition of employment under the grant, the employee will

1.4.1. Abide by the terms of the statement; and

1.4.2. Notify the employer in writing of his or her conviction for a violation of a criminal drug statute occurring in the workplace no later than five calendar days after such conviction;

1.5. Notifying the agency in writing, within ten calendar days after receiving notice under subparagraph 1.4.2 from an employee or otherwise receiving actual notice of such conviction. Employers of convicted employees must provide notice, including position title, to every grant officer on whose grant activity the convicted employee was working, unless the Federal agency

CU/DHHS/110713 Exhibit D – Certification regarding Drug Free Workplace Requirements Page 1 of 2 Vendor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

**Source packet page 69**

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

**New Hampshire Department of Health and Human Services Exhibit D**

*[Image description: State of New Hampshire seal, upper right.]*

has designated a central point for the receipt of such notices. Notice shall include the identification number(s) of each affected grant;

1.6. Taking one of the following actions, within 30 calendar days of receiving notice under subparagraph 1.4.2, with respect to any employee who is so convicted

1.6.1. Taking appropriate personnel action against such an employee, up to and including termination, consistent with the requirements of the Rehabilitation Act of 1973, as amended; or

1.6.2. Requiring such employee to participate satisfactorily in a drug abuse assistance or rehabilitation program approved for such purposes by a Federal, State, or local health, law enforcement, or other appropriate agency;

1.7. Making a good faith effort to continue to maintain a drug-free workplace through implementation of paragraphs 1.1, 1.2, 1.3, 1.4, 1.5, and 1.6.

2.    The grantee may insert in the space provided below the site(s) for the performance of work done in connection with the specific grant.

Place of Performance (street address, city, county, state, zip code) (list each location)

Check ☐ if there are workplaces on file that are not identified here.

Vendor Name: New Hampshire Coalition Against Domestic and Se[…]

5/26/2023 Date

DocuSigned by: *[Image description: Handwritten DocuSign signature reading "Lyn M. Schollett".]*
[EC2EFED23DF3413?] Name: Lyn M. Schollett Title: Executive Director

CU/DHHS/110713 Exhibit D – Certification regarding Drug Free Workplace Requirements Page 2 of 2 Vendor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

Source packet page 70

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C   DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

# New Hampshire Department of Health and Human Services

## Exhibit E

*[Image description: Seal of the State of New Hampshire.]*

### CERTIFICATION REGARDING LOBBYING

The Vendor identified in Section 1.3 of the General Provisions agrees to comply with the provisions of Section 319 of Public Law 101-121, Government wide Guidance for New Restrictions on Lobbying, and 31 U.S.C. 1352, and further agrees to have the Contractor's representative, as identified in Sections 1.11 and 1.12 of the General Provisions execute the following Certification:

US DEPARTMENT OF HEALTH AND HUMAN SERVICES - CONTRACTORS US DEPARTMENT OF EDUCATION - CONTRACTORS US DEPARTMENT OF AGRICULTURE - CONTRACTORS

Programs (indicate applicable program covered): * Temporary Assistance to Needy Families under Title IV-A * Child Support Enforcement Program under Title IV-D * Social Services Block Grant Program under Title XX * Medicaid Program under Title XIX * Community Services Block Grant under Title VI * Child Care Development Block Grant under Title IV

The undersigned certifies, to the best of his or her knowledge and belief, that:

1. No Federal appropriated funds have been paid or will be paid by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement (and by specific mention sub-grantee or sub-contractor).

2. If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, loan, or cooperative agreement (and by specific mention sub-grantee or sub-contractor), the undersigned shall complete and submit Standard Form LLL, (Disclosure Form to Report Lobbying, in accordance with its instructions, attached and identified as Standard Exhibit E-I.)

3. The undersigned shall require that the language of this certification be included in the award document for sub-awards at all tiers (including subcontracts, sub-grants, and contracts under grants, loans, and cooperative agreements) and that all sub-recipients shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by Section 1352, Title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

Vendor Name: New Hampshire Coalition Against Domestic and Se[…]

DocuSigned by: *[Image description: DocuSign signature: "Lyn M. Schollett".]* [EC2EFED23DF3413?]

5/26/2023 Date

Name: Lyn M. Schollett Title: Executive Director

CU/DHHS/110713 Exhibit E – Certification Regarding Lobbying Page 1 of 1 Vendor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

Source packet page 71

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C   DocuSign Envelope ID: 289A70BE-DFB3-E0E-9927-06367CDA1672

# New Hampshire Department of Health and Human Services

## Exhibit F

*[Image description: Seal of the State of New Hampshire.]*

*CERTIFICATION REGARDING DEBARMENT, SUSPENSION AND OTHER RESPONSIBILITY MATTERS*

The Contractor identified in Section 1.3 of the General Provisions agrees to comply with the provisions of Executive Office of the President, Executive Order 12549 and 45 CFR Part 76 regarding Debarment, Suspension, and Other Responsibility Matters, and further agrees to have the Contractor's representative, as identified in Sections 1.11 and 1.12 of the General Provisions execute the following Certification:

**INSTRUCTIONS FOR CERTIFICATION**

1. By signing and submitting this proposal (contract), the prospective primary participant is providing the certification set out below.

2. The inability of a person to provide the certification required below will not necessarily result in denial of participation in this covered transaction. If necessary, the prospective participant shall submit an explanation of why it cannot provide the certification. The certification or explanation will be considered in connection with the NH Department of Health and Human Services' (DHHS) determination whether to enter into this transaction. However, failure of the prospective primary participant to furnish a certification or an explanation shall disqualify such person from participation in this transaction.

3. The certification in this clause is a material representation of fact upon which reliance was placed when DHHS determined to enter into this transaction. If it is later determined that the prospective primary participant knowingly rendered an erroneous certification, in addition to other remedies available to the Federal Government, DHHS may terminate this transaction for cause or default.

4. The prospective primary participant shall provide immediate written notice to the DHHS agency to whom this proposal (contract) is submitted if at any time the prospective primary participant learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

5. The terms "covered transaction," "debarred," "suspended," "ineligible," "lower tier covered transaction," "participant," "person," "primary covered transaction," "principal," "proposal," and "voluntarily excluded," as used in this clause, have the meanings set out in the Definitions and Coverage sections of the rules implementing Executive Order 12549; 45 CFR Part 76. See the attached definitions.

6. The prospective primary participant agrees by submitting this proposal (contract) that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this covered transaction, unless authorized by DHHS.

7. The prospective primary participant further agrees by submitting this proposal that it will include the clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion - Lower Tier Covered Transactions," provided by DHHS, without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions.

8. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that it is not debarred, suspended, ineligible, or involuntarily excluded from the covered transaction, unless it knows that the certification is erroneous. A participant may decide the method and frequency by which it determines the eligibility of its principals. Each participant may, but is not required to, check the Nonprocurement List (of excluded parties).

9. Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and

CU/DHHS/110713 Exhibit F – Certification Regarding Debarment, Suspension And Other Responsibility Matters Page 1 of 2 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

Source packet page 72

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

## New Hampshire Department of Health and Human Services Exhibit F

*[Image description: State of New Hampshire seal, upper right.]*

information of a participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

10. Except for transactions authorized under paragraph 6 of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is suspended, debarred, ineligible, or voluntarily excluded from participation in this transaction, in addition to other remedies available to the Federal government, DHHS may terminate this transaction for cause or default.

PRIMARY COVERED TRANSACTIONS

11. The prospective primary participant certifies to the best of its knowledge and belief, that it and its principals:

11.1. are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from covered transactions by any Federal department or agency;

11.2. have not within a three-year period preceding this proposal (contract) been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State or local) transaction or a contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

11.3. are not presently indicted for otherwise criminally or civilly charged by a governmental entity (Federal, State or local) with commission of any of the offenses enumerated in paragraph (I)(b) of this certification; and

11.4. have not within a three-year period preceding this application/proposal had one or more public transactions (Federal, State or local) terminated for cause or default.

12. Where the prospective primary participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to this proposal (contract).

LOWER TIER COVERED TRANSACTIONS

13. By signing and submitting this lower tier proposal (contract), the prospective lower tier participant, as defined in 45 CFR Part 76, certifies to the best of its knowledge and belief that it and its principals:

13.1. are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participation in this transaction by any federal department or agency.

13.2. where the prospective lower tier participant is unable to certify to any of the above, such prospective participant shall attach an explanation to this proposal (contract).

14. The prospective lower tier participant further agrees by submitting this proposal (contract) that it will include this clause entitled "Certification Regarding Debarment, Suspension, Ineligibility, and Voluntary Exclusion - Lower Tier Covered Transactions," without modification in all lower tier covered transactions and in all solicitations for lower tier covered transactions.

Contractor Name: New Hampshire Coalition Against Domestic and[…]

5/26/2023 Date

DocuSigned by: *[Image description: Handwritten DocuSign signature reading "Lyn M. Schollett".]*
[EC2EFED23DF3413?] Name: Lyn M. Schollett Title: Executive Director

CU/DHHS/110713 Exhibit F – Certification Regarding Debarment, Suspension And Other Responsibility Matters Page 2 of 2 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

Source packet page 73

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C
DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

# New Hampshire Department of Health and Human Services — Exhibit G

*[Image description: State seal, upper right.]*

## CERTIFICATION OF COMPLIANCE WITH REQUIREMENTS PERTAINING TO FEDERAL NONDISCRIMINATION, EQUAL TREATMENT OF FAITH-BASED ORGANIZATIONS AND WHISTLEBLOWER PROTECTIONS

The Contractor identified in Section 1.3 of the General Provisions agrees by signature of the Contractor's representative as identified in Sections 1.11 and 1.12 of the General Provisions, to execute the following certification:

Contractor will comply, and will require any subgrantees or subcontractors to comply, with any applicable federal nondiscrimination requirements, which may include:

- the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. Section 3789d) which prohibits recipients of federal funding under this statute from discriminating, either in employment practices or in the delivery of services or benefits, on the basis of race, color, religion, national origin, and sex. The Act requires certain recipients to produce an Equal Employment Opportunity Plan;
- the Juvenile Justice Delinquency Prevention Act of 2002 (42 U.S.C. Section 5672(b)) which adopts by reference, the civil rights obligations of the Safe Streets Act. Recipients of federal funding under this statute are prohibited from discriminating, either in employment practices or in the delivery of services or benefits, on the basis of race, color, religion, national origin, and sex. The Act includes Equal Employment Opportunity Plan requirements;
- the Civil Rights Act of 1964 (42 U.S.C. Section 2000d, which prohibits recipients of federal financial assistance from discriminating on the basis of race, color, or national origin in any program or activity);
- the Rehabilitation Act of 1973 (29 U.S.C. Section 794), which prohibits recipients of Federal financial assistance from discriminating on the basis of disability, in regard to employment and the delivery of services or benefits, in any program or activity;
- the Americans with Disabilities Act of 1990 (42 U.S.C. Sections 12131-34), which prohibits discrimination and ensures equal opportunity for persons with disabilities in employment, State and local government services, public accommodations, commercial facilities, and transportation;
- the Education Amendments of 1972 (20 U.S.C. Sections 1681, 1683, 1685-86), which prohibits discrimination on the basis of sex in federally assisted education programs;
- the Age Discrimination Act of 1975 (42 U.S.C. Sections 6106-07), which prohibits discrimination on the basis of age in programs or activities receiving Federal financial assistance. It does not include employment discrimination;
- 28 C.F.R. pt. 31 (U.S. Department of Justice Regulations — OJJDP Grant Programs); 28 C.F.R. pt. 42 (U.S. Department of Justice Regulations — Nondiscrimination; Equal Employment Opportunity; Policies and Procedures); Executive Order No. 13279 (equal protection of the laws for faith-based and community organizations); Executive Order No. 13559, which provide fundamental principles and policy-making criteria for partnerships with faith-based and neighborhood organizations;
- 28 C.F.R. pt. 38 (U.S. Department of Justice Regulations — Equal Treatment for Faith-Based Organizations); and Whistleblower protections 41 U.S.C. §4712 and The National Defense Authorization Act (NDAA) for Fiscal Year 2013 (Pub. L. 112-239, enacted January 2, 2013) the Pilot Program for Enhancement of Contract Employee Whistleblower Protections, which protects employees against reprisal for certain whistle blowing activities in connection with federal grants and contracts.

The certificate set out below is a material representation of fact upon which reliance is placed when the agency awards the grant. False certification or violation of the certification shall be grounds for suspension of payments, suspension or termination of grants, or government wide suspension or debarment.

6/27/14 Rev. 10/21/14 Exhibit G Certification of Compliance with requirements pertaining to Federal Nondiscrimination, Equal Treatment of Faith-Based Organizations and Whistleblower protections Page 1 of 2 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

Source packet page 74

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

**New Hampshire Department of Health and Human Services Exhibit G**

*[Image description: State of New Hampshire seal, upper right.]*

In the event a Federal or State court or Federal or State administrative agency makes a finding of discrimination after a due process hearing on the grounds of race, color, religion, national origin, or sex against a recipient of funds, the recipient will forward a copy of the finding to the Office for Civil Rights, to the applicable contracting agency or division within the Department of Health and Human Services, and to the Department of Health and Human Services Office of the Ombudsman.

The Contractor identified in Section 1.3 of the General Provisions agrees by signature of the Contractor's representative as identified in Sections 1.11 and 1.12 of the General Provisions, to execute the following certification:

1.     By signing and submitting this proposal (contract) the Contractor agrees to comply with the provisions indicated above.

Contractor Name: New Hampshire Coalition Against Domestic an[…]

5/26/2023 Date

DocuSigned by: *[Image description: Handwritten DocuSign signature reading "Lyn M. Schollett".]*
[EC2EFED23DF3413?] Name: Lyn M. Schollett Title: Executive Director

Exhibit G Certification of Compliance with requirements pertaining to Federal Nondiscrimination, Equal Treatment of Faith-Based Organizations and Whistleblower protections 6/27/14 Rev. 10/21/14 Exhibit G Certification of Compliance with requirements pertaining to Federal Nondiscrimination, Equal Treatment of Faith-Based Organizations and Whistleblower protections Page 2 of 2 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

Source packet page 75

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C
DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

# New Hampshire Department of Health and Human Services — Exhibit H

## CERTIFICATION REGARDING ENVIRONMENTAL TOBACCO SMOKE

Public Law 103-227, Part C — Environmental Tobacco Smoke, also known as the Pro-Children Act of 1994 (Act), requires that smoking not be permitted in any portion of any indoor facility owned or leased or contracted for by an entity and used routinely or regularly for the provision of health, day care, education, or library services to children under the age of 18, if the services are funded by Federal programs either directly or through State or local governments, by Federal grant, contract, loan, or loan guarantee. The law does not apply to children's services provided in private residences, facilities funded solely by Medicare or Medicaid funds, and portions of facilities used for inpatient drug or alcohol treatment. Failure to comply with the provisions of the law may result in the imposition of a civil monetary penalty of up to $1000 per day and/or the imposition of an administrative compliance order on the responsible entity.

The Contractor identified in Section 1.3 of the General Provisions agrees, by signature of the Contractor's representative as identified in Section 1.11 and 1.12 of the General Provisions, to execute the following certification:

1.  By signing and submitting this contract, the Contractor agrees to make reasonable efforts to comply with all applicable provisions of Public Law 103-227, Part C, known as the Pro-Children Act of 1994.

Contractor Name: New Hampshire Coalition Against Domestic and[…]

DocuSigned by: *[Image description: Handwritten DocuSign signature reading "Lyn M. Schollett".]* [EC2EFED23DF3413?]

5/26/2023 Date

Name: Lyn M. Schollett Title: Executive Director

CU/DHHS/110713 Exhibit H – Certification Regarding Environmental Tobacco Smoke Page 1 of 1 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

Source packet page 76

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C
DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

# New Hampshire Department of Health and Human Services — Exhibit I

## HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT BUSINESS ASSOCIATE AGREEMENT

The Contractor identified in Section 1.3 of the General Provisions of the Agreement agrees to comply with the Health Insurance Portability and Accountability Act, Public Law 104-191 and with the Standards for Privacy and Security of Individually Identifiable Health Information, 45 CFR Parts 160 and 164 applicable to business associates. As defined herein, "Business Associate" shall mean the Contractor and subcontractors and agents of the Contractor that receive, use or have access to protected health information under this Agreement and "Covered Entity" shall mean the State of New Hampshire, Department of Health and Human Services.

## (1) Definitions.

a. "Breach" shall have the same meaning as the term "Breach" in section 164.402 of Title 45, Code of Federal Regulations.

b. "Business Associate" has the meaning given such term in section 160.103 of Title 45, Code of Federal Regulations.

c. "Covered Entity" has the meaning given such term in section 160.103 of Title 45, Code of Federal Regulations.

d. "Designated Record Set" shall have the same meaning as the term "designated record set" in 45 CFR Section 164.501.

e. "Data Aggregation" shall have the same meaning as the term "data aggregation" in 45 CFR Section 164.501.

f. "Health Care Operations" shall have the same meaning as the term "health care operations" in 45 CFR Section 164.501.

g. "HITECH Act" means the Health Information Technology for Economic and Clinical Health Act, TitleXIII, Subtitle D, Part 1 & 2 of the American Recovery and Reinvestment Act of 2009.

h. "HIPAA" means the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191 and the Standards for Privacy and Security of Individually Identifiable Health Information, 45 CFR Parts 160, 162 and 164 and amendments thereto.

i. "Individual" shall have the same meaning as the term "individual" in 45 CFR Section 160.103 and shall include a person who qualifies as a personal representative in accordance with 45 CFR Section 164.501(g).

j. "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 CFR Parts 160 and 164, promulgated under HIPAA by the United States Department of Health and Human Services.

k. "Protected Health Information" shall have the same meaning as the term "protected health information" in 45 CFR Section 160.103, limited to the information created or received by Business Associate from or on behalf of Covered Entity.

3/2014 Exhibit I Health Insurance Portability Act Business Associate Agreement Page 1 of 6 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

Source packet page 77

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C
DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

# New Hampshire Department of Health and Human Services — Exhibit I

l.   "Required by Law" shall have the same meaning as the term "required by law" in 45 CFR Section 164.103.

m.   "Secretary" shall mean the Secretary of the Department of Health and Human Services or his/her designee.

n.   "Security Rule" shall mean the Security Standards for the Protection of Electronic Protected Health Information at 45 CFR Part 164, Subpart C, and amendments thereto.

o.   "Unsecured Protected Health Information" means protected health information that is not secured by a technology standard that renders protected health information unusable, unreadable, or indecipherable to unauthorized individuals and is developed or endorsed by a standards developing organization that is accredited by the American National Standards Institute.

p.   Other Definitions — All terms not otherwise defined herein shall have the meaning established under 45 C.F.R. Parts 160, 162 and 164, as amended from time to time, and the HITECH Act.

### (2) Business Associate Use and Disclosure of Protected Health Information.

a.   Business Associate shall not use, disclose, maintain or transmit Protected Health Information (PHI) except as reasonably necessary to provide the services outlined under Exhibit A of the Agreement. Further, Business Associate, including but not limited to all its directors, officers, employees and agents, shall not use, disclose, maintain or transmit PHI in any manner that would constitute a violation of the Privacy and Security Rule.

b.   Business Associate may use or disclose PHI:

I. For the proper management and administration of the Business Associate;   II. As required by law, pursuant to the terms set forth in paragraph d. below; or   III. For data aggregation purposes for the health care operations of Covered Entity.

c.   To the extent Business Associate is permitted under the Agreement to disclose PHI to a third party, Business Associate must obtain, prior to making any such disclosure, (i) reasonable assurances from the third party that such PHI will be held confidentially and used or further disclosed only as required by law or for the purpose for which it was disclosed to the third party; and (ii) an agreement from such third party to notify Business Associate, in accordance with the HIPAA Privacy, Security, and Breach Notification Rules of any breaches of the confidentiality of the PHI, to the extent it has obtained knowledge of such breach.

d.   The Business Associate shall not, unless such disclosure is reasonably necessary to provide services under Exhibit A of the Agreement, disclose any PHI in response to a request for disclosure on the basis that it is required by law, without first notifying Covered Entity so that Covered Entity has an opportunity to object to the disclosure and to seek appropriate relief. If Covered Entity objects to such disclosure, the Business

3/2014 Exhibit I Health Insurance Portability Act Business Associate Agreement Page 2 of 6 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

Source packet page 78

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

**New Hampshire Department of Health and Human Services**

**Exhibit I**

*[Image description: State of New Hampshire seal, upper right.]*

Associate shall refrain from disclosing the PHI until Covered Entity has exhausted all remedies.

e. If the Covered Entity notifies the Business Associate that Covered Entity has agreed to be bound by additional restrictions over and above those uses or disclosures or security safeguards of PHI pursuant to the Privacy and Security Rule, the Business Associate shall be bound by such additional restrictions and shall not disclose PHI in violation of such additional restrictions and shall abide by any additional security safeguards.

(3) Obligations and Activities of Business Associate.

a. The Business Associate shall notify the Covered Entity's Privacy Officer immediately after the Business Associate becomes aware of any use or disclosure of protected health information not provided for by the Agreement including breaches of unsecured protected health information and/or any security incident that may have an impact on the protected health information of the Covered Entity.

b. The Business Associate shall immediately perform a risk assessment when it becomes aware of any of the above situations. The risk assessment shall include, but not be limited to:

- The nature and extent of the protected health information involved, including the types of identifiers and the likelihood of re-identification;
- The unauthorized person used the protected health information or to whom the disclosure was made;
- Whether the protected health information was actually acquired or viewed
- The extent to which the risk to the protected health information has been mitigated.

The Business Associate shall complete the risk assessment within 48 hours of the breach and immediately report the findings of the risk assessment in writing to the Covered Entity.

c. The Business Associate shall comply with all sections of the Privacy, Security, and Breach Notification Rule.

d. Business Associate shall make available all of its internal policies and procedures, books and records relating to the use and disclosure of PHI received from, or created or received by the Business Associate on behalf of Covered Entity to the Secretary for purposes of determining Covered Entity's compliance with HIPAA and the Privacy and Security Rule.

e. Business Associate shall require all of its business associates that receive, use or have access to PHI under the Agreement, to agree in writing to adhere to the same restrictions and conditions on the use and disclosure of PHI contained herein, including the duty to return or destroy the PHI as provided under Section 3 (l). The Covered Entity shall be considered a direct third party beneficiary of the Contractor's business associate agreements with Contractor's intended business associates, who will be receiving PHI

3/2014 Exhibit I Health Insurance Portability Act Business Associate Agreement Page 3 of 6 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

Source packet page 79

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

**New Hampshire Department of Health and Human Services**

**Exhibit I**

*[Image description: State of New Hampshire seal, upper right.]*

pursuant to this Agreement, with rights of enforcement and indemnification from such business associates who shall be governed by standard Paragraph #13 of the standard contract provisions (P-37) of this Agreement for the purpose of use and disclosure of protected health information.

f.   Within five (5) business days of receipt of a written request from Covered Entity, Business Associate shall make available during normal business hours at its offices all records, books, agreements, policies and procedures relating to the use and disclosure of PHI to the Covered Entity, for purposes of enabling Covered Entity to determine Business Associate's compliance with the terms of the Agreement.

g.   Within ten (10) business days of receiving a written request from Covered Entity, Business Associate shall provide access to PHI in a Designated Record Set to the Covered Entity, or as directed by Covered Entity, to an individual in order to meet the requirements under 45 CFR Section 164.524.

h.   Within ten (10) business days of receiving a written request from Covered Entity for an amendment of PHI or a record about an individual contained in a Designated Record Set, the Business Associate shall make such PHI available to Covered Entity for amendment and incorporate any such amendment to enable Covered Entity to fulfill its obligations under 45 CFR Section 164.526.

i.   Business Associate shall document such disclosures of PHI and information related to such disclosures as would be required for Covered Entity to respond to a request by an individual for an accounting of disclosures of PHI in accordance with 45 CFR Section 164.528.

j.   Within ten (10) business days of receiving a written request from Covered Entity for a request for an accounting of disclosures of PHI, Business Associate shall make available to Covered Entity such information as Covered Entity may require to fulfill its obligations to provide an accounting of disclosures with respect to PHI in accordance with 45 CFR Section 164.528.

k.   In the event any individual requests access to, amendment of, or accounting of PHI directly from the Business Associate, the Business Associate shall within two (2) business days forward such request to Covered Entity. Covered Entity shall have the responsibility of responding to forwarded requests. However, if forwarding the individual's request to Covered Entity would cause Covered Entity or the Business Associate to violate HIPAA and the Privacy and Security Rule, the Business Associate shall instead respond to the individual's request as required by such law and notify Covered Entity of such response as soon as practicable.

l.   Within ten (10) business days of termination of the Agreement, for any reason, the Business Associate shall return or destroy, as specified by Covered Entity, all PHI received from, or created or received by the Business Associate in connection with the Agreement, and shall not retain any copies or back-up tapes of such PHI. If return or destruction is not feasible, or the disposition of the PHI has been otherwise agreed to in the Agreement, Business Associate shall continue to extend the protections of the Agreement, to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Business

3/2014 Exhibit I Health Insurance Portability Act Business Associate Agreement Page 4 of 6 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

Source packet page 80

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C
DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

# New Hampshire Department of Health and Human Services — Exhibit I

Associate maintains such PHI. If Covered Entity, in its sole discretion, requires that the Business Associate destroy any or all PHI, the Business Associate shall certify to Covered Entity that the PHI has been destroyed.

## (4) Obligations of Covered Entity

a.  Covered Entity shall notify Business Associate of any changes or limitation(s) in its Notice of Privacy Practices provided to individuals in accordance with 45 CFR Section 164.520, to the extent that such change or limitation may affect Business Associate's use or disclosure of PHI.

b.  Covered Entity shall promptly notify Business Associate of any changes in, or revocation of permission provided to Covered Entity by individuals whose PHI may be used or disclosed by Business Associate under this Agreement, pursuant to 45 CFR Section 164.506 or 45 CFR Section 164.508.

c.  Covered entity shall promptly notify Business Associate of any restrictions on the use or disclosure of PHI that Covered Entity has agreed to in accordance with 45 CFR 164.522, to the extent that such restriction may affect Business Associate's use or disclosure of PHI.

## (5) Termination for Cause

In addition to Paragraph 10 of the standard terms and conditions (P-37) of this Agreement the Covered Entity may immediately terminate the Agreement upon Covered Entity's knowledge of a breach by Business Associate of the Business Associate Agreement set forth herein as Exhibit I. The Covered Entity may either immediately terminate the Agreement or provide an opportunity for Business Associate to cure the alleged breach within a timeframe specified by Covered Entity. If Covered Entity determines that neither termination nor cure is feasible, Covered Entity shall report the violation to the Secretary.

## (6) Miscellaneous

a.  Definitions and Regulatory References. All terms used, but not otherwise defined herein, shall have the same meaning as those terms in the Privacy and Security Rule, amended from time to time. A reference in the Agreement, as amended to include this Exhibit I, to a Section in the Privacy and Security Rule means the Section as in effect or as amended.

b.  Amendment. Covered Entity and Business Associate agree to take such action as is necessary to amend the Agreement, from time to time as is necessary for Covered Entity to comply with the changes in the requirements of HIPAA, the Privacy and Security Rule, and applicable federal and state law.

c.  Data Ownership. The Business Associate acknowledges that it has no ownership rights with respect to the PHI provided by or created on behalf of Covered Entity.

d.  Interpretation. The parties agree that any ambiguity in the Agreement shall be resolved to permit Covered Entity to comply with HIPAA, the Privacy and Security Rule.

3/2014 Exhibit I Health Insurance Portability Act Business Associate Agreement Page 5 of 6 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

**Source packet page 81**

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

**New Hampshire Department of Health and Human Services**

**Exhibit I**

*[Image description: State of New Hampshire seal, upper right.]*

e.   Segregation. If any term or condition of this Exhibit I or the application thereof to any person(s) or circumstance is held invalid, such invalidity shall not affect other terms or conditions which can be given effect without the invalid term or condition; to this end the terms and conditions of this Exhibit I are declared severable.

f.   Survival. Provisions in this Exhibit I regarding the use and disclosure of PHI, return or destruction of PHI, extensions of the protections of the Agreement in section (3) l, the defense and indemnification provisions of section (3) e and Paragraph 13 of the standard terms and conditions (P-37), shall survive the termination of the Agreement.

IN WITNESS WHEREOF, the parties hereto have duly executed this Exhibit I.

*(Two signature columns; the State's left, the Contractor's right. The DocuSign tabs overprint the underlying form lines.)*

Department of Health and Human Services The State

DocuSigned by: *[Image description: Typed DocuSign signature "Joseph E. Ribsam, Jr.".]* [AAE4DF03055E430?] Signature of Authorized Representative

Joseph E. Ribsam, Jr. Name of Authorized Representative

Director Title of Authorized Representative

5/26/2023 Date

New Hampshire Coalition Against Domestic and Sexual Violenc[…] Name of the Contractor

DocuSigned by: *[Image description: Handwritten DocuSign signature reading "Lyn M. Schollett".]* [EC2EFED23DF3413?] Signature of Authorized Representative

Lyn M. Schollett Name of Authorized Representative

Executive Director Title of Authorized Representative

5/26/2023 Date

3/2014 Exhibit I Health Insurance Portability Act Business Associate Agreement Page 6 of 6 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

Source packet page 82

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C
DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

# New Hampshire Department of Health and Human Services — Exhibit J

## CERTIFICATION REGARDING THE FEDERAL FUNDING ACCOUNTABILITY AND TRANSPARENCY ACT (FFATA) COMPLIANCE

The Federal Funding Accountability and Transparency Act (FFATA) requires prime awardees of individual Federal grants equal to or greater than $25,000 and awarded on or after October 1, 2010, to report on data related to executive compensation and associated first-tier sub-grants of $25,000 or more. If the initial award is below $25,000 but subsequent grant modifications result in a total award equal to or over $25,000, the award is subject to the FFATA reporting requirements, as of the date of the award.

In accordance with 2 CFR Part 170 (Reporting Subaward and Executive Compensation Information), the Department of Health and Human Services (DHHS) must report the following information for any subaward or contract award subject to the FFATA reporting requirements:

1. Name of entity
2. Amount of award
3. Funding agency
4. NAICS code for contracts / CFDA program number for grants
5. Program source
6. Award title descriptive of the purpose of the funding action
7. Location of the entity
8. Principle place of performance
9. Unique identifier of the entity (UEI #)
10. Total compensation and names of the top five executives if: 10.1. More than 80% of annual gross revenues are from the Federal government, and those revenues are greater than $25M annually and 10.2. Compensation information is not already available through reporting to the SEC.

Prime grant recipients must submit FFATA required data by the end of the month, plus 30 days, in which the award or award amendment is made.

The Contractor identified in Section 1.3 of the General Provisions agrees to comply with the provisions of The Federal Funding Accountability and Transparency Act, Public Law 109-282 and Public Law 110-252, and 2 CFR Part 170 (Reporting Subaward and Executive Compensation Information), and further agrees to have the Contractor's representative, as identified in Sections 1.11 and 1.12 of the General Provisions execute the following Certification:

The below named Contractor agrees to provide needed information as outlined above to the NH Department of Health and Human Services and to comply with all applicable provisions of the Federal Financial Accountability and Transparency Act.

Contractor Name: New Hampshire Coalition Against Domestic and[...]

DocuSigned by: *[Image description: Handwritten DocuSign signature reading "Lyn M. Schollett".]* [EC2EFED23DF3413?]

5/26/2023 Date

Name: Lyn M. Schollett Title: Executive Director

CU/DHHS/110713 Exhibit J – Certification Regarding the Federal Funding Accountability And Transparency Act (FFATA) Compliance Page 1 of 2 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

Source packet page 83

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C
DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

# New Hampshire Department of Health and Human Services — Exhibit J

## FORM A

As the Contractor identified in Section 1.3 of the General Provisions, I certify that the responses to the below listed questions are true and accurate.

1. The UEI (SAM.gov) number for your entity is: MS96M91DCAN4

2. In your business or organization's preceding completed fiscal year, did your business or organization receive (1) 80 percent or more of your annual gross revenue in U.S. federal contracts, subcontracts, loans, grants, sub-grants, and/or cooperative agreements; and (2) $25,000,000 or more in annual gross revenues from U.S. federal contracts, subcontracts, loans, grants, subgrants, and/or cooperative agreements?

X NO            ___ YES

If the answer to #2 above is NO, stop here

If the answer to #2 above is YES, please answer the following:

3. Does the public have access to information about the compensation of the executives in your business or organization through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C.78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986?

___ NO            ___ YES

If the answer to #3 above is YES, stop here

If the answer to #3 above is NO, please answer the following:

4. The names and compensation of the five most highly compensated officers in your business or organization are as follows:

Name: _____ Amount: _____ Name: _____ Amount: _____ Name: _____ Amount: _____
Name: _____ Amount: _____ Name: _____ Amount: _____

CU/DHHS/110713 Exhibit J – Certification Regarding the Federal Funding Accountability And Transparency Act (FFATA) Compliance Page 2 of 2 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

Source packet page 84

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C
DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

# New Hampshire Department of Health and Human Services — Exhibit K

## DHHS Information Security Requirements

### A. Definitions

The following terms may be reflected and have the described meaning in this document:

1. "Breach" means the loss of control, compromise, unauthorized disclosure, unauthorized acquisition, unauthorized access, or any similar term referring to situations where persons other than authorized users and for an other than authorized purpose have access or potential access to personally identifiable information, whether physical or electronic. With regard to Protected Health Information, "Breach" shall have the same meaning as the term "Breach" in section 164.402 of Title 45, Code of Federal Regulations.

2. "Computer Security Incident" shall have the same meaning "Computer Security Incident" in section two (2) of NIST Publication 800-61, Computer Security Incident Handling Guide, National Institute of Standards and Technology, U.S. Department of Commerce.

3. "Confidential Information" or "Confidential Data" means all confidential information disclosed by one party to the other such as all medical, health, financial, public assistance benefits and personal information including without limitation, Substance Abuse Treatment Records, Case Records, Protected Health Information and Personally Identifiable Information.

    Confidential Information also includes any and all information owned or managed by the State of NH — created, received from or on behalf of the Department of Health and Human Services (DHHS) or accessed in the course of performing contracted services — of which collection, disclosure, protection, and disposition is governed by state or federal law or regulation. This information includes, but is not limited to Protected Health Information (PHI), Personal Information (PI), Personal Financial Information (PFI), Federal Tax Information (FTI), Social Security Numbers (SSN), Payment Card Industry (PCI), and or other sensitive and confidential information.

4. "End User" means any person or entity (e.g., contractor, contractor's employee, business associate, subcontractor, other downstream user, etc.) that receives DHHS data or derivative data in accordance with the terms of this Contract.

5. "HIPAA" means the Health Insurance Portability and Accountability Act of 1996 and the regulations promulgated thereunder.

6. "Incident" means an act that potentially violates an explicit or implied security policy, which includes attempts (either failed or successful) to gain unauthorized access to a system or its data, unwanted disruption or denial of service, the unauthorized use of a system for the processing or storage of data; and changes to system hardware, firmware, or software characteristics without the owner's knowledge, instruction, or consent. Incidents include the loss of data through theft or device misplacement, loss or misplacement of hardcopy documents, and misrouting of physical or electronic

*(Item 6 continues past the bottom of this page; the sentence resumes on the document's next page, outside this file's range.)*

V5. Last update 10/09/18 Exhibit K DHHS Information Security Requirements Page 1 of 9 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

Source packet page 85

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672 *[Image description: Seal of the State of New Hampshire, upper right.]*

**New Hampshire Department of Health and Human Services**

**Exhibit K**

**DHHS Information Security Requirements**

mail, all of which may have the potential to put the data at risk of unauthorized access, use, disclosure, modification or destruction.

7. "Open Wireless Network" means any network or segment of a network that is not designated by the State of New Hampshire's Department of Information Technology or delegate as a protected network (designed, tested, and approved, by means of the State, to transmit) will be considered an open network and not adequately secure for the transmission of unencrypted PI, PFI, PHI or confidential DHHS data.

8. "Personal Information" (or "PI") means information which can be used to distinguish or trace an individual's identity, such as their name, social security number, personal information as defined in New Hampshire RSA 359-C:19, biometric records, etc., alone, or when combined with other personal or identifying information which is linked or linkable to a specific individual, such as date and place of birth, mother's maiden name, etc.

9. "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 C.F.R. Parts 160 and 164, promulgated under HIPAA by the United States Department of Health and Human Services.

10. "Protected Health Information" (or "PHI") has the same meaning as provided in the definition of "Protected Health Information" in the HIPAA Privacy Rule at 45 C.F.R. § 160.103.

11. "Security Rule" shall mean the Security Standards for the Protection of Electronic Protected Health Information at 45 C.F.R. Part 164, Subpart C, and amendments thereto.

12. "Unsecured Protected Health Information" means Protected Health Information that is not secured by a technology standard that renders Protected Health Information unusable, unreadable, or indecipherable to unauthorized individuals and is developed or endorsed by a standards developing organization that is accredited by the American National Standards Institute.

## I. RESPONSIBILITIES OF DHHS AND THE CONTRACTOR

A. Business Use and Disclosure of Confidential Information.

1. The Contractor must not use, disclose, maintain or transmit Confidential Information except as reasonably necessary as outlined under this Contract. Further, Contractor, including but not limited to all its directors, officers, employees and agents, must not use, disclose, maintain or transmit PHI in any manner that would constitute a violation of the Privacy and Security Rule.

2. The Contractor must not disclose any Confidential Information in response to a

V5. Last update 10/09/18 Exhibit K DHHS Information Security Requirements Page 2 of 9 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

Source packet page 86

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672 *[Image description: Seal of the State of New Hampshire, upper right.]*

**New Hampshire Department of Health and Human Services**

**Exhibit K**

**DHHS Information Security Requirements**

---

request for disclosure on the basis that it is required by law, in response to a subpoena, etc., without first notifying DHHS so that DHHS has an opportunity to consent or object to the disclosure.

3. If DHHS notifies the Contractor that DHHS has agreed to be bound by additional restrictions over and above those uses or disclosures or security safeguards of PHI pursuant to the Privacy and Security Rule, the Contractor must be bound by such additional restrictions and must not disclose PHI in violation of such additional restrictions and must abide by any additional security safeguards.

4. The Contractor agrees that DHHS Data or derivative there from disclosed to an End User must only be used pursuant to the terms of this Contract.

5. The Contractor agrees DHHS Data obtained under this Contract may not be used for any other purposes that are not indicated in this Contract.

6. The Contractor agrees to grant access to the data to the authorized representatives of DHHS for the purpose of inspecting to confirm compliance with the terms of this Contract.

## II. METHODS OF SECURE TRANSMISSION OF DATA

1. Application Encryption. If End User is transmitting DHHS data containing Confidential Data between applications, the Contractor attests the applications have been evaluated by an expert knowledgeable in cyber security and that said application's encryption capabilities ensure secure transmission via the internet.

2. Computer Disks and Portable Storage Devices. End User may not use computer disks or portable storage devices, such as a thumb drive, as a method of transmitting DHHS data.

3. Encrypted Email. End User may only employ email to transmit Confidential Data if email is encrypted and being sent to and being received by email addresses of persons authorized to receive such information.

4. Encrypted Web Site. If End User is employing the Web to transmit Confidential Data, the secure socket layers (SSL) must be used and the web site must be secure. SSL encrypts data transmitted via a Web site.

5. File Hosting Services, also known as File Sharing Sites. End User may not use file hosting services, such as Dropbox or Google Cloud Storage, to transmit Confidential Data.

6. Ground Mail Service. End User may only transmit Confidential Data via *certified* ground mail within the continental U.S. and when sent to a named individual.

7. Laptops and PDA. If End User is employing portable devices to transmit Confidential Data said devices must be encrypted and password-protected.

8. Open Wireless Networks. End User may not transmit Confidential Data via an open

V5. Last update 10/09/18 Exhibit K DHHS Information Security Requirements Page 3 of 9 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

Source packet page 87

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

**New Hampshire Department of Health and Human Services**

**Exhibit K**

**DHHS Information Security Requirements**

*[Image description: State of New Hampshire seal, upper right.]*

wireless network. End User must employ a virtual private network (VPN) when remotely transmitting via an open wireless network.

9. Remote User Communication. If End User is employing remote communication to access or transmit Confidential Data, a virtual private network (VPN) must be installed on the End User's mobile device(s) or laptop from which information will be transmitted or accessed.

10. SSH File Transfer Protocol (SFTP), also known as Secure File Transfer Protocol. If End User is employing an SFTP to transmit Confidential Data, End User will structure the Folder and access privileges to prevent inappropriate disclosure of information. SFTP folders and sub-folders used for transmitting Confidential Data will be coded for 24-hour auto-deletion cycle (i.e. Confidential Data will be deleted every 24 hours).

11. Wireless Devices. If End User is transmitting Confidential Data via wireless devices, all data must be encrypted to prevent inappropriate disclosure of information.

III. **RETENTION AND DISPOSITION OF IDENTIFIABLE RECORDS**

The Contractor will only retain the data and any derivative of the data for the duration of this Contract. After such time, the Contractor will have 30 days to destroy the data and any derivative in whatever form it may exist, unless, otherwise required by law or permitted under this Contract. To this end, the parties must:

A. Retention

1. The Contractor agrees it will not store, transfer or process data collected in connection with the services rendered under this Contract outside of the United States. This physical location requirement shall also apply in the implementation of cloud computing, cloud service or cloud storage capabilities, and includes backup data and Disaster Recovery locations.

2. The Contractor agrees to ensure proper security monitoring capabilities are in place to detect potential security events that can impact State of NH systems and/or Department confidential information for contractor provided systems.

3. The Contractor agrees to provide security awareness and education for its End Users in support of protecting Department confidential information.

4. The Contractor agrees to retain all electronic and hard copies of Confidential Data in a secure location and identified in section IV. A.2

5. The Contractor agrees Confidential Data stored in a Cloud must be in a FedRAMP/HITECH compliant solution and comply with all applicable statutes and regulations regarding the privacy and security. All servers and devices must have currently-supported and hardened operating systems, the latest anti-viral, anti-hacker, anti-spam, anti-spyware, and anti-malware utilities. The environment, as a

V5. Last update 10/09/18 Exhibit K DHHS Information Security Requirements Page 4 of 9 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

Source packet page 88

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

**New Hampshire Department of Health and Human Services**

**Exhibit K**

**DHHS Information Security Requirements**

*[Image description: State of New Hampshire seal, upper right.]*

whole, must have aggressive intrusion-detection and firewall protection.

6.   The Contractor agrees to and ensures its complete cooperation with the State's Chief Information Officer in the detection of any security vulnerability of the hosting infrastructure.

B. Disposition

1.   If the Contractor will maintain any Confidential Information on its systems (or its sub-contractor systems), the Contractor will maintain a documented process for securely disposing of such data upon request or contract termination; and will obtain written certification for any State of New Hampshire data destroyed by the Contractor or any subcontractors as a part of ongoing, emergency, and or disaster recovery operations. When no longer in use, electronic media containing State of New Hampshire data shall be rendered unrecoverable via a secure wipe program in accordance with industry-accepted standards for secure deletion and media sanitization, or otherwise physically destroying the media (for example, degaussing) as described in NIST Special Publication 800-88, Rev 1, Guidelines for Media Sanitization, National Institute of Standards and Technology, U. S. Department of Commerce. The Contractor will document and certify in writing at time of the data destruction, and will provide written certification to the Department upon request. The written certification will include all details necessary to demonstrate data has been properly destroyed and validated. Where applicable, regulatory and professional standards for retention requirements will be jointly evaluated by the State and Contractor prior to destruction.

2.   Unless otherwise specified, within thirty (30) days of the termination of this Contract, Contractor agrees to destroy all hard copies of Confidential Data using a secure method such as shredding.

3.   Unless otherwise specified, within thirty (30) days of the termination of this Contract, Contractor agrees to completely destroy all electronic Confidential Data by means of data erasure, also known as secure data wiping.

IV.   **PROCEDURES FOR SECURITY**

A. Contractor agrees to safeguard the DHHS Data received under this Contract, and any derivative data or files, as follows:

1.   The Contractor will maintain proper security controls to protect Department confidential information collected, processed, managed, and/or stored in the delivery of contracted services.

2.   The Contractor will maintain policies and procedures to protect Department confidential information throughout the information lifecycle, where applicable, (from creation, transformation, use, storage and secure destruction) regardless of the media used to store the data (i.e., tape, disk, paper, etc.).

V5. Last update 10/09/18 Exhibit K DHHS Information Security Requirements Page 5 of 9 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

Source packet page 89

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672 *[Image description: Seal of the State of New Hampshire, upper right.]*

**New Hampshire Department of Health and Human Services**

**Exhibit K**

**DHHS Information Security Requirements**

3. The Contractor will maintain appropriate authentication and access controls to contractor systems that collect, transmit, or store Department confidential information where applicable.

4. The Contractor will ensure proper security monitoring capabilities are in place to detect potential security events that can impact State of NH systems and/or Department confidential information for contractor provided systems.

5. The Contractor will provide regular security awareness and education for its End Users in support of protecting Department confidential information.

6. If the Contractor will be sub-contracting any core functions of the engagement supporting the services for State of New Hampshire, the Contractor will maintain a program of an internal process or processes that defines specific security expectations, and monitoring compliance to security requirements that at a minimum match those for the Contractor, including breach notification requirements.

7. The Contractor will work with the Department to sign and comply with all applicable State of New Hampshire and Department system access and authorization policies and procedures, systems access forms, and computer use agreements as part of obtaining and maintaining access to any Department system(s). Agreements will be completed and signed by the Contractor and any applicable sub-contractors prior to system access being authorized.

8. If the Department determines the Contractor is a Business Associate pursuant to 45 CFR 160.103, the Contractor will execute a HIPAA Business Associate Agreement (BAA) with the Department and is responsible for maintaining compliance with the agreement.

9. The Contractor will work with the Department at its request to complete a System Management Survey. The purpose of the survey is to enable the Department and Contractor to monitor for any changes in risks, threats, and vulnerabilities that may occur over the life of the Contractor engagement. The survey will be completed annually, or an alternate time frame at the Departments discretion with agreement by the Contractor, or the Department may request the survey be completed when the scope of the engagement between the Department and the Contractor changes.

10. The Contractor will not store, knowingly or unknowingly, any State of New Hampshire or Department data offshore or outside the boundaries of the United States unless prior express written consent is obtained from the Information Security Office leadership member within the Department.

11. Data Security Breach Liability. In the event of any security breach Contractor shall make efforts to investigate the causes of the breach, promptly take measures to prevent future breach and minimize any damage or loss resulting from the breach. The State shall recover from the Contractor all costs of response and recovery from

V5. Last update 10/09/18 Exhibit K DHHS Information Security Requirements Page 6 of 9 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

**Source packet page 90**

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672 *[Image description: Seal of the State of New Hampshire, upper right.]*

**New Hampshire Department of Health and Human Services**

**Exhibit K**

**DHHS Information Security Requirements**

---

the breach, including but not limited to: credit monitoring services, mailing costs and costs associated with website and telephone call center services necessary due to the breach.

12. Contractor must comply with all applicable statutes and regulations regarding the privacy and security of Confidential Information, and must in all other respects maintain the privacy and security of PI and PHI at a level and scope that is not less than the level and scope of requirements applicable to federal agencies, including, but not limited to, provisions of the Privacy Act of 1974 (5 U.S.C. § 552a), DHHS Privacy Act Regulations (45 C.F.R. §5b), HIPAA Privacy and Security Rules (45 C.F.R. Parts 160 and 164) that govern protections for individually identifiable health information and as applicable under State law.

13. Contractor agrees to establish and maintain appropriate administrative, technical, and physical safeguards to protect the confidentiality of the Confidential Data and to prevent unauthorized use or access to it. The safeguards must provide a level and scope of security that is not less than the level and scope of security requirements established by the State of New Hampshire, Department of Information Technology. Refer to Vendor Resources/Procurement at https://www.nh.gov/doit/vendor/index.htm for the Department of Information Technology policies, guidelines, standards, and procurement information relating to vendors.

14. Contractor agrees to maintain a documented breach notification and incident response process. The Contractor will notify the State's Privacy Officer and the State's Security Officer of any security breach immediately, at the email addresses provided in Section VI. This includes a confidential information breach, computer security incident, or suspected breach which affects or includes any State of New Hampshire systems that connect to the State of New Hampshire network.

15. Contractor must restrict access to the Confidential Data obtained under this Contract to only those authorized End Users who need such DHHS Data to perform their official duties in connection with purposes identified in this Contract.

16. The Contractor must ensure that all End Users:

    a. comply with such safeguards as referenced in Section IV A. above, implemented to protect Confidential Information that is furnished by DHHS under this Contract from loss, theft or inadvertent disclosure.

    b. safeguard this information at all times.

    c. ensure that laptops and other electronic devices/media containing PHI, PI, or PFI are encrypted and password-protected.

    d. send emails containing Confidential Information only if encrypted and being sent to and being received by email addresses of persons authorized to receive such information.

V5. Last update 10/09/18 Exhibit K DHHS Information Security Requirements Page 7 of 9 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

**Source packet page 91**

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

**New Hampshire Department of Health and Human Services**

**Exhibit K**

**DHHS Information Security Requirements**

*[Image description: State of New Hampshire seal, upper right.]*

e.    limit disclosure of the Confidential Information to the extent permitted by law.

f.    Confidential Information received under this Contract and individually identifiable data derived from DHHS Data, must be stored in an area that is physically and technologically secure from access by unauthorized persons during duty hours as well as non-duty hours (e.g., door locks, card keys, biometric identifiers, etc.).

g.    only authorized End Users may transmit the Confidential Data, including any derivative files containing personally identifiable information, and in all cases, such data must be encrypted at all times when in transit, at rest, or when stored on portable media as required in section IV above.

h.    in all other instances Confidential Data must be maintained, used and disclosed using appropriate safeguards, as determined by a risk-based assessment of the circumstances involved.

i.    understand that their user credentials (user name and password) must not be shared with anyone. End Users will keep their credential information secure. This applies to credentials used to access the site directly or indirectly through a third party application.

Contractor is responsible for oversight and compliance of their End Users. DHHS reserves the right to conduct onsite inspections to monitor compliance with this Contract, including the privacy and security requirements provided in herein, HIPAA, and other applicable laws and Federal regulations until such time the Confidential Data is disposed of in accordance with this Contract.

## V. LOSS REPORTING

The Contractor must notify the State's Privacy Officer and Security Officer of any Security Incidents and Breaches immediately, at the email addresses provided in Section VI.

The Contractor must further handle and report Incidents and Breaches involving PHI in accordance with the agency's documented Incident Handling and Breach Notification procedures and in accordance with 42 C.F.R. §§ 431.300 - 306. In addition to, and notwithstanding, Contractor's compliance with all applicable obligations and procedures, Contractor's procedures must also address how the Contractor will:

1. Identify Incidents;
2. Determine if personally identifiable information is involved in Incidents;
3. Report suspected or confirmed Incidents as required in this Exhibit or P-37;
4. Identify and convene a core response group to determine the risk level of Incidents and determine risk-based responses to Incidents; and

V5. Last update 10/09/18 Exhibit K DHHS Information Security Requirements Page 8 of 9 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

Source packet page 92

Docusign Envelope ID: F0BF11DF-2A73-403F-BBFE-3634EF81D44C DocuSign Envelope ID: 289A70BE-DFB3-4E0E-9927-06367CDA1672

**New Hampshire Department of Health and Human Services**

**Exhibit K**

**DHHS Information Security Requirements**

*[Image description: State of New Hampshire seal, upper right.]*

5.    Determine whether Breach notification is required, and, if so, identify appropriate Breach notification methods, timing, source, and contents from among different options, and bear costs associated with the Breach notice as well as any mitigation measures.

Incidents and/or Breaches that implicate PI must be addressed and reported, as applicable, in accordance with NH RSA 359-C:20.

VI.    **PERSONS TO CONTACT**

A. DHHS Privacy Officer:

DHHSPrivacyOfficer@dhhs.nh.gov

B. DHHS Security Officer:

DHHSInformationSecurityOffice@dhhs.nh.gov

V5. Last update 10/09/18 Exhibit K DHHS Information Security Requirements Page 9 of 9 Contractor Initials *[Image description: DocuSign initials "LS".]* 5/26/2023 Date

# EXHIBIT 3

NH Administrative Rules He-W 400

Child Support Services Rules

Including He-W 401.01(q): "Never-Assistance Case" Definition

*[Attach document behind this page]*

CHAPTER He-W 400  SUPPORT OF DEPENDENT CHILDREN

PART He-W 401  DEFINITIONS

He-W 401.01  Definitions.

(a)  "Annual" means the recurring one year period that coincides with the federal fiscal year, which begins on October 1 and ends on September 30.

(b)  "Arrearage" means "arrearage" as defined in RSA 458-B:1, I namely, "the total amount of unpaid support which has accrued since the effective date of a legal order which stipulates a periodic support amount due, and shall include any amount of unreimbursed assistance accumulated prior to the issuance of the legal order of support".

(c)  "Assistance debt" means the amount of unreimbursed assistance that accrued prior to the issuance of a legal order which makes the payor liable for that debt.

(d)  "Assistance expended" means the amount of financial aid provided to an individual under Title IV-A, Title IV-E, or Title XIX of the Social Security Act.

(e)  "Assistance reimbursed" means payments disbursed to the state as reimbursement for assistance provided.

(f)  "Child support monthly support obligation (CSMSO)" means the amount derived from multiplying the ordered child support obligation amount by the number of payment due dates during the month.

(g)  "Conditionally assigned arrearages" means arrearages:

(1)  Which were temporarily assigned to the state prior to 10/01/2009 as a condition of eligibility for IV-A services, and became conditionally assigned to the state when the family stopped receiving IV-A services, thereby ending the temporary assignment; and

(2)  Are paid to the family unless they are collected through federal income tax refund offset, in which case the collected amount is retained by the state.

(h)  "Current assistance case" means any child support case where the family is also receiving temporary assistance to needy families (TANF) benefits under Title IV-A of the Social Security Act or foster care provided under Title IV-E of the Social Security Act.

(i)  "Debt type" means child support, spousal support, medical support, assistance debt, miscellaneous, or another state's arrearages.

(j)  "Disbursement" means the payment of money to a payee, individual, state, or other entity.

(k)  "Distribution" means the allocation of receipts to obligations.

(l)  "Family" means, for a child support case that is currently receiving TANF, the TANF casehead and all dependents included in that TANF case irrespective of the number of child support cases, or the payee for the individual member obligations, or the check recipient for the individual obligations.

(m)  "Former assistance case" means any child support case where the family formerly received aid to families with dependent children (AFDC) or TANF benefits.

(n)  "Futures" means money held by the department that either represents payment on the required support obligation(s) for future months and is applied to future months, or is non-distributable.

(o)  "Medical support monthly support obligation (MSMSO)" means the amount derived from multiplying the ordered medical support obligation amount by the number of payment due dates during the month.

He-W 400 Support Children

(p) "Never-assigned arrearages" means all arrearages in never-assistance cases, and all arrearages that accrue in former assistance cases after the family's most recent period of assistance ends.

(q) "Never-assistance case" means any child support case where the family has never received AFDC, TANF, or foster care IV-E benefits.

(r) "Non-distributable" means any received amount that remains after satisfying the monthly support obligation for the current month and all arrearages, for which no allocation obligation exists, and which is therefore refundable.

(s) "Non-IV-D case" means a case that is not being enforced by the bureau of child support services, is subject to an income assignment pursuant to RSA 458-B, and where ordered support payments are monitored, collected, and disbursed through the IV-D state disbursement unit.

(t) "Obligation" means any combination of case member and debt type as specified in a legally enforceable order to pay support.

(u) "Obligee" means "obligee" as defined in RSA 458-B:1, VII namely, "the person found to be legally entitled to receive child support, spousal support, or combination child and spousal support". This term includes "payee".

(v) "Obligor" means "obligor" as defined in RSA 458-B:1, VIII namely, "the person found to be legally liable for child support, spousal support, or combination child and spousal support". This term includes "payor".

(w) "Overpayment" means a disbursed support payment that becomes monies presumably owed to the state of New Hampshire as a result of:

(1) A misdirected child support payment resulting from a posting error or distribution error;

(2) An adjustment being made by the U.S. Department of Treasury to a previously filed tax return, reducing the refund, after the division collected support arrearages through the Federal Offset Program;

(3) A paying government entity, for example the Social Security Administration, requiring that the division return all or part of a payment; or

(4) A child support payment check that has been returned, or electronic payment reversed by the financial institution from which it was issued, for either insufficient funds, a closed account, stop-payment order, marked as "refer to maker", or other reason by the financial institution.

(x) "Payment type" means the classification of an obligation to a specific category, such as TANF, medicaid-only, IV-E foster care, or non-TANF.

(y) "Permanently assigned arrearages" means those arrearages which are assigned to the department of health and human services under an assignment entered into prior to 10/1/1997, and all arrearages which accrue on or after 10/1/1997, while a family is receiving TANF benefits.

(z) "Recoupment" means the process of recovering from a payee a monetary loss arising from an overpayment.

(aa) "Recovery" means the process of recovering from a payor or an employer a monetary loss arising from an overpayment.

(ab) "Temporarily assigned arrearages" means the sum of never-assigned arrearages, unassigned pre-assistance arrearages, and unassigned during-assistance arrearages which was temporarily assigned to the department of health and human services before 10/01/2009, as a condition of eligibility for IV-A services.

(ac) "Title IV-A" means the joint federal-state program described in Title IV-A of the Social Security Act, "Block Grants to States for Temporary Assistance for Needy Families," and administered in New Hampshire by the division of

family assistance.

(ad) "Title IV-D" means the joint federal-state program described in Title IV-D of the Social Security Act, "Child Support and Establishment of Paternity," and administered in New Hampshire by the division of child support services.

(ae) "Title IV-E" means the joint federal-state program described in Title IV-E of the Social Security Act, "Federal Payments for Foster Care and Adoption Assistance," and administered in New Hampshire by the division for children, youth and families.

(af) "Title XIX" means the joint federal-state program described in Title XIX of the Social Security Act, "Grants to States for Medical Assistance Programs," and administered in New Hampshire under the medicaid program.

(ag) "Total arrearages" means the sum of the difference between life-to-date owed and life-to-date paid for each obligation.

(ah) "Unassigned arrearages" means all arrearages except permanently or temporarily assigned arrearages.

(ai) "Unassigned during-assistance arrearages" means all previously assigned arrearages which exceed the cumulative amount of unreimbursed assistance when the family leaves the assistance program and which accrued during the receipt of assistance.

(aj) "Unassigned pre-assistance arrearages" means all previously assigned arrearages which exceed the cumulative amount of unreimbursed assistance when the family leaves the assistance program and which accrued prior to the receipt of assistance.

(ak) "Unreimbursed assistance (URA)" means the difference between the AFDC,TANF, or IV-E foster care assistance expended and assistance reimbursed.

> Source. #2396, eff 6-30-83; amd by #2437, eff 8-1-83; ss by #2920, eff 12-4-84, EXPIRED: 12-4-90
>
> New. #9206, eff 7-19-08; ss by #9549, eff 10-1-09; ss by #10677, eff 9-26-14, EXPIRED: 9-26-34
>
> New. #14125, INTERIM, eff 11-26-25, EXPIRES: 5-25-25 *(Remains in effect per RSA 541-A:14-a)*; ss by #14274, eff 6-24-25, EXPIRES: 6-24-35

## PART He-W 402 ESTABLISHING PATERNITY - EXPIRED

> Source. #2396, eff 6-30-83; ss by #2920, eff 12-4-84, EXPIRED: 12-4-90

## PART He-W 403 DISTRIBUTION AND DISBURSEMENT OF SUPPORT PAYMENTS

He-W 403.01 Distribution.

(a) In TANF cases, child support payment amounts received shall be distributed in the following order:

(1) To satisfy the child support monthly support obligation (CSMSO), amounts shall be retained by the state as reimbursement for the assistance expended for the month;

(2) Portions of the CSMSO that exceed the assistance expended for the month shall be distributed in the following order:

a. Retained by the state as assistance reimbursed, up to the amount of unreimbursed assistance (URA); and

b. Paid to the family when the URA is satisfied;

(3) Amounts collected in excess of the CSMSO, up to the amount of URA, shall be retained by the state to reduce temporarily assigned arrearages;

(4) Amounts collected in excess of temporarily assigned arrearages, up to the amount of URA, shall be retained by the state and applied to reduce permanently assigned arrearages;

(5) Amounts collected in excess of permanently assigned arrearages shall be applied to reduce conditionally assigned arrearages, as follows:

a. Amounts received through federal tax intercept, up to the amount of URA, shall be retained by the state; and

b. Amounts not received through federal tax intercept shall be paid to the obligee;

(6) Amounts collected in excess of conditionally assigned arrearages, up to the amount of URA, shall be retained by the state and applied to reduce IV-E foster care arrearages;

(7) Amounts collected in excess of IV-E foster care arrearages shall be paid to the obligee and applied to reduce never-assigned arrearages;

(8) Amounts collected in excess of never-assigned arrearages shall be paid to the obligee and applied to reduce unassigned pre-assistance arrearages;

(9) Amounts collected in excess of unassigned pre-assistance arrearages shall be paid to the obligee and applied to reduce unassigned during assistance arrearages; and

(10) Amounts collected in excess of all arrearages shall be held as futures.

(b) In IV-E foster care cases, child support amounts received shall be distributed in the following order:

(1) To satisfy the CSMSO, amounts collected up to the IV-E assistance expended for the month, but less than the CSMSO, shall be retained by the state as reimbursement for the IV-E assistance expended for the month;

(2) Amounts collected above the IV-E assistance expended for the month, but less than the CSMSO, shall be retained by the state and applied to reduce the URA;

(3) Amounts collected in excess of the CSMSO, up to the amount of URA, shall be retained by the state and applied to reduce IV-E foster care arrearages;

(4) Amounts collected in excess of foster care arrearages, up to the amount of URA, shall be retained by the state and applied to reduce permanently assigned arrearages;

(5) Amounts collected in excess of permanently assigned arrearages shall be applied to reduce conditionally assigned arrearages, as follows:

a. Amounts received through federal tax intercept, up to the amount of URA, shall be retained by the state; and

b. Amounts not received through federal tax intercept shall be paid to the obligee;

(6) Amounts collected in excess of conditionally assigned arrearages shall be paid to the obligee and applied to reduce never-assigned arrearages;

(7) Amounts collected in excess of never-assigned arrearages shall be paid to the obligee and applied to reduce unassigned pre-assistance arrearages;

(8) Amounts collected in excess of unassigned pre-assistance arrearages shall be paid to the obligee and applied to reduce unassigned during-assistance arrearages; and

(9) Amounts collected in excess of all arrearages shall be held as futures.

(c) In former assistance cases, child support amounts received shall be distributed as follows:

(1) To satisfy the CSMSO, amounts applied to the CSMSO shall be paid to the obligee;

(2) Amounts collected in excess of the CSMSO shall be paid to the obligee and applied to reduce never-assigned arrearages;

(3) Amounts collected in excess of never-assigned arrearages shall be paid to the obligee and applied to reduce unassigned pre-assistance arrearages;

(4) Amounts collected in excess of unassigned pre-assistance arrearages shall be applied to reduce conditionally assigned arrearages, as follows:

a. Amounts received through federal tax intercept, up to the amount of URA, shall be retained by the state; and

b. Amounts not received through federal tax intercept shall be paid to the obligee;

(5) Amounts collected in excess of conditionally assigned arrearages shall be retained by the state, up to the amount of URA, and applied to reduce permanently assigned arrearages;

(6) Amounts collected in excess of permanently assigned arrearages, up to the amount of URA, shall be retained by the state and applied to reduce IV-E foster care arrearages;

(7) Amounts collected in excess of IV-E foster care arrearages shall be paid to the obligee and applied to reduce unassigned during-assistance arrears; and

(8) Amounts collected in excess of all arrearages shall be held as futures.

(d) In never-assistance cases, child support amounts received shall be distributed as follows:

(1) To satisfy the CSMSO, amounts applied to the CSMSO shall be paid to the obligee;

(2) Amounts collected in excess of the CSMSO shall be paid to the obligee and applied to reduce never-assigned arrearages; and

(3) Amounts collected in excess of all arrearages shall be held as futures.

(e) In TANF, medicaid, and foster care cases, medical support payment amounts shall be distributed in the following order:

(1) To satisfy the medical support monthly support obligation (MSMSO), amounts up to the MSMSO shall be retained by the state as reimbursement for the medical assistance expended for the month;

(2) Amounts collected in excess of the MSMSO shall be retained by the state and applied to reduce permanently assigned arrearages;

(3) Amounts collected in excess of permanently assigned arrearages shall be paid to the obligee and applied to reduce never-assigned arrearages; and

(4) Amounts collected in excess of all arrearages shall be held as futures.

(f) In never-assistance and former assistance cases, medical support payment amounts shall be distributed in the following order:

(1) To satisfy the medical support monthly support obligation (MSMSO), amounts applied to the MSMSO shall be paid to the obligee;

(2) Amounts collected in excess of the MSMSO shall be paid to the obligee and applied to reduce never-assigned arrearages;

(3) Amounts collected in excess of never-assigned arrearages shall be retained by the state and applied to reduce permanently assigned arrearages; and

(4) Amounts collected in excess of all arrearages shall be held as futures.

(g) In all cases:

(1) Payments shall be distributed consistently and in the sequence outlined in He-W 403.01(a)-(f) above, based on payment type, payment due dates, and arrearages;

(2) If a obligor has multiple obligations within a case, payments received shall be allocated proportionally among the obligor's obligations;

(3) If a obligor who is in multiple cases makes a payment without specifying that the payment is for a specific case, the payment shall be allocated proportionally among all the obligor's obligations and arrearages, and distributed for each case according to case type;

(4) If a payment adjustment is made to a case, distribution shall be based on the obligee's case type at the time the adjustment is made; and

(5) Payments received prior to the establishment of a legal obligation shall be:

a. Counted as assistance reimbursed, thereby reducing URA;

b. Distributed at case or obligor level and affect no other obligor balances; and

c. Disbursed normally based on case type.

Source. #2671, eff 4-13-84; ss by #2920, eff 12-4-84, EXPIRED: 12-4-90

New. #5090, eff 3-11-91; amd by #6390, INTERIM, eff 12-1-96; amd by #6446, eff 2-1-96; ss by #6465, INTERIM, eff 3-10-97, EXPIRES: 7-8-97; ss by #6537, eff 7-8-97; amd by #6600, INTERIM, eff 10-8-97, EXPIRES: 2-5-98; ss by #6707, eff 3-3-98; ss by #7125, eff 11-1-99; ss by #9020, eff 11-1-07; renumbered by #9206 (formerly -); ss by #9549, eff 10-1-09; ss by #10677, eff 9-26-14, EXPIRED: 9-26-24

New. #14126, INTERIM, eff 11-26-24, EXPIRES: 5-25-25 *(Remains in effect per RSA 541-A:14-a)*; ss by #14275, eff 6-24-25, EXPIRES: 6-24-35

He-W 403.02  Disbursement.

(a) All child support payments shall be disbursed by the state disbursement unit (SDU) to a debit card account provided to obligees.

(b) Use of the child support debit card shall be subject to the transaction fees as detailed in the informational enrollment package sent to obligees by the department.

(c) Obligees may submit a written request to the address in (d) below to:

(1) Elect to receive direct deposit into their checking or savings accounts;

(2) Request payment by paper check due to qualifying for a hardship exemption, as described in (h) below; or

(3) Subsequently change their payment method.

(d) Obligees shall mail written requests to:

State Disbursement Unit
P.O. Box 9504
Manchester, NH 03108.

(e) Obligees electing payment by direct deposit or requesting payment by paper check shall submit their written request to the SDU within 30 days of receipt of the enrollment notice to avoid issuance of a debit card.

(f) Obligees electing payment by direct deposit shall provide the SDU with a voided check or letter from the obligee's bank stating the obligee's bank account number and routing number.

(g) Obligees requesting payment by paper check shall indicate in their written request the hardship exemption reason preventing them from accessing an electronically transferred payment.

(h) A hardship exemption shall be accepted if:

(1) A physical or other disability imposes a hardship for the obligee in accessing an electronically transferred payment;

(2) A language or literacy barrier imposes a hardship for the obligee in accessing an electronically transferred payment;

(3) The obligee lives and works more than 5 miles from an automated teller machine and more than 5 miles from a financial institution where the funds may be accessed; or

(4) Other individual circumstances exist that impose a hardship for the obligee in accessing an electronically transferred payment.

(i) Intercepted federal tax refunds made to satisfy a non-IV-A debt that are associated with a joint tax return shall be held for a period of 6 months, or until the department of health and human services is notified by the secretary of the United States treasury that the unobligated spouse's proper share of the refund has been paid, whichever is earlier.

Source. #2671, eff 4-13-84; ss by #2920, eff 12-4-84, EXPIRED: 12-4-90

New. #5090, eff 3-11-91; ss by #6465, INTERIM,
eff 3-10-97, EXPIRES: 7-8-97; ss by #6537, eff 7-8-97; ss by #6707, eff 3-3-98; ss by #7125, eff 11-1-99; ss by#9020, eff 11-1-07; renumbered by #9206 (formerly He-W 403.03); ss by #9663, eff 5-1-10; amd by

#10467, eff 11-26-13; ss by #12585, eff 7-24-18; ss by #13349, eff 3-2-22; ss by #14275, eff 6-24-25, EXPIRES: 6-24-35

He-W 403.03 Recoupment of Overpayments.

(a) Child support obligees shall indicate on Form BCSS 152, "Important Notice Regarding Overpayment of Child Support and Authorization to Withhold" (June 2025), whether or not they authorize BCSS to recoup overpayments by withholding a percentage of future child support payments, as described in paragraph (b) below, that are collected on their behalf until the overpayment is repaid.

(b) When an overpayment occurs, BCSS shall initiate withholding of 20% of future child support payments if the obligee has checked the applicable box on Form BCSS 152, "Important Notice Regarding Overpayment of Child Support and Authorization to Withhold" (June 2025), authorizing such withholding to recoup the overpayment. When the overpayment occurs from a federal tax offset adjustment, the rate of withholding of future child support payments shall be 50%. Prior to withholding, BCSS shall provide the obligee with Form BCSS 153, "Notice of Overpayment of Child Support" (June 2025).

(c) BCSS shall inform the obligee that the overpayment may be repaid by sending a check or money order for the full amount of the overpayment to BCSS.

(d) If the obligee has not authorized withholding of future child support payments by checking the box on Form DCSS 152 BCSS shall provide the obligee with Form BCSS 621A, "Notice of Overpayment of Child Support and Request for Repayment" (June 2025).

(e) The obligee shall complete, sign, and return the repayment agreement section of Form BCSS 621A selecting an agreement to either:

(1) Repay the full overpayment amount within 30 days; or

(2) Let BCSS keep 20% of all future child support collected until the overpayment is repaid to BCSS. If the overpayment occurred from a federal tax offset adjustment, the rate of withholding of future child support payments shall be 50% until the overpayment is repaid to BCSS.

(f) If the obligee returns the repayment agreement section of Form BCSS 621A authorizing withholding of child support payments, BCSS shall initiate the authorized withholding.

(g) If the obligee does not return the repayment agreement section of Form BCSS 621A within 10 days of the date the form was mailed to the obligee, BCSS shall provide the obligee with Form BCSS 621B, "Second Notice of Overpayment of Child Support and Request for Repayment" (June 2025).

(h) The obligee shall complete, sign and return the repayment agreement section of Form BCSS 621B selecting an agreement to either:

(1) Repay the full overpayment amount within 20 days; or

(2) Let BCSS keep 20% of all future child support collected until the overpayment is repaid to BCSS. If the overpayment occurred from a federal tax offset adjustment, the rate of withholding of future child support payments shall be 50% until the overpayment is repaid to BCSS.

(i) If the obligee returns the repayment agreement section of Form BCSS 621B authorizing withholding of child support payments, BCSS shall initiate the authorized withholding.

(j) If the obligee does not return the repayment agreement section of Form BCSS 621B within 10 days of the date the form was mailed to the obligee, BCSS shall provide the obligee with Form BCSS 621C, "Final Notice of Overpayment of Child Support and Request for Repayment" (June 2025).

(k) The obligee shall complete, sign and return the Repayment Agreement section of Form BCSS 621C selecting an agreement to either:

(1) Repay the full overpayment amount with 10 days; or

(2) Let BCSS keep 20% of all future child support collected until the overpayment is repaid to BCSS. If the overpayment occurred from a federal tax offset adjustment, the rate of withholding of future child support payments shall be 50%, until the overpayment is repaid to BCSS.

(l) If the obligee returns the repayment agreement section of Form BCSS 621C authorizing withholding of child support payments, BCSS shall initiate the authorized withholding.

(m) If the obligee does not return the repayment agreement section of Form BCSS 621C within 10 days of the date the form was mailed to the obligee, or does not notify BCSS verbally or in writing that the obligee does not authorize the withholding of support payments, then permission to recoup the overpayment by withholding child support payments shall be assumed.

(n) Once initiated, withholding of child support payments shall continue until the overpayment is fully recouped.

Source. #5341, eff 3-3-92; EXPIRED: 3-3-98

New. #6741, eff 4-28-98, EXPIRED: 4-28-06; ss by #8602, INTERIM, eff 4-28-06, EXPIRES: 10-25-06; ss by #8685, eff 7-21-06; amd and renumbered by #9206, eff 7-19-08 (former paragraph (a) deleted) (formerly He-W 403.04); ss by #10467, eff 11-26-13; ss by #10760, eff 1-19-15; ss by #14275, eff 6-24-25, EXPIRES: 6-24-35

He-W 403.04  Recovery of Payments for Returned Child Support Payment Checks and Reversed Electronic Payments Made by a Obligor.

(a) Upon discovering that a obligor's child support payment check has been returned, or that electronic payment has been reversed by the financial institution from which it was issued, for either insufficient funds, a closed account, stop-payment order, marked as "refer to maker" or any other reason, BCSS shall provide the obligor with Form BCSS 149A, "Notice of Returned Check and Demand for Repayment" (June 2025).

(b) If the obligor fails to replace the returned check or reversed electronic payment by bank check or money order and send payment and the "Returned Check Repayment Coupon" provided on the Form BCSS 149A within 10 calendar days of the date on Form BCSS 149A, BCSS shall provide the obligor with Form BCSS 149B, "Second Notice of Returned Check and Demand for Repayment" (June 2025).

(c) In order to receive credit for a recovery payment on the debt owed to the state, the obligor shall submit to BCSS the recovery payment by bank check or money order with the "Returned Check Repayment Coupon" provided on Form BCSS 149A or Form BCSS 149B.

(d) When it is determined that a bank error has occurred, a recovery payment submitted by personal check without the "Returned Check Repayment Coupon" shall not be accepted as a recovery payment and shall be returned to the obligor.

(e) Payments for returned checks that are submitted by bank check or money order without the "Returned Check Repayment Coupon" shall be processed as a regular child support payment pursuant to He-W 403.01 and He-W 403.02, and shall not be credited as a recovery payment of the returned check or electronic reversal.

(f) Upon receipt of a partial recovery payment of a returned check or electronic reversal, BCSS shall provide the obligor with Form BCSS 150, "Notice of Receipt of Partial Repayment of Returned Check" (June 2025).

(g)  Upon receipt of repayment in full of the returned check or electronic payment, BCSS shall provide the obligor with Form BCSS 155 "Notice of Receipt of Repayment of Returned Check" (June 2025).

(h)  If full recovery payment is not received by BCSS within 14 days of the date on either Form BCSS 149B "Second Notice of Returned Check and Demand for Repayment" or Form BCSS 150 "Notice of Receipt of Partial Repayment of Returned Check" then BCSS shall file with the appropriate court to establish a legal order against the obligor for the debt.

(i)  If full recovery payment is not received by BCSS within 14 days of the date on either Form BCSS 149B "Second Notice of Returned Check and Demand for Repayment" or Form BCSS 150 "Notice of Receipt of Partial Repayment of Returned Check" then BCSS shall refer the obligor's case to the appropriate law enforcement agency for investigation and possible criminal prosecution.

(j)  BCSS shall continue to accept the obligor's child support payments by check or electronic transfer if full recovery payment is received by BCSS within 10 calendar days of the date on Form BCSS 149A, "Notice of Returned Check and Demand for Repayment" using the provided "Returned Check Repayment Coupon" and either:

(1)  The obligor provides evidence the check was returned or electronic payment reversed due to an error by the financial institution or other circumstances beyond the check issuer's control; or

(2)  No other child support payments received by BCSS from the check issuer in the preceding year have been returned or electronically reversed.

(k)  If the obligor fails to replace the returned check or reversed electronic payment in full to BCSS within 10 calendar days of the date on Form BCSS 149A, "Notice of Returned Check and Demand for Repayment" the obligor shall be required to pay by bank check or money order until the following conditions have been met, at which time the obligor may pay support by personal check or electronic payment:

(1)  A minimum of one calendar year has gone by beginning 10 days from the date of Form BCSS 149A, "Notice of Returned Check and Demand for Repayment;"

(2)  BCSS has received full recovery payment for the returned check or electronic reversal; and

(3)  The obligor has been in compliance with the legal order for support during the one year period described in (1) above.

> Source.  #8685, eff 7-21-06; renumbered by #9206 (formerly He-W 403.05); ss by #10639, INTERIM, eff 7-21-14, EXPIRES: 1-19-15; ss by #10760, eff 1-19-15; ss by #14275, eff 6-24-25, EXPIRES: 6-24-35

He-W 403.05  Recovery of Payments for Returned Child Support Payment Checks and Reversed Electronic Payments Made by an Employer.

(a)  Upon discovering that a child support payment check submitted by an employer pursuant to RSA 458-B has been returned, or that an electronic payment has been reversed by the financial institution from which it was issued, for either insufficient funds, a closed account, stop-payment order, marked as "refer to maker," or any other reason BCSS shall provide the employer with Form BCSS 149C, "Notice of Returned Check and Demand for Repayment" (June 2025). BCSS shall provide the obligor with a copy of Form BCSS 149C.

(b)  If the employer fails to replace the returned check or reversed electronic payment by bank check or money order and the "Returned Check Repayment Coupon" provided on Form BCSS 149C within 10 calendar days of the date on Form 149C, BCSS shall provide the employer with Form BCSS 149D, "Second Notice of Returned Check and Demand for Repayment" (June 2025).

(c)  In order to receive credit for a recovery payment on the debt owed to the state, the employer shall submit the recovery payment with the "Returned Check Repayment Coupon" provided on Form BCSS 149C or Form BCSS

149D.

(d) When it is determined that a bank error has occurred, a recovery payment submitted by personal or business check without the "Returned Check Repayment Coupon" shall not be accepted as a recovery payment and shall be returned to the employer.

(e) Recovery payments for returned checks that are submitted by bank check or money order without a provided "Returned Check Repayment Coupon" shall be processed as a regular child support payment pursuant to He-W 403.01 and He-W 403.02, and shall not be credited as a recovery payment of the returned check or electronic reversal.

(f) Upon receipt of a partial recovery payment of a returned check or electronic reversal, BCSS shall provide the employer with Form BCSS 150, "Notice of Receipt of Partial Repayment of Returned Check" (June 2025).

(g) Upon receipt of repayment in full of the returned check or electronic payment, BCSS shall provide the employer with Form BCSS 155 "Notice of Receipt of Repayment of Returned Check" (June 2025).

(h) If full recovery payment is not received by BCSS within 14 days of the date on Form BCSS 149D "Second Notice of Returned Check and Demand for Repayment" or Form BCSS 150 "Notice of Receipt of Partial Repayment of Returned Check" BCSS shall file with the appropriate court to establish a legal order against the obligor for the debt.

(i) If full recovery payment is not received, and the statute of limitations provided in the NH Criminal Code has not expired, BCSS shall refer the obligor's case to the appropriate law enforcement agency for investigation and possible criminal prosecution.

(j) BCSS shall continue to accept the employer's child support payments by check or electronic transfer if full recovery payment is received by BCSS within 10 calendar days of the date on Form BCSS 149C "Notice of Returned Check and Demand for Repayment" using the provided "Returned Check Repayment Coupon" and either:

(1) The employer provides evidence that the check was returned or electronic payment was reversed due to an error by the financial institution or other circumstances beyond the check issuer's control; or

(2) No other child support payments received by BCSS from the employer in the preceding year have been returned or electronically reversed.

(k) If the employer fails to replace the returned check or reversed electronic payment in full to BCSS within 10 calendar days of the date on Form BCSS 149C, "Notice of Returned Check and Demand for Repayment" the employer shall be required to pay by bank check or money order until the following conditions have been met, after which time the employer may pay support by business check or electronic payment:

(1) A minimum of one calendar year has gone by beginning 10 days from the date of Form BCSS 149C, "Notice of Returned Check and Demand for Repayment" and

(2) BCSS has received full recovery payment for the returned check or electronic reversal.

> Source. #8685, eff 7-21-06; renumbered by #9206 (formerly He-W 403.06); ss by #10639, INTERIM, eff 7-21-14, EXPIRES: 1-19-15; ss by #10760, eff 1-19-15; ss by #14275, eff 6-24-25, EXPIRES: 6-24-35

He-W 403.06 Recovery of Payments Resulting from an Adjusted Federal Tax Return.

(a) Whenever the federal Internal Revenue Service (IRS) requires BCSS to return all or part of a tax refund that was intercepted through the federal offset program, BCSS shall recover the amount returned to the IRS as follows:

(1) In cases where a portion of a obligor's intercepted federal tax refund remained after applying the intercepted amount to all certified arrearages, and the remaining balance of the refund was sent to

the obligor upon request, BCSS shall provide the obligor with Form BCSS 154, "Notice of Adjusted Tax Return and Demand for Repayment" (June 2025);

(2)  In order to receive credit for repayment of the debt amount, the obligor shall return the payment with the "Adjusted Tax Refund Intercept Repayment Coupon" provided on Form BCSS 154;

(3)  Payments that are submitted without an adjusted tax refund intercept repayment coupon shall be processed as a regular child support payment, and shall not be credited as a repayment of the debt amount;

(4)  If full recovery payment is not received by BCSS within 14 days of the date on Form BCSS 154 "Notice of Adjusted Tax Return and Demand for Repayment" BCSS shall file with the appropriate court to establish a legal order against the obligor for the debt; and

(5)  In cases where the intercepted tax refund was disbursed to an obligee, the recoupment process described in He-W 403.03 shall be used to recover the debt amount.

> Source.  #8685, eff 7-21-06; renumbered by #9206 (formerly He-W 403.07); ss by #10467, eff 11-26-13; ss by #10760, eff 1-19-15; ss by #14275, eff 6-24-25, EXPIRES: 6-24-35

He-W 403.07 Appeals and Review Process.

(a)  An individual against whom recovery action pursuant to section He-W 403.04 and He-W 403.05 has been initiated, shall only request an administrative appeal on the basis of mistake of fact, which includes but is not limited to:

(1)  The individual is not the right person; or

(2)  The individual's child support payment was not returned or electronically reversed.

(b)  An individual subject to recoupment or recovery action pursuant to sections He-W 403.03 or He-W 403.06, may request an administrative appeal only on the basis of mistake of fact, or a substantial change of circumstance resulting in economic hardship, which includes but is not limited to:

(1)  The individual is not the right person;

(2)  The individual obligee did not authorize withholding of future child support payments exclusively pursuant to He-W 403.03(a) or (b); or

(3)  The individual claims a substantial change in circumstance resulting in economic hardship.

(c)  There shall be 2 levels of administrative appeal:

(1)  Supervisory review; and

(2)  Administrative hearing.

(d)  An individual may seek judicial review in the court of appropriate jurisdiction when they seek to:

(1)  Modify or amend a legal obligation of support;

(2)  Amend the legal obligation of support, support order, or administrative determination of support responsibility made by another state; or

(3)  Appeal the results of a final administrative hearing decision.

(e) A supervisory review shall:

(1) Be requested from BCSS within 30 days of the date on the respective notice of recovery action, Form BCSS 149A or Form BCSS 149C;

(2) Be requested from BCSS within 20 days of the date on the respective notice of recovery action, Form BCSS 149B or Form BCSS 149D; and

(3) Consist of a face-to-face meeting between the individual and the district office supervisor for the purpose of determining if there has been a mistake of fact pursuant to He-W 403.07(a) (1)-(2), and if there has been a mistake of fact or substantial change in circumstances pursuant to He-W 403.07(b)(1)-(3).

(f) An individual who is dissatisfied with the results of a supervisory review may file an appeal to request an administrative hearing pursuant to He-C 200.

(g) An individual shall request an administrative hearing within 30 days of the date on the finding issued as a result of the supervisory review.

(h) An individual who is dissatisfied with the results of an administrative hearing may appeal the final administrative hearing decision to the appropriate New Hampshire court.

> Source. #8685, eff 7-21-06; renumbered by #9206 (formerly He-W 403.08); ss by #10639, INTERIM, eff 7-21-14, EXPIRES: 1-19-15; ss by #10760, eff 1-19-15; ss by #14275, eff 6-24-25, EXPIRES: 6-24-35

PART He-W 404 NEW HAMPSHIRE LOTTERY INTERCEPT FOR COLLECTION OF CHILD SUPPORT ARREARS

He-W 404.01 Identification, Confirmation, and Interception of Child Support Arrearages.

(a) Pursuant to RSA 284:21-v, the New Hampshire lottery commission (NHLC), shall intercept lottery prizes controlled by NHLC from prize winners who have child support arrearages in cases for which the New Hampshire bureau of child support services (BCSS) is responsible.

(b) NHLC shall confirm that the prize winner is an obligor in an open case through their limited access to the child support case management system, and if confirmed, contact BCSS. Any personally identifiable information obtained by NHCL shall be protected pursuant to Lot 902.04.

(c) If BCSS is contacted pursuant to (b) above, BCSS shall provide verbal confirmation to NHLC of the following:

(1) Whether the prize winner has a child support arrearage; and

(2) The amount of any arrearage.

(d) BCSS shall provide written confirmation to NHLC by Form 743, "Confirmation of Child Support Arrearage," (June 2025) of the individual who has a child support arrearage.

(e) NHLC shall complete and provide to each individual whose lottery prize has been intercepted BCSS Form 742, "Notice of Intercept of Lottery Winnings for Child Support," (June 2025) using information provided by BCSS in Form 743.

(f) The amount intercepted shall be the amount of the child support arrearage or the full amount of the prize, whichever is less.

Source. #6393, eff 12-4-96, EXPIRED: 12-04-04

New. #8416, INTERIM, eff 8-23-05, EXPIRES: 2-19-06; ss by #8541, eff 2-20-06; renumbered by #9206 (formerly He-W 404.02); ss by #10645, eff 7-22-14, EXPIRED: 7-22-24

New. #14127, INTERIM, eff 11-26-24, EXPIRES: 5-25-25 *(Remains in effect per RSA 541-A:14-a)*; ss by #14276, eff 6-24-25, EXPIRES: 6-24-35

He-W 404.02 Appeal Process.

(a) An individual whose lottery prize has been intercepted may request a formal appeal only on the basis of a mistake in fact, which includes, but is not limited to:

(1) The individual whose prize was intercepted is not the right person;

(2) The individual does not have a child support arrearage; or

(3) The amount intercepted was not correct.

(b) There shall be 3 levels of appeal, as follows:

(1) Supervisory review;

(2) Administrative hearing; and

(3) Judicial review.

(c) An individual whose lottery prize has been intercepted shall exhaust each level of appeal according to the sequence given in (b) above before proceeding to the next higher level.

(d) A supervisory review shall be requested from BCSS within 15 days of the date on Form 742.

(e) The individual shall not be required to appear at the scheduled review, but they shall provide BCSS with documentation in support of their claim that there has been a mistake of fact pursuant to He-W 404.02(a)(1)-(3).

(f) An individual who is dissatisfied with the results of a supervisory review may request an administrative hearing pursuant to He-C 200.

(g) An individual shall request an administrative hearing within 30 days of the date on the finding issued as a result of the supervisory review.

(h) An individual who is dissatisfied with the results of an administrative hearing may appeal the administrative hearing decision to the New Hampshire superior court, pursuant to He-W 410.01(g).

Source. #6393, eff 12-4-96, EXPIRED: 12-04-04

New. #8416, INTERIM, eff 8-23-05, EXPIRES: 2-19-06; ss by #8541, eff 2-20-06; renumbered by #9206 (formerly He-W 404.03); ss by #10645, eff 7-22-14; amd by #12611, eff 8-23-18; amd by #14127, INTERIM, eff 11-26-24, EXPIRES: 5-25-25 *(Remains in effect per RSA 541-A:14-a)*; ss by #14276, eff 6-24-25, EXPIRES: 6-24-35

He-W 404.03 <u>Distribution of Intercepted Lottery Prizes</u>. Intercepted amounts shall be distributed in accordance with He-W 403.

<div style="text-align:right">

<u>Source.</u> #6393, eff 12-4-96, EXPIRED: 12-04-04

<u>New.</u> #8416, INTERIM, eff 8-23-05, EXPIRES: 2-19-06; ss by #8541, eff 2-20-06; renumbered by #9206 (formerly He-W 404.04); ss by #10645, eff 7-22-14, EXPIRED: 7-22-24

<u>New.</u> #14127, INTERIM, eff 11-26-24, EXPIRES: 5-25-25 *(Remains in effect per RSA 541-A:14-a)*; ss by #14276, eff 6-24-25, EXPIRES: 6-24-35

</div>

He-W 404.04 <u>Refund of Erroneously Intercepted Lottery Prizes</u>. BCSS shall refund any portion of intercepted lottery winnings that a BCSS supervisory review, administrative hearing, or judicial review determines was erroneously withheld from a prize winner.

<div style="text-align:right">

<u>Source.</u> #6393, eff 12-4-96, EXPIRED: 12-04-04

<u>New.</u> #8416, INTERIM, eff 8-23-05, EXPIRES: 2-19-06; ss by #8541 eff 2-20-06; renumbered by #9206 (formerly He-W 404.05); ss by #10645, eff 7-22-14, EXPIRED: 7-22-28

<u>New.</u> #14127, INTERIM, eff 11-26-24, EXPIRES: 5-25-25 *(Remains in effect per RSA 541-A:14-a)*; ss by #14276, eff 6-24-25, EXPIRES: 6-24-35

</div>

PART He-W 405  FEES

He-W 405.01 <u>Annual Fee for Services</u>.

(a)  In all never-assistance cases where DCSS has collected and disbursed at least $550.00 of support, DCSS shall impose an annual fee of $35.00 pursuant to RSA 161-B:3, IV.

(b)  The fee shall be retained by DCSS from the support collected on behalf of the payee, but not from the first $550.00 so collected.

(c)  DCSS shall distribute to the payee the portion of the amount so collected that remains after withholding the fee in accordance with He-W 403.01.

(d)  In all cases where the annual fee is retained from a support collection, the payor's child support account shall be credited for the entire amount of the collected support payment.

<div style="text-align:right">

<u>Source.</u> #9029, eff 11-17-07; renumbered by #9206 (formerly He-W 405.02); ss by #10955, eff 10-22-15; amd by #12612, eff 8-23-18

</div>

He-W 405.02 <u>Child Support Disbursement Fee</u>. - REPEALED

<div style="text-align:right">

<u>Source.</u> #9759, eff 8-1-10; amd by #9925, eff 7-1-11; rpld by #12551, eff 6-20-18

</div>

PART He-W 406  MANDATORY WAGE ASSIGNMENT - EXPIRED

<div style="text-align:right">

<u>Source.</u> #2156, eff 10-18-82; amd by #2396, eff 6-30-83; ss by #2920, eff 12-4-84, EXPIRED: 12-4-90

</div>

PART He-W 407  ADMINISTRATIVE HEARINGS PROCESS - EXPIRED

<div style="text-align:right">

<u>Source.</u> #2396, eff 6-30-83; ss by #2920, eff 12-4-84, EXPIRED: 12-4-90

</div>

PART He-W 408  CASE INITIATION

He-W 408.01  Prioritization of Child Support Cases.

(a)  A11 child support cases shall be assigned a priority number from one, which shall be the highest priority, to 3, which shall be the lowest priority.

(b)  The priority number assigned to a case shall be based upon the following criteria:

(1)  A case shall be assigned priority one status when the DCSS has the following minimum information to initiate paternity, support order establishment or support order enforcement action:

a.  The absent parent's name; and

b.  The absent parent's current address and/or the name and address of the absent parent's current employer;

(2)  A case shall be assigned priority 2 status when DCSS does not have all the information required in (1) above, but has the following minimum information to initiate locate action:

a.  The absent parent's name; and

b.  The absent parent's social security number and/or date of birth; and

(3)  A case shall be assigned priority 3 status when DCSS cannot take any actions because:

a.  The absent parent is receiving temporary assistance to needy families (TANF);

b.  The absent parent is incarcerated and paternity has already been established; or

c.  There is not enough information in the case record to take any required action.

(c)  When a case is assigned priority 2 status, DCSS shall only take action to locate the absent parent.

(d)  Whenever case circumstances change and new information is received for a child support case, the priority status of that case shall be reassessed and, if warranted by the reassessment, a new priority number shall be assigned.

> Source.  #5743, eff 11-24-93; ss by #7137, INTERIM, eff 11-24-99, EXPIRED: 3-23-00
>
> New.  #7244, eff 4-27-00, EXPIRED: 4-27-08
>
> New.  #9206, eff 7-19-08, EXPIRED: 7-19-16

PART He-W 409  CLOSURE OF CHILD SUPPORT CASES

He-W 409.01  Criteria for Case Closure.

(a)  In addition to cases meeting closure criteria defined in RSA 161-B:3, II and federal regulations at 45 CFR 303.11, child support cases which meet the following criteria shall be subject to closure:

(1)  There is no longer an order for support enforceable under New Hampshire law and the arrearage owed is less than $2,500.00;

(2)  The case is a refugee assistance or TANF intact family case where the father is the responsible parent for all of the children in the case;

(3)  The case is a TANF case where the client has completed an affidavit attesting that she does not know who the father of her child is;

(4) The client has moved out of New Hampshire, paternity has not been established, and paternity testing has not been initiated or completed;

(5) Another state has authorized or requested closure of the case; or

(6) The case was opened erroneously.

(b) A case which has been closed shall be reopened pursuant to 45 CFR 303.11(c) if the client provides additional or new information which would enable the division of child support services (DCSS) to establish paternity or a support order or enforce an order.

Source. #5743, eff 11-24-93; ss by #7137, INTERIM, eff 11-24-99, EXPIRED: 3-23-00

New. #7244, eff 4-27-00, EXPIRED: 4-27-08

New. #9206, eff 7-19-08, EXPIRED: 7-19-16

PART He-W 410  APPEALS OF BUREAU OF CHILD SUPPORT SERVICES ACTIONS AND DECISIONS

He-W 410.01  Appeals of Bureau of Child Support Services Actions and Decisions.

(a) A party may appeal any action or decision in accordance with (b) – (g) below unless the criteria for appeals for that action or decision is otherwise specified in state statute or other department rules.

(b) There shall be three levels of appeal available to parties wishing to contest a child support establishment or enforcement action or decision:

(1) Supervisory review;

(2) Administrative hearing, pursuant to He-C 200 and He-C 201; and

(3) Judicial review.

(c) A party wishing to appeal shall sequentially exhaust each level of appeal in (b) above, starting with (b)(1) before proceeding to the next level of appeal.

(d) A supervisory review shall:

(1) Be requested by the party within 30 days of the date on the notice of decision of the action;

(2) Be requested by the party in writing, including electronic methods available through the department of health and human services; and

(3) Be conducted for the sole purpose of determining if a mistake of fact has occurred, or as otherwise stated in other department rules or state statute.

(e) Mistake of fact in (d)(3) above shall include:

(1) Misidentification of the party;

(2) An incorrect arrearage amount calculated;

(3) The incorrect date of an action;

(4) An incorrect foreign exchange rate used in a currency conversion; or

(5) Any other material mistake of fact.

(f) A party who is dissatisfied with the results of a supervisory review may request an administrative hearing, pursuant to He-C 201.03.

(g) A party may request judicial review from the New Hampshire Superior Court:

(1) Within 30 calendar days of the date on the notice of decision from the administrative hearing; or

(2) Within 30 calendar days of the date on the notice of decision from the rehearing or denial of a request for a rehearing of an administrative hearing.

Source, #12611, eff 8-23-18

## APPENDIX

| Rule | Specific State Statute the Rule Implements |
|---|---|
|  |  |
| He-W 401 | RSA 161:4-a, V |
| He-W 401.01 | RSA 161:4-a, V |
| He-W 403.01 | Section 457 of the SSA (42 USC 657); 45 CFR 302.51; 45 CFR 302.52 |
| He-W 403.02 | Section 454B of the SSA [42 USC 654B(c)] |
| He-W 403.03 | RSA 161:4-a; 42 USC 657 |
| He-W 403.04 | RSA 161-4-a VIII-a; 42 USC 657; 42 USC 654 (b)(c) |
| He-W 403.05 | RSA 161:4-a, VIII-a; 42 USC 657; 42 USC 654(b)(c) |
| He-W 403.06 | RSA 161:4-a, VIII-a; 42 USC 657 |
| He-W 403.07 | RSA 161:4-a, VIII-a |
| He-W  404.01  –  He-W 404.04 | 42 USC 666(c)(1)(G)(II); RSA 284:21-v |
| He-W 405.01 | Section 454(6)(B)(ii) [42 USC 654(6)(B)(ii)]; RSA 161-B:3, IV; and RSA 161-B:8, II |
| He-W 405.02 - Repealed | RSA 161-B:8, II; RSA 161-B:3, IV |
| He-W 408.01 | RSA 161:4, IX |
| He-W 409.01 | RSA 161:4-a, IX, 45 CFR 303.11 |
| He-W 410 | RSA 126-A:5, VIII, RSA 161-B:11, RSA 161-C:27, RSA 541:6; 45 CFR 303.35 |

# EXHIBIT 4

## 42 U.S.C. § 658a

Federal Incentive Payments to States

Based on Child Support Collection Performance

*[Attach document behind this page]*

Case 1:26-cv-00226-SM-TSM Document 20 Filed 08/04/26 Page 154 of 175

LII > U.S. Code > Title 42 > CHAPTER 7 > SUBCHAPTER IV > Part D
> § 658a

Quick search by citation:

**Title**

enter title

**Section**

section

Go!

# 42 U.S. Code § 658a - Incentive payments to States

U.S. Code    Notes    Authorities (CFR)

### (a) IN GENERAL
In addition to any other payment under this part, the Secretary shall, subject to subsection (f), make an incentive payment to each State for each fiscal year in an amount determined under subsection (b).

### (b) AMOUNT OF INCENTIVE PAYMENT

#### (1) IN GENERAL
The incentive payment for a State for a fiscal year is equal to the incentive payment pool for the fiscal year, multiplied by the State incentive payment share for the fiscal year.

Case 1:26-cv-00226-SM-TSM    Document 20    Filed 08/04/26    Page 155 of 175

**(2)** INCENTIVE PAYMENT POOL

### (A) In general

In paragraph (1), the term "incentive payment pool" means—

**(i)** $422,000,000 for fiscal year 2000;

**(ii)** $429,000,000 for fiscal year 2001;

**(iii)** $450,000,000 for fiscal year 2002;

**(iv)** $461,000,000 for fiscal year 2003;

**(v)** $454,000,000 for fiscal year 2004;

**(vi)** $446,000,000 for fiscal year 2005;

**(vii)** $458,000,000 for fiscal year 2006;

**(viii)** $471,000,000 for fiscal year 2007;

**(ix)** $483,000,000 for fiscal year 2008; and

**(x)** for any succeeding fiscal year, the amount of the incentive payment pool for the fiscal year that precedes such succeeding fiscal year, multiplied by the percentage (if any) by which the CPI for such preceding fiscal year exceeds the CPI for the second preceding fiscal year.

### (B) CPI

For purposes of subparagraph (A), the CPI for a fiscal year is the average of the Consumer Price Index for the 12-month period ending on September 30 of the fiscal year. As used in the preceding sentence, the term "Consumer Price Index" means the last Consumer Price Index for all-urban consumers published by the Department of Labor.

**(3)** STATE INCENTIVE PAYMENT SHARE

In paragraph (1), the term "State incentive payment share" means, with respect to a fiscal year—

**(A)** the incentive base amount for the State for the fiscal year; divided by

**(B)** the sum of the incentive base amounts for all of the States for the fiscal year.

8/3/26, 7:30 PM    42 U.S. Code § 658a - Incentive payments to States | U.S. Code | US Law | LII / Legal Information Institute

Case 1:26-cv-00226-SM-TSM    Document 20    Filed 08/04/26    Page 156 of 175

In paragraph (3), the term "incentive base amount" means, with respect to a State and a fiscal year, the sum of the applicable percentages (determined in accordance with paragraph (6)) multiplied by the corresponding maximum incentive base amounts for the State for the fiscal year, with respect to each of the following measures of State performance for the fiscal year:

**(A)** The paternity establishment performance level.

**(B)** The support order performance level.

**(C)** The current payment performance level.

**(D)** The arrearage payment performance level.

**(E)** The cost-effectiveness performance level.

**(5) MAXIMUM INCENTIVE BASE AMOUNT**

**(A) In general**

For purposes of paragraph (4), the maximum incentive base amount for a State for a fiscal year is—

**(i)** with respect to the performance measures described in subparagraphs (A), (B), and (C) of paragraph (4), the State collections base for the fiscal year; and

**(ii)** with respect to the performance measures described in subparagraphs (D) and (E) of paragraph (4), 75 percent of the State collections base for the fiscal year.

**(B) Data required to be complete and reliable**

Notwithstanding subparagraph (A), the maximum incentive base amount for a State for a fiscal year with respect to a performance measure described in paragraph (4) is zero, unless the Secretary determines, on the basis of an audit performed under section 652(a)(4)(C)(i) of this title, that the data which the State submitted pursuant to section 654(15)(B) of this title for the fiscal year and which is used to determine the performance level involved is complete and reliable.

**(C) State collections base**

For purposes of subparagraph (A), the State collections base for a fiscal year is equal to the sum of—

**(i)** 2 times the sum of—

Case 1:26-cv-00226-SM-TSM Document 30 Filed 08/04/26 Page 157 of 175

**(I)** the total amount of support collected during the fiscal year under the State plan approved under this part in cases in which the support obligation involved is required to be assigned to the State pursuant to part A or E of this subchapter or subchapter XIX; and

**(II)** the total amount of support collected during the fiscal year under the State plan approved under this part in cases in which the support obligation involved was so assigned but, at the time of collection, is not required to be so assigned; and

**(ii)** the total amount of support collected during the fiscal year under the State plan approved under this part in all other cases.

**(6)** DETERMINATION OF APPLICABLE PERCENTAGES BASED ON PERFORMANCE LEVELS

### (A) Paternity establishment

#### (i) Determination of paternity establishment performance level

The paternity establishment performance level for a State for a fiscal year is, at the option of the State, the IV–D paternity establishment percentage determined under section 652(g)(2)(A) of this title or the statewide paternity establishment percentage determined under section 652(g)(2)(B) of this title.

#### (ii) Determination of applicable percentage

The applicable percentage with respect to a State's paternity establishment performance level is as follows:

| If the paternity establishment performance level is: | | The applicable percentage is: |
|---|---|---|
| **At least:** | **But less than:** | |
| 80% | | 100 |
| 79% | 80% | 98 |
| 78% | 79% | 96 |
| 77% | 78% | 94 |
| 76% | 77% | 92 |
| 75% | 76% | 90 |
| 74% | 75% | 88 |
| 73% | 74% | 86 |

Case 1:26-cv-00226-SM-TSM    Document 20    Filed 08/04/26    Page 158 of 175

| If the paternity establishment performance level is: | | The applicable percentage is: |
| --- | --- | --- |
| **At least:** | **But less than:** | |
| 72% | 73% | 84 |
| 71% | 72% | 82 |
| 70% | 71% | 80 |
| 69% | 70% | 79 |
| 68% | 69% | 78 |
| 67% | 68% | 77 |
| 66% | 67% | 76 |
| 65% | 66% | 75 |
| 64% | 65% | 74 |
| 63% | 64% | 73 |
| 62% | 63% | 72 |
| 61% | 62% | 71 |
| 60% | 61% | 70 |
| 59% | 60% | 69 |
| 58% | 59% | 68 |
| 57% | 58% | 67 |
| 56% | 57% | 66 |
| 55% | 56% | 65 |
| 54% | 55% | 64 |
| 53% | 54% | 63 |
| 52% | 53% | 62 |
| 51% | 52% | 61 |
| 50% | 51% | 60 |
| 0% | 50% | 0. |

Notwithstanding the preceding sentence, if the paternity establishment performance level of a State for a fiscal year is less than 50 percent but exceeds by at least 10 percentage points the paternity establishment performance level of the State for the immediately preceding fiscal year, then the applicable percentage

Case 1:26-cv-00226-SM-TSM    Document 20    Filed 08/04/26    Page 159 of 175

with respect to the State's paternity establishment performance level is 50 percent.

## (B) Establishment of child support orders

### (i) Determination of support order performance level

The support order performance level for a State for a fiscal year is the percentage of the total number of cases under the State plan approved under this part in which there is a support order during the fiscal year.

### (ii) Determination of applicable percentage

The applicable percentage with respect to a State's support order performance level is as follows:

| If the support order performance level is: | | The applicable percentage is: |
|---|---|---|
| **At least:** | **But less than:** | |
| 80% | | 100 |
| 79% | 80% | 98 |
| 78% | 79% | 96 |
| 77% | 78% | 94 |
| 76% | 77% | 92 |
| 75% | 76% | 90 |
| 74% | 75% | 88 |
| 73% | 74% | 86 |
| 72% | 73% | 84 |
| 71% | 72% | 82 |
| 70% | 71% | 80 |
| 69% | 70% | 79 |
| 68% | 69% | 78 |
| 67% | 68% | 77 |
| 66% | 67% | 76 |
| 65% | 66% | 75 |
| 64% | 65% | 74 |
| 63% | 64% | 73 |

Case 1:26-cv-00226-SM-TSM    Document 20    Filed 08/04/26    Page 160 of 175

| If the support order performance level is: | | The applicable percentage is: |
| --- | --- | --- |
| **At least:** | **But less than:** | |
| 61% | 62% | 71 |
| 60% | 61% | 70 |
| 59% | 60% | 69 |
| 58% | 59% | 68 |
| 57% | 58% | 67 |
| 56% | 57% | 66 |
| 55% | 56% | 65 |
| 54% | 55% | 64 |
| 53% | 54% | 63 |
| 52% | 53% | 62 |
| 51% | 52% | 61 |
| 50% | 51% | 60 |
| 0% | 50% | 0. |

Notwithstanding the preceding sentence, if the support order performance level of a State for a fiscal year is less than 50 percent but exceeds by at least 5 percentage points the support order performance level of the State for the immediately preceding fiscal year, then the applicable percentage with respect to the State's support order performance level is 50 percent.

**(C) Collections on current child support due**

**(i) Determination of current payment performance level**

The current payment performance level for a State for a fiscal year is equal to the total amount of current support collected during the fiscal year under the State plan approved under this part divided by the total amount of current support owed during the fiscal year in all cases under the State plan, expressed as a percentage.

**(ii) Determination of applicable percentage**

The applicable percentage with respect to a State's current payment performance level is as follows:

Case 1:26-cv-00226-SM-TSM    Document 20    Filed 08/04/26    Page 161 of 175

| If the current payment performance level is: | | The applicable percentage is: |
|---|---|---|
| **At least:** | **But less than:** | |
| 80% | | 100 |
| 79% | 80% | 98 |
| 78% | 79% | 96 |
| 77% | 78% | 94 |
| 76% | 77% | 92 |
| 75% | 76% | 90 |
| 74% | 75% | 88 |
| 73% | 74% | 86 |
| 72% | 73% | 84 |
| 71% | 72% | 82 |
| 70% | 71% | 80 |
| 69% | 70% | 79 |
| 68% | 69% | 78 |
| 67% | 68% | 77 |
| 66% | 67% | 76 |
| 65% | 66% | 75 |
| 64% | 65% | 74 |
| 63% | 64% | 73 |
| 62% | 63% | 72 |
| 61% | 62% | 71 |
| 60% | 61% | 70 |
| 59% | 60% | 69 |
| 58% | 59% | 68 |
| 57% | 58% | 67 |
| 56% | 57% | 66 |
| 55% | 56% | 65 |
| 54% | 55% | 64 |
| 53% | 54% | 63 |

Case 1:26-cv-00226-SM-TSM    Document 20    Filed 08/04/26    Page 162 of 175

| If the current payment performance level is: | | The applicable percentage is: |
| At least: | But less than: | |
| --- | --- | --- |
| 51% | 52% | 61 |
| 50% | 51% | 60 |
| 49% | 50% | 59 |
| 48% | 49% | 58 |
| 47% | 48% | 57 |
| 46% | 47% | 56 |
| 45% | 46% | 55 |
| 44% | 45% | 54 |
| 43% | 44% | 53 |
| 42% | 43% | 52 |
| 41% | 42% | 51 |
| 40% | 41% | 50 |
| 0% | 40% | 0. |

Notwithstanding the preceding sentence, if the current payment performance level of a State for a fiscal year is less than 40 percent but exceeds by at least 5 percentage points the current payment performance level of the State for the immediately preceding fiscal year, then the applicable percentage with respect to the State's current payment performance level is 50 percent.

**(D) Collections on child support arrearages**

**(i) Determination of arrearage payment performance level**
The arrearage payment performance level for a State for a fiscal year is equal to the total number of cases under the State plan approved under this part in which payments of past-due child support were received during the fiscal year and part or all of the payments were distributed to the family to whom the past-due child support was owed (or, if all past-due child support owed to the family was, at the time of receipt, subject to an assignment to the State, part or all of the payments were retained by the State) divided by the total number of cases under the State plan in which there is past-due child support, expressed as a percentage.

Case 1:26-cv-00226-SM-TSM    Document 20    Filed 08/04/26    Page 163 of 175

## (ii) Determination of applicable percentage

The applicable percentage with respect to a State's arrearage payment performance level is as follows:

| If the arrearage payment performance level is: | | The applicable percentage is: |
|---|---|---|
| **At least:** | **But less than:** | |
| 80% | | 100 |
| 79% | 80% | 98 |
| 78% | 79% | 96 |
| 77% | 78% | 94 |
| 76% | 77% | 92 |
| 75% | 76% | 90 |
| 74% | 75% | 88 |
| 73% | 74% | 86 |
| 72% | 73% | 84 |
| 71% | 72% | 82 |
| 70% | 71% | 80 |
| 69% | 70% | 79 |
| 68% | 69% | 78 |
| 67% | 68% | 77 |
| 66% | 67% | 76 |
| 65% | 66% | 75 |
| 64% | 65% | 74 |
| 63% | 64% | 73 |
| 62% | 63% | 72 |
| 61% | 62% | 71 |
| 60% | 61% | 70 |
| 59% | 60% | 69 |
| 58% | 59% | 68 |
| 57% | 58% | 67 |
| 56% | 57% | 66 |
| 55% | 56% | 65 |

Case 1:26-cv-00226-SM-TSM    Document 20    Filed 08/04/26    Page 164 of 175

| If the arrearage payment performance level is: | | The applicable percentage is: |
|---|---|---|
| **At least:** | **But less than:** | |
| 54% | 55% | 64 |
| 53% | 54% | 63 |
| 52% | 53% | 62 |
| 51% | 52% | 61 |
| 50% | 51% | 60 |
| 49% | 50% | 59 |
| 48% | 49% | 58 |
| 47% | 48% | 57 |
| 46% | 47% | 56 |
| 45% | 46% | 55 |
| 44% | 45% | 54 |
| 43% | 44% | 53 |
| 42% | 43% | 52 |
| 41% | 42% | 51 |
| 40% | 41% | 50 |
| 0% | 40% | 0. |

Notwithstanding the preceding sentence, if the arrearage payment performance level of a State for a fiscal year is less than 40 percent but exceeds by at least 5 percentage points the arrearage payment performance level of the State for the immediately preceding fiscal year, then the applicable percentage with respect to the State's arrearage payment performance level is 50 percent.

### (E) Cost-effectiveness

### (i) Determination of cost-effectiveness performance level
The cost-effectiveness performance level for a State for a fiscal year is equal to the total amount collected during the fiscal year under the State plan approved under this part divided by the total amount expended during the fiscal year under the State plan, expressed as a ratio.

### (ii) Determination of applicable percentage

Case 1:26-cv-00226-SM-TSM    Document 20    Filed 08/04/26    Page 165 of 175

The applicable percentage with respect to a State's cost-effectiveness performance level is as follows:

| If the cost-effectiveness performance level is: | | The applicable percentage is: |
|---|---|---|
| At least: | But less than: | |
| 5.00 | | 100 |
| 4.50 | 4.99 | 90 |
| 4.00 | 4.50 | 80 |
| 3.50 | 4.00 | 70 |
| 3.00 | 3.50 | 60 |
| 2.50 | 3.00 | 50 |
| 2.00 | 2.50 | 40 |
| 0.00 | 2.00 | 0. |

## (c) TREATMENT OF INTERSTATE COLLECTIONS

In computing incentive payments under this section, support which is collected by a State at the request of another State shall be treated as having beer. collected in full by both States, and any amounts expended by a State in carrying out a special project assisted under section 655(e) of this title shall be excluded.

## (d) ADMINISTRATIVE PROVISIONS

The amounts of the incentive payments to be made to the States under this section for a fiscal year shall be estimated by the Secretary at/or before the beginning of the fiscal year on the basis of the best information available. The Secretary shall make the payments for the fiscal year, on a quarterly basis (with each quarterly payment being made no later than the beginning of the quarter involved), in the amounts so estimated, reduced or increased to the extent of any overpayments or underpayments which the Secretary determines were made under this section to the States involved for prior periods and with respect to which adjustment has not already been made under this subsection. Upon the making of any estimate by the Secretary under the preceding sentence, any appropriations available for payments under this section are deemed obligated.

## (e) REGULATIONS

Case 1:26-cv-00226-SM-TSM   Document 30   Filed 08/04/26   Page 166 of 175

The Secretary shall prescribe such regulations as may be necessary governing the calculation of incentive payments under this section, including directions for excluding from the calculations certain closed cases and cases over which the States do not have jurisdiction.

### (f) Reinvestment

A State to which a payment is made under this section shall expend the full amount of the payment to supplement, and not supplant, other funds used by the State—

**(1)** to carry out the State plan approved under this part; or

**(2)** for any activity (including cost-effective contracts with local agencies) approved by the Secretary, whether or not the expenditures for the activity are eligible for reimbursement under this part, which may contribute to improving the effectiveness or efficiency of the State program operated under this part.

(Aug. 14, 1935, ch. 531, title IV, §458, formerly §458A, as added and renumbered §458, Pub. L. 105–200, title II, §201(a), (f)(2)(A), July 16, 1998, 112 Stat. 648, 658.)

## 💼 U.S. Code Toolbox

Law about... Articles from Wex

8/3/26, 7:30 PM
Case 1:26-cv-00286-SM-TSM    Document 20    Filed 09/04/26    Page 167 of 175
42 U.S. Code § 658a - Incentive payments to States | U.S. Code | US Law | LII / Legal Information Institute

Parallel Table of Authorities

How current is this?

Help

Terms of use

Privacy

*Collier v. State of New Hampshire, et al. — Case No. 1:26-cv-00226-SM-TSM*

# EXHIBIT 5

Executive Order 12549 / 2 C.F.R. Part 180

Federal Debarment Framework

Applicable to Title IV-D Covered Transactions

*[Attach document behind this page]*

Top


NATIONAL ARCHIVES

# Executive Orders

### Executive Order 12549--Debarment and suspension

**Source:** The provisions of Executive Order 12549 of Feb. 18, 1986, appear at 51 FR 6370, 3 CFR, 1986 Comp., p. 189, unless otherwise noted.

By the authority vested in me as President by the Constitution and laws of the United States of America, and in order to curb fraud, waste, and abuse in Federal programs, increase agency accountability, and ensure consistency among agency regulations concerning debarment and suspension of participants in Federal programs, it is hereby ordered that:

**Section 1.** (a) To the extent permitted by law and subject to the limitations in Section 1(c), Executive departments and agencies shall participate in a system for debarment and suspension from programs and activities involving Federal financial and nonfinancial assistance and benefits. Debarment or suspension of a participant in a program by one agency shall have government-wide effect.
(b) Activities covered by this Order include but are not limited to: grants, cooperative agreements, contracts of assistance, loans, and loan guarantees.
(c) This Order does not cover procurement programs and activities, direct Federal statutory entitlements or mandatory awards, direct awards to foreign governments or public international organizations, benefits to an individual as a personal entitlement, or Federal employment.

**Sec. 2.** To the extent permitted by law, Executive departments and agencies shall:
(a) Follow government-wide criteria and government-wide minimum due process procedures when they act to debar or suspend participants in affected programs.
(b) Send to the agency designated pursuant to Section 5 identifying information concerning debarred and suspended participants in affected programs, participants who have agreed to exclusion from participation, and participants declared ineligible under applicable law, including Executive Orders. This information shall be included in the list to be maintained pursuant to Section 5.
(c) Not allow a party to participate in any affected program if any Executive department or agency has debarred, suspended, or otherwise excluded (to the extent specified in the exclusion agreement) that party from participation in an affected program. An agency may grant an exception permitting a debarred, suspended, or excluded party to participate in a particular transaction upon a written determination by the agency head or authorized designee stating the reason(s) for deviating from this Presidential policy. However, I intend that exceptions to this policy should be granted only infrequently.

**Sec. 3.** Executive departments and agencies shall issue regulations governing their implementation of this Order that shall be consistent with the guidelines issued under Section 6. Proposed regulations shall be submitted to the Office of Management and Budget for review within four months of the date of the guidelines issued under Section 6. The Director of the Office of Management and Budget may return for reconsideration proposed regulations that the Director believes are inconsistent with the guidelines. Final regulations shall be published within twelve months of the date of the guidelines.

**Sec. 4.** There is hereby constituted the Interagency Committee on Debarment and Suspension, which shall monitor implementation of this Order. The Committee shall consist of representatives of agencies designated by the Director of the Office of Management and Budget.

**Sec. 5.** The Director of the Office of Management and Budget shall designate a Federal agency to perform the following functions: maintain a current list of all individuals and organizations excluded from program participation under this Order, periodically distribute the list to Federal agencies, and study the feasibility of automating the list; coordinate with the lead agency responsible for government-wide debarment and suspension of contractors; chair the Interagency Committee established by Section 4; and report periodically to the Director on implementation of this Order, with the first report due within two years of the date of the Order.

**Sec. 6.** The Director of the Office of Management and Budget is authorized to issue guidelines to Executive departments and agencies that govern which programs and activities are covered by this Order, prescribe government-wide criteria and government-wide minimum due process procedures, and set forth other related details for the effective administration of the guidelines.

**Sec. 7.** The Director of the Office of Management and Budget shall report to the President within three years of the date of this Order on Federal agency compliance with the Order, including the number of exceptions made under Section 2(c), and shall make recommendations as are appropriate further to curb fraud, waste, and abuse.

**The U.S. National Archives and Records Administration**
1-86-NARA-NARA or 1-866-272-6272

Top

LII  > Electronic Code of Federal Regulations (e-CFR)

 > Title 2—Federal Financial Assistance

 > Subtitle A—Office of Management and Budget Guidance for Federal Financial Assistance

 > CHAPTER I—OFFICE OF MANAGEMENT AND BUDGET GOVERNMENT-WIDE GUIDANCE FOR FEDERAL FINANCIAL ASSISTANCE

 **> PART 180—OMB GUIDELINES TO AGENCIES ON GOVERNMENT-WIDE DEBARMENT AND SUSPENSION (NONPROCUREMENT)**

# 2 CFR Part 180 - OMB GUIDELINES TO AGENCIES ON GOVERNMENT-WIDE DEBARMENT AND SUSPENSION (NONPROCUREMENT)

CFR

§ 180.5 What does this part do?

§ 180.10 How is this part organized?

§ 180.15 To whom does the guidance apply?

§ 180.20 What must a Federal agency do to implement these guidelines?

§ 180.25 What must a Federal agency address in its implementation of the guidance?

§ 180.30 Where does a Federal agency implement these guidelines?

§ 180.40 How are these guidelines maintained?

§ 180.45 Do these guidelines cover persons who are disqualified, as well as those who are excluded from nonprocurement transactions?

Subpart A—General (§§ 180.100 - 180.155)

Subpart B—Covered Transactions (§§ 180.200 - 180.225)

Subpart C—Responsibilities of Participants Regarding Transactions Doing Business With

Case 1:26-cr-30286-SM-TSM  Document 20  Filed 08/04/36  Page 173 of 175

Subpart D—Responsibilities of Federal Agency Officials Regarding Transactions (§§ 180.400 - 180.450)

Subpart E—System for Award Management (SAM.gov) Exclusions (§§ 180.500 - 180.530)

Subpart F—General Principles Relating to Suspension and Debarment Actions (§§ 180.600 - 180.660)

Subpart G—Suspension (§§ 180.700 - 180.760)

Subpart H—Debarment (§§ 180.800 - 180.885)

Subpart I—Definitions (§§ 180.900 - 180.1020)

Appendix A to Part 180—Covered Transactions

**AUTHORITY:**

31 U.S.C. 503; 31 U.S.C. 6102; 31 U.S.C. 6307; Pub. L. 103-355; Pub. L. 109-282; Pub. L. 110-252; Pub. L. 111-84; Pub. L. 113-101Pub. L. 115-232; Pub. L. 117-40; E.O. 12549; E.O. 12689.

**SOURCE:**

89 FR 30115, Apr. 22, 2024, unless otherwise noted.

 **CFR Toolbox**

Law about... Articles from Wex

Table of Popular Names

Parallel Table of Authorities

Accessibility
About LII
Contact us
Advertise here
Help
Terms of use
Privacy